## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Knife Rights, Inc.; Cameron Sjodin; David Draeger; and Kevin Crystal, | Court File No.  24-cv-03749 (PJS/DTS) |
| Plaintiffs, | |
| vs. | **DEFENDANT ELLISON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT OPINIONS** |
| Keith Ellison, in his official capacity as Attorney General of the State of Minnesota; Brad Wise, in his official capacity as Sheriff of the Anoka County Sheriff's Office; Brad Johnson, in his official capacity as County Attorney of the Anoka County Attorney's Office, | |
| Defendants. | |

## INTRODUCTION

Concerned with an increase in gang knife violence and based on the observations of law enforcement officers, the Minnesota Legislature passed a law banning switchblade knives in 1959, joining at least 20 states in banning the same type of weapon.  Minnesota's ban followed enactment of the Federal Switchblade Act (FSA) in 1958, which prohibited interstate transfer of switchblades.

Plaintiffs, three Minnesota residents and a knife advocacy organization, claim the Minnesota Legislature's decision infringes on their Second Amendment rights and ask the Court to declare the law invalid.  The Court should reject Plaintiffs' claim.  The record shows that switchblades are dangerous and unusual weapons that are uncommon for self-defense.  The record also shows that a ban on switchblades fits comfortably within the

Nation's historical tradition of restricting weapons associated with fighting and crime. Plaintiffs' experts' unreliable opinions on commonality do little to inform the Court's analysis. As Plaintiffs' claims fail as a matter of law with or without their expert opinions, the Court should grant summary judgment for Defendant Ellison and dismiss Plaintiffs' claims in their entirety and with prejudice.

## FACTS

The Minnesota Legislature banned switchblades in 1959 (Switchblade Ban). It joined what was then a growing number of jurisdictions restricting access to switchblades based on the observations of law enforcement that such weapons predominated among street gangs. This section describes the circumstances of Minnesota's regulation of switchblades and other weapons associated with fighting and criminality, followed by the procedural posture of this litigation.

## I.    MINNESOTA'S DANGEROUS WEAPONS STATUTE

Minnesota law makes it a misdemeanor or gross misdemeanor to manufacture, transfer, or possess "a switch blade knife opening automatically." Minn. Stat. § 609.66, subd. 1(4). The same statute also prohibits possession of other dangerous weapons, such as explosives, slungshots, sand clubs, or "any other dangerous article or substance for the purpose of being used unlawfully as a weapon against another." Minn. Stat. § 609.66, subd. 1(3)-(5).[1] The statute does not define "switch blade knife opening automatically."

---

[1] The Complaint makes a passing reference to Minnesota Statutes Section 609.02, subd. 6, which defines "dangerous weapon." (ECF No. 1, ¶ 25.) Plaintiffs do not appear to claim that the definition of "dangerous weapon" is somehow part of the Switchblade Ban, and it does not seem to be at issue in this litigation.

A switchblade is commonly understood as "[a] pocketknife having a spring-operated blade that opens instantly when a release on the handle is pressed."  Switchblade, *American Heritage Dictionary of the English Language* at 1762 (5th Ed. 2011); *see also* Deposition of Knife Rights, Inc. (Knife Rights Dep.) 70-71[2] (testifying that a switchblade is typically understood "as an automatically opening knife, which is a knife that operates with the press of button in the handle").  A switchblade differs from other kinds of folding knives because it has a "bias towards opening," which means "that there is some manner of spring that is held under tension and it is locked closed."  (Knife Rights Dep. at 74-75.)

Switchblades were not common in colonial America so there was little need for colonial governments to regulate them.  Regulations on the manufacture, transfer, or possession of other kinds of knives in the colonial era would have made little sense to Americans at the time, because the knives "of that era were handmade and designed for practical use by farmers, artisans, and homemakers, not for combat; and they were seldom used in homicides."  (Declaration of Randolph Roth (Roth Decl.) ¶ 12.)[3]  Regulation of bladed weapons, however, has a pedigree dating to at least the 1800s.  (*See generally id.* ¶¶ 18-41.)  Historically, state and local authorities have imposed restrictions in response to new weapon technology or new uses of existing weapons deemed "particularly lethal,

---

[2] The transcript of the deposition of Knife Rights, Inc. is attached as Exhibit 1 to the Declaration of Michael Goodwin.

[3] The Declaration of Randolph Roth is attached as Exhibit 2 to the Declaration of Michael Goodwin.

prone to misuse, and a danger to the public." (*Id.* ¶ 8.) Notably, these include "folding knives, dirk knives, and Bowie knives."[4] (*Id.* ¶¶ 23-24.)

For example, homicide rates in the American South rose in the immediate aftermath of the revolution, and restrictions on the most common weapons used in such homicides, including knives, followed. (*Id.* ¶¶ 22-25.) During this era, new types of knives emerged that were designed expressly for fighting. (*Id.* ¶ 24.) "Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to the rising crime rates." (*Id.* ¶ 26.)

Knife fighting became more common and lethal in the mid-1800s because of the increased manufacturing of knives designed explicitly for violence (i.e., fighting knives). (*Id.* ¶ 31.) State legislatures responded accordingly, experimenting with restrictions on knives that ranged from concealed-carry restrictions to outright bans on certain kinds of knives associated with crime and fighting.[5] (*Id.* ¶¶ 36-41.) Indeed, by the early 20th century "every state either banned concealed firearms and fighting knives or placed severe

---

[4] "Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents and thrust deeper into their bodies." (Roth Decl. ¶ 24.)

[5] *E.g.*, *State v. Wilburn*, 66 Tenn. 57, 61 (1872) (upholding ban on open and concealed carry of fighting knives); *Nunn v. State*, 1 Ga. 243, 251 (1846) (holding that concealed carry prohibition was valid but striking down prohibition on open carry.); An Act to Regulate the Keeping and Bearing of Deadly Weapons, ch. 34, 1871 Tex. Gen. Laws 25 (banning open and concealed carry of fighting knives in most circumstances).

restrictions on their possession." (*Id.* ¶ 27.)  As early as 1837, Georgia prohibited the sale

of certain fighting knives.  (*Id.* ¶ 25.)  Arkansas followed suit in 1881.[6]  (*Id.* ¶ 37.)

Although early models of switchblades date to the 1800s, switchblades did not

become prevalent in the United States until after World War II.  (Knife Rights Dep. 79;

Declaration of Robert Escobar (Escobar Decl.)[7] ¶ 27.)  Around that time and after,

switchblades gained a cultural association with criminality in the United States.  (Escobar

Decl. ¶¶ 27-31.)  As with historical fighting knives, the rapidity with which concealed

switchblades could be pulled out, extended, and used to stab a person created an element

of surprise and an additional degree of danger.  (Deposition of Randolph Roth (Roth Dep.)

50:2-53:17.)[8]  It was these concerns that led to local, state, and federal restrictions on

switchblades.  (Goodwin Decl. Exh. 3, 6-11.)

Consistent with the Nation's history dating to the antebellum era, the Minnesota

Legislature first banned switchblades in 1959.  S.F. 378, 61st Leg., Reg. Sess. 233 (Minn.

1959).  The current language of what is now Section 609.66, subd. 1(4) was codified in

1963 and has remained unchanged since that time.  H.F. 449, 63d Leg., Reg. Sess. 1228

(Minn. 1963).  Testifying in support of a previous version of a proposed legislative ban on

switchblades, a Hennepin County Sheriff's captain illustrated the association with

criminality by showing legislators switchblades "which had recently been picked up from

---

[6] 1881 Ark. Acts 191-93 (prohibiting the sale and transfer of dirks and bowie knives).

[7] The Declaration of Robert Escobar is attached as Exhibit 4 to the Declaration of Michael Goodwin.

[8] The transcript of the deposition of Randolph Roth is attached as Exhibit 5 to the Declaration of Michael Goodwin.

teen-age gangs." (Meeting Minutes, Minnesota House Committee of Law Enforcement and Crime Prevention (March 11, 1957), Goodwin Decl., Ex. 3.).

Minnesota's Switchblade Ban followed Congressional enactment of the Federal Switchblade Act (FSA), which also restricted the interstate sale of switchblade knives. 15 U.S.C. §§ 1241–1245. The principal author of the FSA, a representative from New York, cited concerns about gang possession of switchblades and their prevalence in crime, based on a survey of 40 large-city police chiefs throughout the country, including Minneapolis. (Switchblade Knives: Hearing Before House Subcomm. on Interstate and Foreign Commerce, 85th Cong. at 12 (1958) (comments of Rep. Delaney); S. Rep. No. 1429 at 5-7; House Rep. No. 1945 at 2-4.)[9] He stated that switchblades had little utilitarian use, good only for a "sneak attack." (Rep. Delaney comments at 13.) Congress reasonably found that "[s]witchblade knives were increasingly being used for criminal purposes, especially by young gang members." *United States v. Nelsen*, 859 F.2d 1318, 1320 (8th Cir. 1988) (explaining Congressional purpose in enacting the FSA and finding that it did not violate either the Due Process Clause or the Second Amendment).[10] In support of the FSA, a Minneapolis police captain noted that switchblades were banned by a Minneapolis city ordinance but were readily available through the mail, necessitating a federal ban. (104 Cong. Record 15707, 15710 (July 31, 1958) (comments of Clifford G. Bailey, captain of

---

[9] These legislative history documents are publicly available and attached as Exhibits 6-10 to the Goodwin Declaration for the convenience of the Court and the parties.

[10] *Nelsen* is a pre-*Heller* case and thus is not necessarily good law for purposes of the current analysis. It is cited for its historical analysis of the FSA.

the Minneapolis Crime Prevention Bureau, Goodwin Decl. Ex. 11; Escobar Decl. ¶¶ 30-31.)

Even in jurisdictions where they are lawful to carry, switchblades are uncommon choices as defensive weapons because of the risk of mechanical failure, user error, and generally poor structural integrity. (Escobar Decl. ¶¶ 47-66, 70.) Even Plaintiff Knife Rights, Inc. admits that fixed-blade knives are a better choice for self-defense because the blade would "already be open" and ready to use against a potential attacker. (Knife Rights Dep. 75-76.)

## II.    PLAINTIFFS

Plaintiffs are three Minnesota residents and Knife Rights, Inc., a nonprofit knife advocacy organization. Knife Rights claims to have been harmed because the Switchblade Ban, has forced it to "expend substantial time, effort, money, and other resources directed at ensuring the Second Amendment right to bladed arms is fully protected in Minnesota." (ECF No. 1, ¶ 10; Knife Rights' Answers to Interrogatories, Answer No. 9, Goodwin Decl. Ex. 12; Knife Rights Dep. 63-65, 68-70.)[11]

_____

[11] Knife Rights claims organizational standing based on an alleged diversion of resources to this litigation. (*E.g.*, ECF No. 1, ¶ 10.) But this type of injury is insufficient; Knife Rights cannot obtain Article III standing by "diverting its resources" in response to the Switchblade Ban (which does not apply to Knife Rights). *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."). Defendant Ellison does not, however, challenge the individual plaintiffs' standing to contest the ban on the concealed carry of switchblades, and, as such, concedes that Knife Rights has associational standing. Plaintiffs do not, however, have standing to challenge the prohibition on manufacturing or transferring switchblades.

Knife Rights recruited the three individual plaintiffs through social medial solicitations and the Minnesota Gun Owners' Caucus. (Knife Rights Dep. 51-54; Deposition of Kevin Crystal (Crystal Dep.)[12] 11-13; Deposition of Cameron Sjodin (Sjodin Dep.)[13] 8.) The individual plaintiffs testified that they want to possess switchblades in Minnesota for self-defense as well as tasks like opening mail and slicing cheese. (Crystal Dep. 18-19; Deposition of David Draeger (Draeger Dep.)[14] 13:10-17; Sjodin Dep. 9-10.)

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of stating grounds for its motion and identifying portions of pleadings, answers to discovery requests, affidavits, or declarations that demonstrate the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The other party must then provide admissible evidence showing that a genuine disputed material fact exists. *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Only disputes over facts that might affect the outcome of the case will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When cross motions for summary judgment are filed, the Court's approach is "only slightly modified," with the Court viewing the record in a light most favorable to Plaintiffs when

---

[12] The transcript of the deposition of Kevin Crystal is attached as Exhibit 13 to the Declaration of Michael Goodwin.
[13] The transcript of the deposition of Cameron Sjodin is attached as Exhibit 14 to the Declaration of Michael Goodwin.
[14] The transcript of the deposition of David Draeger is attached as Exhibit 15 to the Declaration of Michael Goodwin.

considering Defendants' motion, and vice versa.  *Fjelstad v. State Farm Ins.,* 845 F. Supp. 2d 981, 984 (D. Minn. 2012).

Here, Plaintiffs only bring a facial challenge to the Switchblade Ban.  As a result, the Switchblade Ban only needs to be "constitutional in some of its applications."  *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("This is the most difficult challenge to mount successfully, because it requires a defendant to establish that no set of circumstances exists under which the [Switchblade Ban] would be valid.") (citation modified).

## ARGUMENT

The Court should reject Plaintiff's facial challenge, grant Defendant Ellison's motion for summary judgment, and dismiss Plaintiffs' claims in their entirety and with prejudice.[15]  First, Plaintiffs cannot meet their burden of showing that switchblades are in common use for self-defense and that these weapons are not dangerous and unusual. Second, even if Plaintiffs can meet their burden, a switchblade ban is well within the history and tradition of the Nation's regulation of bladed weapons, particularly those associated with criminality and fighting.  Finally, the Court should exclude Plaintiffs' experts' opinions on commonality because they are speculative, unsupported by sufficient facts, and unreliable.

_____

[15] Plaintiffs' claim is properly analyzed as a facial challenge, as they seek a declaration that the Switchblade Ban "violates the right to keep and bear arms protected under the Second and Fourteenth Amendments."  (ECF No. 1, Prayer for Relief); *see Miller v. City of Excelsior,* 618 F. Supp. 3d 820, 832 n.3 (D. Minn. 2022) (explaining that the difference between facial and as-applied challenges is whether the relief would reach beyond the particular circumstances of the plaintiff).

I.    **MINNESOTA'S PROHIBITION ON SWITCHBLADE KNIVES IS CONSTITUTIONAL**

Minnesota's Switchblade Ban is constitutional.  First, switchblades are unusually dangerous weapons that are not commonly used for self-defense.  Second, even if switchblades are commonly used for self-defense, Minnesota's statute fits comfortably within the Nation's historical tradition of regulating weapons (particularly easily concealable weapons) associated with fighting and crime.  And Plaintiff cannot demonstrate that the Switchblade Ban is unconstitutional in all applications, which is required to prevail on their facial challenge.  *Rahimi*, 602 U.S. at 693.

### A.  The Supreme Court Has Established a Two-Part Framework for Analyzing Second Amendment Challenges to Statutes

The Second Amendment states that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The core of this right is individual self-defense, as the Supreme Court has repeatedly stated.  The Court has held "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense."  *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1, 17 (2022).  The text of the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  *District of Columbia v. Heller,* 554 U.S. 570, 592 (2008); *Worth v. Jacobson*, 108 F.4th 677, 687 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 1924 (2025) (holding that the Second Amendment codified a "natural law" right to "resistance," "self-preservation and defence").  "Derived from English practice and codified in the Second Amendment, the right secures for Americans a means of self-defense."  *Rahimi*, 602 U.S. at 690.

As the Supreme Court has explained on several occasions, Second Amendment rights are subject to important limitations, including on the kinds of weapons to which the right extends.  The Second Amendment does not "protect the right of citizens to carry arms for any sort of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for any purpose." *Heller*, 554 U.S. at 595.  "Arms" do not mean anything that can conceivably be used to defend oneself, as the right expressed in the Second Amendment "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Rahimi*, 602 U.S. at 691 (citation modified).  At the founding, common restrictions that were understood to be consistent with the Second Amendment were bans on "dangerous and unusual weapons" as well as "concealed firearms."  *Id.* (citation modified); *see also United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 2708 (2025) (recognizing that Second Amendment rights are "subject to certain reasonable, well-defined restrictions") (quoting *Bruen*, 597 U.S. at 70); *Bianchi v. Brown*, 111 F.4th 438, 449 (4th Cir. 2024) (en banc), *cert. denied sub nom.*, *Snope v. Brown*, 145 S. Ct. 1534 (2025) ("Limitations on this right to self-defense have been recognized in common law since before our nation's founding.").

Plaintiffs state that they wish to carry switchblades outside the home for self-defense and other purposes. (Sjodin Dep. 12; Crystal Dep. 19; Draeger Dep. 15-16, 24-25.)  Because this is a facial challenge, the Plaintiff must show the statute is unconstitutional in all applications. *Rahimi*, 602 U.S. at 694.

The *Bruen* analysis "has two parts: text, then history."  *Worth*, 108 F.4th at 687; *United States v. Charles*, 159 F.4th 545, 547 (8th Cir. 2025) (applying *Bruen's* "two-step

framework" to a federal ban on machine guns).  As stated by the Supreme Court: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.  The plaintiff has the burden at step one, and the government has the burden at step two.  *Duncan v. Bonta,* 133 F.4th 852, 866 n.2 (9th Cir. 2025) (en banc).

The Switchblade Ban is constitutional under both parts of the *Bruen* framework.  First, Plaintiffs lack evidence that switchblades are in common use for self-defense.  Switchblades are also properly classified as unusually dangerous weapons that are not entitled to Second Amendment protection.  Finally, a ban on switchblades fits well within the Nation's historical tradition of regulating weapons associated with fighting and crime, rendering Minnesota's law constitutional.

### B.  Plaintiffs Cannot Demonstrate That Switchblades Are in Common Use for Self-Defense or That Switchblades Are Not Dangerous and Unusual

At the first step of *Bruen*, the Court asks whether the Plaintiffs' desired activity falls within the Second Amendment at all.  In cases where the application of the Second Amendment to a particular weapon is at issue, most courts have assessed whether (1) the weapons at issue are "arms" in common use for self-defense, and (2) the weapons are unusually dangerous.  Switchblades fail on both counts.

### a.  Switchblades Are Not Arms in Common Use for Self-Defense

As the Eighth Circuit recently stated, the first part of the *Bruen* textual analysis is an analysis of whether the weapon is in common use.  *Charles*, 159 F.4th at 547; *United States v. Veasley*, 98 F.4th 906, 910 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 304 (2024) (assuming handguns were in "common use" as part of the textual analysis of the Second Amendment).  Analyzing common use in the first part of the *Bruen* analysis is consistent with the approach of most circuits.  *Lane v. Cacace*, No. 7:22-CV-10989, 2025 WL 903766, at *7 (S.D.N.Y. Mar. 25. 2025) (noting "overwhelming majority of courts" analyze "common use" at step one and collecting cases); *Contra United States v. Bridges*, 150 F.4th 517, 524 (6th Cir. 2025) (analyzing common use at the second step and finding a ban on machine guns constitutional).

The common use analysis necessarily requires the plaintiff to show the weapon at issue is in common use for self-defense.  *Duncan*, 133 F.4th at 866 n.2; *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024).  This analysis is not "a trivial counting exercise" in which courts decide common use just by looking at the number of a particular weapon that are privately owned.  *Bianchi*, 111 F.4th at 460; *Duncan*, 133 F.4th at 883 (collecting cases rejecting "ownership statistics" theory of common use).  This makes sense because merely counting the number of a particular instrument in private hands "makes a mockery of the careful interest balancing between individual self-defense and societal order that our legal tradition has carved into the heart of the right to keep and bear arms."  *Bianchi*, 111 F.4th at 460.

Nor can a party simply present evidence that a particular weapon is lawful to own in a certain number of jurisdictions; that would allow a ban on a particular type of weapon to see-saw between constitutionality and unconstitutionality based on legislative whim. *See Duncan*, 133 F.4th at 883; *Bevis v. City of Naperville*, 85 F.4th 1175, 1199 (7th Cir. 2023).  Rather, Plaintiffs must demonstrate that all covered switchblades are both suitable for self-defense and commonly used for that purpose, looking to the objective features of the weapon's design.  *Del. State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 212 (3d Cir. 2024) (Roth, J. concurring), *cert. denied sub nom.*, *Gray v. Jennings*, 145 S. Ct. 1049 (2025).

In the Eighth Circuit, courts examine the objective characteristics of the weapon at issue to help answer the legal question of whether the plaintiff has demonstrated that the weapon is commonly used for self-defense.  *Charles*, 159 F.4th at 547 (describing the support structures required to carry certain types of machine guns); *see also Bianchi*, 111 F.4th at 454-59 (examining the characteristics of the assault weapons at issue and determining they are "ill-suited" for self-defense); *DSSA*, 108 F.4th at 212 (Roth, J., concurring).  Here, as Mr. Escobar explains, switchblades are ill-suited for self-defense because of poor structural integrity, the risk of mechanical failure, and the difficulty of using one in a real-world defense scenario.  (Escobar Decl. ¶¶ 47-66, 70.)  Indeed, Knife Rights itself agrees with the premise that a fixed-blade knife is a better choice for self-defense, as the blade is open and ready to use if necessary.  (Knife Rights Dep. 75-76.)  So Plaintiffs cannot point to any probative evidence that shows switchblades are commonly used for self-defense.  This is an independent basis for summary judgment. *See Bianchi*,

111 F.4th at 458 (reasoning that most switchblades' "combat-functional features make it ill-suited for the vast majority of self-defense situations in which civilians find themselves").

Plaintiffs' purported evidence of commonality is insufficient as a matter of law. To start, Plaintiffs' belief that "millions" of switchblades are in circulation is insufficient for at least three reasons. (Knife Rights Dep. 75-76; Declaration of Ken Onion (Onion Decl.)[16] ¶ 22, 55, 58; Declaration of Ernest Emerson (Emerson Decl.)[17] ¶ 34.) First, Plaintiffs' contention is based on the exact "trivial counting exercise" that has been roundly rejected by circuit courts of appeals. *E.g.*, *Bianchi*, 111 F.4th at 460; *Duncan*, 133 F.4th at 883 (collecting cases rejecting "ownership statistics" theory of common use). Second, Plaintiffs have no current data on switchblades' alleged popularity, as their belief that "millions" are in circulation is based on a 65-year-old Senate report that was issued before the FSA made interstate transfer of switchblades unlawful. (Knife Rights Dep. 80-81.) The remaining evidence Plaintiffs point to on numerical commonality is based on anecdotal perusal of websites and observations of tables at knife shows. (Knife Rights Dep. 80-81.) Nothing about these anecdotal observations tells the Court anything about how such items are used for self-defense.

Plaintiffs also believe that switchblades are "jurisdictionally common" because some kinds of switchblades are legal in a number of jurisdictions. (Knife Rights Dep. at

---

[16] The Declaration of Ken Onion is attached as Exhibit 16 to the Declaration of Michael Goodwin.
[17] The Declaration of Ernest Emerson is attached as Exhibit 17 to the Declaration of Michael Goodwin.

14-15.)    But judging whether the Second Amendment protects a right to possess switchblades on this metric would allow the constitutional status to change from year to year based on shifts in public sentiment, successful lobbying efforts, and legislative whim. *See Duncan*, 133 F.4th at 883; *Bevis*, 85 F.4th at 1199.

Moreover, the switchblade's "historical connection to crime in the United States illustrates its lack of connection to lawful purposes." *Bridges*, 150 F.4th at 528.  "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. But the Second Amendment "extends only to certain types of weapons" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 624-25 (citing *United States v. Miller*, 307 U.S. 174 (1939)).  The *Heller* Court explained that *Miller*, a case about sawed-off shotguns, remains good law for the proposition that legislatures may continue to lawfully ban weapons associated with, and popular among, criminals. *Id*.; *see also United States v. Price*, 111 F.4th 392, 405 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1891 (2025) (finding that firearms with obliterated serial numbers are not in common use by law-abiding citizens for self-defense).

Switchblades have a similar historical connection to crime.  As Minnesota law enforcement officers explained in pushing for local, state, and federal restrictions on switchblades, they were often used by gangs to threaten, intimidate, and commit other crimes.  (Goodwin Decl., Exs. 3, 6-11.)  Lawmakers have historically responded to such threats by banning certain types of weapons associated with crime.  (Roth Decl. ¶¶ 8, 23,

36-41.)  *Miller*, *Heller*, and the recent circuit cases cited above confirm that that they can do so without running afoul of the Second Amendment.

### b.  Switchblades are Dangerous and Unusual

As *Bruen* itself recognized, "dangerous and unusual" weapons have never been entitled to Second Amendment protection.  *Bruen*, 597 U.S. at 21.  This regulatory tradition "encompasses those arms that legislators determined were unusually dangerous because of their characteristics."  *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 233 (2d Cir. 2025).  Whether a weapon is "dangerous and unusual" centers on its use for self-defense. *Knife Rts., Inc. v. Bonta*, Case No.: 3:23-cv-00474, 2024 WL 4224809, at *6-7.  (S.D.C.A. Aug. 23, 2024), *aff'd on other grounds*, *Knife Rts., Inc. v. Bonta*, 165 F.4th 1330 (9th Cir. 2026).

As discussed above, switchblades are not commonly for self-defense and are dangerous because they are prone to a higher risk of mechanical failure, user error, and difficulty of use real-world attack scenario.  (Escobar Decl. ¶¶ 47-66, 70); *see Knife Rts., Inc.*, 2024 WL 42248009, at *6 (citing switchblades' "higher propensity of failure" as uniquely dangerous property).  Switchblades also possess uniquely dangerous properties that distinguish them from other knives, such as the ease of automation.  (Escobar Decl. ¶¶ 47-60, 70); *see Knife Rts., Inc.*, 2024 WL 42248009, at * 6 (citing switchblades' "ease of automation" as a uniquely dangerous property).  Again, Knife Rights itself agrees with the premise that a fixed-blade knife is a better choice for self-defense, as the blade is open and ready to use if necessary.  (Knife Rights Dep. 75-76.)  And, as discussed above,

switchblades are historically associated with criminal activity, making them uncommon as lawful self-defense weapons and dangerous to the public. *Bridges*, 150 F.4th at 528.

These record facts are consistent with the findings of courts in Minnesota and elsewhere, with a slew of case law recognizing that at least some varieties of switchblades are unusually dangerous because they are concealable, rapidly deployable for fighting purposes, and associated with crime. The Eighth Circuit recently recognized as much, rejecting the argument that a switchblade was not a "dangerous weapon" and describing it as "a switchblade with a retractable and instantly extendable blade, designed for the specific purpose of causing injury." *United States v. Wolfe*, No. 24-3167, 2025 WL 2452369, at *1 (8th Cir. Aug. 26, 2025). Similarly, the Minnesota Court of Appeals categorized a switchblade as a knife "so commonly understood to be a weapon that little additional evidentiary support is necessary to prove the element," noting its common association with gangs and contrasting it with "a common pocketknife." *In re Welfare of S.M.L.*, No. A10-1661, 2011 WL 2750298, at *4 (Minn. Ct. App. July 18, 2011); *see Crowley Cutlery Co. v. United States*, 849 F.2d 273, 278 (7th Cir. 1988) ("Switchblade knives are more dangerous than regular knives because they are more readily concealable and hence more suitable for criminal use."); *Fall v. Esso Standard Oil Co.*, 297 F.2d 411, 416 (5th Cir. 1961) ("It is now settled beyond doubt that a switchblade knife is a dangerous weapon"); *State v. Winters*, 821 N.W.2d 287 (Iowa Ct. App. 2012) (affirming trial court conclusion that a switchblade is "a per se dangerous weapon" for purposes of dangerous weapon statute). Indeed, that is why Congress enacted the FSA, because it determined that switchblades were poor choices for utilitarian purposes and were good only for a "sneak

attack." Goodwin Decl. Ex. 6 at 13; *Nelsen*, 859 F.2d at 1320 (describing purpose of FSA). The Minnesota Legislature enacted the Switchblade Ban for similar reasons. (Goodwin Decl., Exs. 3, 11.)

Switchblades are unusually dangerous weapons that are not entitled to Second Amendment protection. As such, Minnesota's ban on them is constitutional. The Court's analysis should end here.

### C. Minnesota's Prohibition on Switchblades Is Consistent with the Nation's Historical Tradition of Restrictions on Dangerous Weapons

If the Court either presumes or holds that switchblades are entitled to Second Amendment protection at *Bruen*'s first step, Plaintiffs' claims still fail at the second step because the Switchblade Ban is well-within the Nation's historical tradition of regulating weapons (especially concealable weapons) associated with fighting and crime. *Knife Rts., Inc.*, 165 F.4th at 1339-45 (assuming switchblades were in common use and holding that California's switchblade law was consistent with historical traditions of weapons regulation); *Veasley*, 98 F.4th at 910 (assuming handguns satisfied the first step of *Bruen* and proceeding to the second step). "In every Second Amendment case, the overarching question is whether a limitation on the right to keep and bear arms is consistent with this Nation's historical tradition of firearm regulation." *United States v. Cooper*, 127 F.4th 1092, 1094 (8th Cir. 2025) (citation modified), *cert. denied*, 146 S. Ct. 348 (2025). "[T]his historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Bruen*, 597 U.S. 1, 28 (2022).

This "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id*. at 30.  It requires only that the government identify "a well-established and representative historical analogue, not a historical *twin*." *Id*. (emphasis original); *United States v. Bernard*, 136 F.4th 762, 764 (8th Cir. 2025), *cert. denied*, 146 S. Ct. 254 (2025) (holding that statute prohibiting domestic abusers from possession of firearms was within tradition of disarming individuals who present credible threat to the physical safety of others).  The government's analogues need only "comport with the principles underlying the Second Amendment." *Knife Rts.*, 165 F.4th at 1340-41 (quoting *Rahimi*, 602 U.S. at 692)).  "When the historical laws 'address[ed] particular problems' there is a good chance 'contemporary laws imposing similar restrictions for similar reasons' are also permissible." *United States v. Rush*, 130 F.4th 633, 641 (7th Cir. 2025), *cert. denied*, No. 24-1259, 2025 WL 3620422 (U.S. Dec. 15, 2025) (quoting *Rahimi*, 602 U.S. at 692).

At the second step of *Bruen*, courts ask "how and why" the regulation at issue burdens the Second Amendment right to armed self-defense, with reference to the Nation's historical tradition of arms regulation.  *Rahimi*, 602 U.S. at 692.  The Switchblade Ban and the historical analogues offered by Defendant Ellison "need only be relevantly similar[18] in terms of why and how they burden the Second Amendment Right." *Knife Rts., Inc.*, 165 F.4th at 1339–40 (citing *Rahimi*, 502 U.S. at 698) (citation modified).  Again, because

---

[18] "Modern legislatures will necessarily regulate arms in a different manner than did historic legislatures, as new challenges and social interests arise." *Knife Rts., Inc.*, 165 F.4th at 1341.

Plaintiffs bring a facial challenge, Defendant Ellison need only show that the Switchblade Ban is consistent with the principles underlying the Second Amendment in one of its applications. *See Rahimi*, 602 U.S. at 693. Although the Switchblade Ban is constitutional in all its applications, the following analysis focuses on the Switchblade Ban's prohibition against possession, which necessarily includes Plaintiffs' desired activity of concealed carry in public.

The "how" analysis turns on how the regulation at issue burdens Second Amendment rights. *Worth*, 108 F.4th at 693; *Knife Rts., Inc.*, 165 F.4th at 1339-40. The Switchblade Ban's burden on Second Amendment rights is negligible, as it prohibits carrying only a small subset of bladed weapons. *Duncan*, 133 F.4th at 879 (describing how California's ban on large capacity magazines "prohibits only one very specific use of some firearms"). Minnesotans are free to possess a variety of bladed weapons for lawful purposes such as self-defense, including fixed-blade knives that Knife Rights concedes are more readily advantageous for that purpose. (Knife Rights Dep. 75-76.) This is similar to the "how" of historical bans on particular types of bladed tools, all of which left people free to choose any number of other bladed arms for self-defense or other lawful purposes.

The "why" analysis turns on the rationale for the prohibition at issue. *Knife Rts., Inc.*, 165 F.4th at 1341, 1345. Like Minnesota, California "targeted switchblades specifically because of the particular danger these weapons present, and their common association with criminality." *Id.* at 1345 (citation modified). And like Minnesota, California did so "in response to a significant increase in the criminal use of switchblades in the 1950s." *Id.* (citation modified).

The Switchblade Ban comports with a long history of legislative restrictions on knives that were uniquely suited for (and associated with) criminality and fighting.  For much of early American history, violent crime committed with knives far outpaced those committed with firearms and were considered far more dangerous.  Joseph Blocher, Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 147 (2023).   Accordingly, 19th century legislatures regulated possession and carrying of Bowie knives and "other knives that were well-suited for fighting."  David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 293 (2024); Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 89 (2023).

As Professor Roth explains, state and local authorities responded to rising rates of homicide in the 19th Century by restricting access to weapons associated with fighting and crime, with a particular concern for weapons that were easily concealable.  (Roth Decl. ¶ 8, 22-26, 36-41.)  This included restrictions on concealed-carry as well as outright bans on certain types of weapons, such as the Bowie knife and Arkansas Toothpick.  (*Id.* ¶¶ 25, 27, 36-41.)  Thus, as with historical principles detailed by Professor Roth, Minnesota passed the Switchblade Ban "to address concerns about threats to public safety caused by the use of switchblades in criminal activity," which "closely mirrors the purposes for which antebellum and post-Civil War legislatures" adopted similar regulations of fighting knives. *Knife Rts., Inc.*, 165 F.4th at 1345 (citation modified).  The Switchblade Ban thus accords with the principles of bans on bladed weapons commonly associated with crime and

fighting, as explained by Minnesota law enforcement officers at the time the law went into effect. (Goodwin Decl. Exs. 3, 11.)

Moreover, regulations banning the concealed carry of such bladed weapons were even more common. As the Ninth Circuit recently recognized, the "Supreme Court has long understood that prohibitions on carrying concealed weapons were lawful under the Second Amendment." *Knife Rts., Inc.*, 165 F.4th at 1341 (citing *Heller*, 554 U.S. at 626) (holding that "California's prohibition on the concealed carry of switchblades is relevantly similar to historical concealed carry regulations of Bowie knives, dirks, daggers, slingshots, and other weapons"). As stated above and detailed by Professor Roth, laws banning the concealed carry of fighting knives were widespread in the antebellum period. (Roth Decl. ¶¶ 18-41); *see Knife Rts., Inc.*, 165 F.4th at 1341-43 (collecting examples of concealed carry bans during the antebellum and post-civil war eras). And by the early 20th century "every state either banned concealed firearms and fighting knives or placed severe restrictions on their possession." (Roth Decl. ¶ 27.) Plaintiff's experts do not discuss the historical evidence of knife bans in general or switchblade bans in particular.

Professional historians such as Professor Roth can be helpful in evaluating this historical evidence, as courts have recognized. *Bianchi*, 111 F.4th at 464 (noting its reliance on "the careful work of professional historians," including Professor Roth). Although Massachusetts' highest state court recently determined that the state's ban on switchblades was unconstitutional in a criminal case, the court's nonbinding analysis was flawed and distinguishable. *Commonwealth v. Canjura*, 240 N.E.3d 213, 219 (Mass. 2024). As *Bruen* recognized, courts "decide a case based on the historical record compiled

23

by the parties", 597 U.S. at 25 n.6, and the court in *Canjura* cited no expert testimony, particularly historical expert testimony.

*Canjura* summarily concluded that switchblades were more comparable to a common pocketknife than a knife commonly associated with criminality and fighting. 240 N.E.3d at 218-220. It rejected historical analogues banning dangerous knives, such as dirks and Bowie knives, as being insufficiently similar to the challenged law. *Id*. But the record evidence here demonstrates why this was erroneous. Aside from its historical association with street crime, a switchblade is different than a common pocketknife because it has a bias towards opening, opens with the push of a button, and is prone to mechanical failure. (Knife Rights Dep. at 74-75; Escobar Decl. ¶ 60.) Properly analyzed, and with the benefit of expert testimony, regulations on switchblades are more like regulations dirks, Bowie knives, and other kinds of fighting knives, as the Ninth Circuit recently recognized in upholding California's switchblade ban. *Knife Rts*, 165 F.4th at 1341.

Even if a pocketknife is an appropriate comparator, *Canjura* cites no evidence that pocketknives are commonly used for self-defense. Furthermore, the court used numerical and jurisdictional measures in its common use analysis that have been roundly rejected by courts since *Canjura*. *See Duncan*, 133 F.4th at 883 (collecting cases rejecting this approach). The Court can and should find *Canjura* unpersuasive.

In sum, switchblades are not commonly used for self-defense, are unusually dangerous, and Minnesota's Switchblade Ban falls comfortable within the Nation's history and tradition of regulating similarly dangerous fighting knives. As a result, the Court

should reject Plaintiffs' Second Amendment challenge, grant Defendant Ellison's motion for summary judgment, and dismiss Plaintiffs' claims with prejudice.

## II. THE COURT SHOULD EXCLUDE PLAINTIFFS' EXPERTS' OPINIONS ON COMMONALITY.

Pursuant to the Court's briefing order, Defendant Ellison moves to exclude the opinions relating to the commonality of switchblades offered by Plaintiffs' proffered experts Michael Janich, Ken Onion, and Ernest Emerson for two reasons. (ECF No. 37.) First, these opinions are speculative, unsupported by sufficient facts, and unreliable. To the extent these opinions are connected to facts and data, it is only by *ipse dixit*. Second, some of the proffered opinions lack relevance because they relate to knives that do not fall within the Switchblade Ban's scope. Plaintiffs' experts' opinions are presented in declaration format; the relevant opinions are addressed in turn.

**Mr. Janich**[19]

Mr. Janich offers several unsupported opinions on the purported common lawful uses of switchblades, including for self-defense. First, he states that switchblades "were in mass production in the United States" during the late 1800s, widely sold and marketed during the first half of the 20th century, and are now broadly accepted in the modern era. (Declaration of Michael Janich (Janich Decl.) ¶¶ 16-17, 31.)[20] Mr. Janich asserts that there has been a "substantial increase in the commercial availability of automatic knives of the

---

[19] Mr. Janich is a knife collector and enthusiast; his opinions are based his "own independent personal knowledge, research, education, employment background, and specialized knowledge." (Janich Decl. ¶¶ 1, 4, 12.)

[20] The Declaration of Michael Janich is attached as Exhibit 18 to the Declaration of Michael Goodwin.

past 20 years."  (*Id.* ¶ 16.)  Second, Mr. Janich opines throughout his declaration that switchblades "can be and are used in self-defense."  (*Id.* ¶ 26-27, 36-37.)

**Mr. Onion[21]**

Mr. Onion provides several unsupported opinions on the purported common lawful uses of switchblades.  Throughout his declaration, Mr. Onion opines that "folding knives are some of the most widely owned and used knives in the United States and have been for over a hundred years" and the "number in circulation within the United States is conservatively in the tens of millions."  (Declaration of Ken Onion (Onion Decl.) ¶ 22, 55, 58.)[22]  Second, Mr. Onion asserts that "spring assisted" knives are "widely marketed and sold in the United States and worldwide," with "countless numbers in circulation."  (*Id.* ¶¶ 27-29.)

**Ernest Emerson[23]**

Mr. Emerson provides several unsupported opinions on the purported commonality of switchblades.  First, he states that "there are millions of automatically opening knives (switchblades) owned and possessed throughout the United States."  (Declaration of Ernest Emerson (Emerson Decl.) ¶ 34.)  Elaborating, Mr. Emerson asserts that the mass production "of switchblades in the United States started in the early 1900s" and they "have been continuously manufactured, sold, and used since then."  (*Id.*)  Mr. Emerson also states

---

[21] Mr. Onion is a knifemaker, designer, and inventor; his opinions are based on his "own research, knowledge, and experience."  (Onion Decl. ¶¶ 3, 8, 12, 16.)

[23] Mr. Emerson is a knife designer; his opinions are based on his "own independent personal knowledge, research, education, employment background, and specialized knowledge."  (Emerson Decl. ¶¶ 6, 9, 27.)

that "automatically opening knives (switchblades) are commonly owned and possessed throughout the United States and are used for many lawful purposes." (*Id.* ¶ 33.)

## A. Legal Standard

Pursuant to Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The proponent of the expert testimony has the burden to prove admissibility by a preponderance of the evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). The proffer must indicate "that the expert evidence is reliable and relevant." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).

In the Eighth Circuit, the *Daubert* inquiry involves a three-part test for admissibility under Rule 702. *E.g., Lauzon v. Senco Prods.,* 270 F.3d 681, 686 (8th Cir. 2001). First, the "evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact." *Id.* Usefulness depends on if there is a fit between the testimony and disputed issues; in other words, whether the testimony relates to an issue in the case. *Daubert*, 509 U.S. at 591. Second, the expert

must be qualified. *Lauzon*, 270 F.3d at 686. Third, the proposed evidence must be reliable. *Id.* While there is "no single requirement for admissibility", the proffer must indicate "that the expert evidence is reliable and relevant." *Unrein*, 394 F.3d at 1011.

### B. The Opinions on Commonality are Unreliable and Should be Excluded

Expert testimony "is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). Courts may exclude testimony "if it finds that there is simply too great an analytical gap between the data and the opinion proffered." *S&H Farm Supply, Inc. v. Bad Boy, Inc.*, 25 F.4th 541, 551 (8th Cir. 2022) (citation modified). And the expert must offer more than "vague theorizing based on general principles." *Pro Serv. Automative, L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006); *Weisgram v. Marley Co.*, 169 F.3d 514, 518 (8th Cir. 1999) (requiring more than speculation and pure conjecture).

Conclusory statements "without sufficient evidentiary support" should be excluded. *In re Baycol Prod. Litig.*, 596 F.3d 884, 892 (8th Cir. 2010); *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (providing that an expert opinion must be excluded if it is so "fundamentally unsupported that it can offer no assistance to the [factfinder]") (citation modified). This includes statements supported solely by hearsay that is not of the type reasonably relied on by experts in the field.[24] *Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 955 (8th Cir. 2000). An expert is not required to conduct their own quantitative

---

[24] Plaintiffs' experts do not assert that the anecdotal hearsay cited in their declarations is of the type reasonably relied on by experts in their field.

testing, but there still must be other factual underpinnings for their conclusions.  *See Aviva*

*Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 826–27 (D. Minn. 2011).

Nor should courts admit evidence "that is connected to existing data only by the *ipse*

*dixit* of the expert."  *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1000

(8th Cir. 2019) (citation modified); *Smith v. Cangieter*, 462 F.3d 920, 924-25 (8th Cir.

2006) (excluding expert opinion connected to facts by *ipse dixit*); *see Aviva Sports, Inc.*,

829 F. Supp. 2d at 826-27 ("When presented with only the experts' qualifications, their

conclusions and their assurances of reliability, it is not enough.")

Finally, Defendant Ellison recognizes that courts within the Eighth Circuit apply a

"relaxed *Daubert* standard" for bench trials.  *E.g., David E. Watson, P.C. v. United States*,

668 F.3d 1008, 1015 (8th Cir. 2012).  Still, the requirements under Rule 702 must be met

for admissibility.  *E.g., In re ResCap Liquidating Tr. Litig.,* 432 F. Supp. 3d 902, 914 (D.

Minn. 2020).

As a threshold matter, although each of Plaintiffs' experts state their opinions are

based on "research," it is entirely unclear whether they conducted their own empirical

research, what type of research they conducted, the methodology involved in any such

research, or whether they evaluated the research of others (and, if so, what research was

evaluated).  Notably, no research that may have been conducted by the experts themselves

is cited in their respective declarations.

Regardless, it is impossible to bridge the analytical gap between any possible

underlying source of data and their opinions on commonality.  *See S&H Farm Supply, Inc.*,

25 F.4th at 551.  There is not a discernable theory, technique, or methodology used by the

experts in connection with their "research," including whether it has been tested or subjected to peer review, all of which are factors for evaluating admissibility. *Unrein*, 394 F.3d at 1011.

Starting with Mr. Janich. He states that switchblades were: 1) mass produced in the late 1800s to early 1900s; 2) the preferred cutting tool for many people and for lawful purposes (Janich Decl. ¶ 17); 3) widely sold and marketed as utilitarian tools in the first half of the 20th century; 4) broadly accepted in the modern marketplace with a substantial increase in commercial availability over the past 20 years; and 5) readily available in the United States (*Id.* ¶ 16). Mr. Janich's opinions, however, are entirely unsupported. He cites no underlying data, research, or studies to support his opinions. Indeed, there is no apparent basis for his opinions beyond anecdotal hearsay and *ipse dixit*. Mr. Janich also states that switchblades are used effectively in self-defense and are commonly possessed and carried for lawful purposes. Here, too, his opinions are unsupported beyond *ipse dixit* and anecdotal hearsay, none of which are sufficient to show reliability under Rule 702.

Mr. Janich's opinions on switchblade commonality, including for self-defense, represent the exact type of conclusory statements lacking sufficient evidentiary support that courts within the Eighth Circuit consistently exclude.

Mr. Onion's opinions suffer from the same flaws. Mr. Onion opines that switchblades are: 1) "popular and represent the vast majority of knives sold and used" in the United States (Onion Decl. ¶ 22); 2) "some of the most widely owned and used knives" that number "conservatively in the tens of millions"; and 3) variations of pocket knives "that have been used in the many millions for generations" (*Id.* ¶ 58.) The problem is that

he fails to provide *any* facts to support his opinions, let alone sufficient facts.  Mr. Onion does not cite any studies, research, empirical data, sales figures, or otherwise.  Again, these are the exact types of "conclusory statements without sufficient evidentiary support" that courts within the Eighth Circuit routinely exclude as unreliable.  *E.g., In re Baycol Prod. Litig.*, 596 F.3d at 892.

Mr. Emerson fares no better.  He states that: 1) there "are millions" of switchblades in the United States; 2) mass production began in the early 1900s; 3) switchblades are "commonly owned and possessed" and used for "many lawful purposes"; and 4) this has been the case since the mid-1800s (Emerson Decl. ¶ 33).  As Mr. Emerson acknowledges in his declaration, these opinions are based solely on his personal experience as a knifemaker and knife designer.  And as with Mr. Janich and Mr. Onion, Mr. Emerson's opinions on commonality are factually unsupported.

Plaintiffs' experts' opinions about the commonality of switchblades, including their use for self-defense, are unsupported by any facts beyond *ipse dixit* and anecdotal hearsay. These opinions amount to conclusory statements without evidentiary support and, as a result, should be excluded as unreliable.

### C.  Certain Opinions on Commonality are Irrelevant and Should be Excluded

In addition to being reliable, expert testimony must also be relevant.  *Unrein*, 394 F.3d at 1011.  Again, under *Bruen*, the relevant issue is whether switchblades are in common use for self-defense.  Several opinions offered by Plaintiffs' experts on commonality, however, relate to knives that are not switchblades or subject to the Switchblade Ban.

For instance, in discussing his "first commercially successful assisted opening design" for folding knives, Mr. Onion opines that "spring assisted" knives are "widely marketed and sold in the United States." (Onion Decl. ¶¶ 27-29.)  He asserts that "there are countless numbers in circulation within the United States." (*Id.* ¶ 29.)  According to Mr. Onion, "[t]here is no question that the number of these knives owned and in circulation is conservatively in the several millions." (*Id.*)

Mr. Onion's declaration makes it clear that the knives discussed in connection with these opinions do not fall under Minnesota's "legal definition" of a switchblade. (*E.g.*, *id.* ¶¶ 25-33.)  By his own admission, Mr. Onion's opinions relate to knives that are not subject to the Switchblade Ban and, as a result, are irrelevant.

Turning to Mr. Emerson, he states that excluding kitchen knives, "folding pocket knives are by far the most common knives manufactured and sold in the U.S. market and have been for more than 100 years." (Emerson Decl. ¶ 32.)  Yet Mr. Emerson fails to distinguish between the various types of folding knives.  As a result, this opinion tells us nothing about switchblades and is irrelevant to whether they are in common use for self-defense.

Both Mr. Onion and Mr. Emerson provide opinions about the commonality of switchblades, but do so with unsupported assertions about knives that are not subject to the Switchblade Ban.  These opinions are irrelevant and, as a result, should be excluded.

## CONCLUSION

Plaintiffs ask the Court to undo a choice made by the Minnesota Legislature six decades ago in response to the Legislature's view that switchblades were a threat to public

safety.  Plaintiffs, who have thousands of other knives that are better suited to the purpose for which they wish to use them, offer the Court no probative evidence that switchblades are commonly used for self-defense.  Moreover, the Switchblade Ban is well within the Nation's historical tradition of regulation of bladed weapons.  The Court should grant Defendant's motion for summary judgment, and dismiss Plaintiffs' claims in their entirety and with prejudice.

Dated: March 6, 2026

KEITH ELLISON
Attorney General
State of Minnesota


s/ Michael Goodwin
MICHAEL GOODWIN
Assistant Attorney General
Atty. Reg. No. 0390244

MATT MASON
Assistant Attorney General
Atty. Reg. No. 0397573

445 Minnesota Street, Suite 600
St. Paul, MN 55101-2125
(651) 583-6731 (Voice)
(651) 282-5832 (Fax)
Michael.Goodwin@ag.state.mn.us
Matt.Mason@ag.state.mn.us

ATTORNEYS FOR DEFENDANT KEITH
ELLISON

|#6311965-v1