The Office of
**Minnesota Attorney General Keith Ellison**
helping people afford their lives and live with dignity, safety, and respect  •  www.ag.state.mn.us

July 27, 2026

The Honorable Patrick J. Schiltz
U.S. District Judge
United States District Court
300 South Fourth Street
Minneapolis, MN 55415

      **Re:**    **Knife Rights, Inc., et al. v. Keith Ellison, et al.**
              **Court File No. 24-cv-03749 (PJS/DTS)**

Dear Judge Schiltz:

Defendant Ellison files this notice of supplemental authority to bring to the Court's attention the following case law developments:

1. *Knife Rts., Inc. v. Bonta*, No. 24-5536, 2026 WL 2054987 (9th Cir. July 16, 2026) (denying Plaintiff Knife Rights' petition for rehearing en banc). The Ninth Circuit's panel decision was cited by the parties in their briefing.
2. *Barnett v. Raoul*, No. 24-3060, 2026 WL 1982951 (7th Cir. July 9, 2026) (holding Illinois assault rifle statute did not violate Second Amendment).

Copies of both decisions are attached.

           Sincerely,

           ***/s/ Michael Goodwin***
           MICHAEL GOODWIN
           Assistant Attorney General

           (651) 757-1456 (Voice)
           (651) 296-7438 (Fax)
           michael.goodwin@ag.state.mn.us
           *Attorney for Defendant Keith Ellison*

CC: Counsel of record (via ECF)
Enclosures

|#6416759-v1

2026 WL 2054987
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

KNIFE RIGHTS, INC.; Eliot Kaagan; Jim Miller; Garrison Ham; North County Shooting Center, Inc.; PWGG, LP, Plaintiffs – Appellants,
v.
Rob BONTA, California Attorney General, Defendant – Appellee.

No. 24-5536
|
Filed July 16, 2026

D.C. No. 3:23-cv-00474-JES-DDL, Southern District of California, San Diego

Before: Kim McLane Wardlaw, Ronald M. Gould, and Lucy H. Koh, Circuit Judges.

Order;

Concurrence by Judge Wardlaw;

Dissent by Judge VanDyke;

Dissent by Judge Tung

**ORDER**

Judges Wardlaw, Gould, and Koh voted to deny the Petition for Panel Rehearing and Rehearing En Banc. The full court was advised of the Petition for Rehearing En Banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. *See* Fed. R. App. P. 40. The Petition for Panel Rehearing and Rehearing En Banc is **DENIED**.

WARDLAW, J., joined by GOULD, J., and KOH, J., concurring in the denial of rehearing en banc:

**\*2** *Bruen* may be in its infancy, but *Salerno*'s facial challenge standard dates back nearly four decades. *See New York Pistol & Rifle Ass'n v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022); *United States*

*v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). This case comes down to Plaintiffs' choice to pursue the "most difficult challenge to mount successfully": a facial one. *United States v. Rahimi*, 602 U.S. 680, 693, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024); *see also Faulk v. JELD-WEN, Inc.*, 159 F.4th 618, 623 (9th Cir. 2025) ("Because the plaintiff is the master of the complaint, she gets to determine which substantive claims to bring against which defendants." (citation modified)). There is no dispute that under this standard, Plaintiffs are "require[d] ... to 'establish that *no set of circumstances exists* under which [California's switchblade regulations] would be valid.' " *Rahimi*, 602 U.S. at 693, 144 S.Ct. 1889 (quoting *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095) (emphasis added). As we have recently been reminded by the Supreme Court, the parties' conscious choices concerning which claims to put before us and which to withhold from our review have consequences. *See Clark v. Sweeney*, 607 U.S. 7, 9, 146 S.Ct. 410, 223 L.Ed.2d 157 (2025) (explaining that the principle of party presentation demands that courts decide only the issues raised to them by the parties).

**I.**

Neither "dissental" seriously disputes that California's prohibition on the concealed carry of switchblade knives is consistent with our Nation's history and tradition of arms regulation. *See Knife Rights, Inc. v. Bonta*, 165 F.4th 1330, 1339–45 (9th Cir. 2026). In our dissenting colleagues' view, even if our Nation's history and tradition of arms regulation supports a regulation banning the concealed carry of switchblade knives, the law is unconstitutional because a *different* application of the same law bans the open carry of switchblade knives. *See* Dissent of Tung, J., at —— – ——. Because that view flouts the facial challenge standard established in *Salerno* and applied to a Second Amendment challenge in *Rahimi*, 602 U.S. at 693, 144 S.Ct. 1889, we properly rejected Plaintiffs' facial challenge.

As stated, in a facial challenge to a regulation that burdens Second Amendment rights, the plaintiff bears the exceptional burden of "establish[ing] that *no set of circumstances exists* under which the regulation would be valid." *Rahimi*, 602 U.S. at 693, 144 S.Ct. 1889

(emphasis added). As Justice Gorsuch's concurrence explained, "the question [is] whether th[e] law, in at least some of its applications, is consistent with historic firearm regulations." *Id.* at 708, 144 S.Ct. 1889 (Gorsuch, J., concurring). So long as, "in at least some applications, the challenged law does not diminish any aspect of the right the Second Amendment was originally understood to protect," the facial challenge must fail. *Id.* at 711, 144 S.Ct. 1889 (Gorsuch, J., concurring).

In *Rahimi*, the Supreme Court considered the constitutionality of 18 U.S.C. § 922(g)(8), a federal law criminalizing the possession of a firearm while subject to a qualifying domestic violence restraining order. 602 U.S. at 688, 144 S.Ct. 1889. Critically, the Court noted that § 922(g)(8)(C) contained two separate bases for liability. *Id.* The Court ultimately concluded that our Nation's history and tradition contained sufficient historical analogues to support one basis for liability, § 922(g)(8)(C)(i), and that the Court therefore *did not need to consider* whether the other basis for liability, § 922(g)(8)(C)(ii), was constitutional at all. *See id.* In other words, "the constitutionality of just one of [§ 922(g)(8)'s] sources [of liability] was sufficient for the statute to survive a facial challenge." *Knife Rights,* 165 F.4th at 1338. The Court declined to consider the constitutionality of § 922(g)(8)(C)(ii) and did not ask how the operation of that distinct source of liability affected the total range of prohibited conduct. *Rahimi,* 602 U.S. at 688–89, 693, 144 S.Ct. 1889.

We followed *Rahimi*'s clear guidance. After recognizing Plaintiffs' heavy burden on their facial challenge, we identified one of several bases for liability under the statute: the concealed carry of switchblade knives. *See Knife Rights,* 165 F.4th at 1339. We then asked whether this application of California's switchblade regulations violates the Second Amendment. *See id.* at 1339–45. Answering that question in the negative, we concluded that Plaintiffs' facial challenge failed. *Id.* We declined to express a view "on whether the regulation of any of the other conduct prohibited by California's switchblade regulations is constitutional." *Id.* at 1339 n.4. That is exactly what the Supreme Court did in *Rahimi*.

**\*3** Consistent with this understanding, Courts of Appeals across the country have upheld laws that

comport with the Second Amendment in at least some respects, even if those laws might be unconstitutional in other respects. [1] *See also Rahimi,* 602 U.S. at 701 n.2, 144 S.Ct. 1889 (Even where there are a myriad of potential faults present in a challenged regulation, "unless these hypothetical faults occur in every case, they do not justify invalidating [the law] on its face.").

*Bruen* does not help the Plaintiffs' or our dissenting colleagues' position. As the Second Circuit explained in *Antonyuk*, "the premise of the proper-cause rule at issue in *Bruen* (that ordinary, law abiding, adult citizens can be prohibited from carrying a gun if they lack a good reason to do so) was unsupported by history and thus violated the Second Amendment." 120 F.4th at 986 (citation modified). "How that rule was applied in particular cases was irrelevant given its facial constitutional flaw." *Id.* In other words, *every application* of the law challenged in *Bruen* was affected by an unconstitutional condition that was unsupported by our Nation's history and tradition. *Id.* It was irrelevant that some individuals would ultimately obtain a license to carry a firearm because those individuals would still need to prove a "special need" in order to obtain the license—and thus, would still be subject to the unconstitutional condition. *Bruen,* 597 U.S. at 38, 142 S.Ct. 2111. The same is not true here. California's switchblade regulations comport with our Nation's history and tradition to the extent that they prohibit the concealed carry of these dangerous edged weapons. *See Knife Rights,* 165 F.4th at 1339–45. No unconstitutional condition affects that application of the law. Even if other applications might be independently unconstitutional, it is no answer to say that we should invalidate California's switchblade regulations in full.

**\*4** Indeed, even if our dissenting colleagues are correct that California's switchblade regulations operate as a total ban, their analysis of Plaintiffs' Second Amendment challenge is still inconsistent with *Rahimi* and runs counter to the purpose of facial challenges. A pair of hypotheticals illustrates why this is an easy case. First, consider a man who walks into a bank in California and sets off its metal detector. A security officer frisks the man and finds a concealed switchblade knife in his pocket. The man is charged with and convicted of a misdemeanor under California Penal Code § 21510(b). The man brings

an as-applied Second Amendment challenge to his conviction. That challenge must fail for all of the reasons set forth in our opinion. *See Knife Rights*, 165 F.4th at 1339–45. That is the end of this case. *See United States v. Diaz*, 116 F.4th at 471–72 (rejecting a facial challenge to 18 U.S.C. § 922(g)(1) "because the statute is constitutional as applied to the facts of [the defendant's] own case").

Next, consider a related hypothetical: A different man walks into the same bank with a switchblade knife holstered in plain view on his belt. He is charged with and convicted of a misdemeanor under California Penal Code § 21510(b). The second man may or may not be able to lodge a meritorious as-applied Second Amendment challenge to his conviction. As applied to him, a court may determine that a ban on open carry under § 21510(b) is unconstitutional. But that is precisely the point: as-applied challenges can surgically address unconstitutional applications of statutes while facial challenges cannot. *See, e.g., Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (An "as-applied attack ... challenges only one of the rules in a statute ... *or* the application of the statute to a specific factual circumstance" because we "can separate valid from invalid subrules or applications." (citation modified)). At bottom, the dissent's primary disagreement with our opinion seems to rest with *Salerno*'s facial challenge standard itself. [2]

Plaintiffs remain free to bring an as-applied challenge to the application of California's switchblade regulations to the open carry of switchblade knives. They also remain free to challenge its other provisions. There may be a sufficient history and tradition of arms regulation to support each application of California's switchblade regulations such that even an as-applied challenge would fail under *Bruen*'s second step. Or, those challenges may fail for a different reason. For example, perhaps the unique character of switchblades distinguishes them from other knives used at the time of the Founding, such that a ban on open carry would be consistent with our "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Bruen*, 597 U.S. at 21, 142 S.Ct. 2111 (internal quotation marks and citation omitted). Perhaps switchblades are not protected by the Second Amendment at all. We did not reach, and did not need to reach, these questions.

**\*5**  The old adage, "choices have consequences," is particularly apt under these circumstances. Plaintiffs swung for the fences by asking the district court to invalidate California's switchblade regulations in full. Their challenge was unsuccessful for the reasons explained in our opinion. Our dissenting colleagues' approach would effectively require us to overrule *Salerno* and *Rahimi*. That, we cannot do. [3]

## II.

Judge VanDyke's dissent deserves but a brief response. While all agree that the Second Amendment is not "a second-class right," *Bruen*, 597 U.S. at 70, 142 S.Ct. 2111 (citation omitted), "constitutional rights ... come with exceptions," *Rahimi*, 602 U.S. at 716, 144 S.Ct. 1889 (Kavanaugh, J., concurring), and, like the First Amendment, "the Second Amendment is not absolute," *id.* at 737, 144 S.Ct. 1889 (Barrett, J., concurring). The procedural posture of a case matters as well. As we have explained, facial challenges are disfavored for a simple reason: we don't want to throw the baby out with the bathwater. *See Bucklew v. Precythe*, 587 U.S. 119, 138, 139 S.Ct. 1112, 203 L.Ed.2d 521 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications."). We took *Rahimi*'s lead and ruled narrowly: California constitutionally prohibits the concealed carry of switchblade knives. *See Knife Rights*, 165 F.4th at 1339–45. We did not need to say any more to resolve this case.

The dissents both insist that California could not have banned open carry. We are not so sure. If the Appendices attached to Judge Tung's dissent reveal anything, it is that the historical record contains analogues for banning the open carry of some types of knives. *See* Dissent of Tung, J., Appendix D. Are those "outliers" as Judge Tung suggests? Perhaps. But perhaps not. [4] Are there other independent bases on which to uphold California's switchblade regulations as a whole? Perhaps. Or perhaps not. We resolved this case narrowly and responsibly.

### III.

**\*6** Judge Tung's dissent is centered on disagreements with our interpretation of the law. Discussing differing interpretations of the law is our Court's duty, but the other dissent's attacks on colleagues' credibility, including those who are deceased, simply because of differing views, is not. [5]

VANDYKE, Circuit Judge, dissenting from the denial of rehearing en banc:

I agree entirely with Judge Tung's excellent dissental. I write separately to explain why the panel's flawed decision never should have happened. It was possible only because our court's improper automatic vacatur practice enabled Hawaii to strategically moot a panel opinion striking down a similar blanket ban on butterfly knives. This gave categorical knife bans a second chance to obtain a more favorable ruling from a more favorable panel (from the government's perspective). And that's exactly what happened in this case.

I also write with a modest proposal. This case is just the latest chapter in our court's long and concerning history of refusing to vindicate the Second Amendment. Come hell or high water, *Heller* or *Bruen*, our court will find a way to uphold any weapons restriction that a liberal State can dream up. And the Supreme Court's occasional grant of certiorari and reversal has done *nothing*—and I mean that literally—to change our court's behavior. By now it's clear enough that, especially with regard to the Second Amendment, our court has fully adopted the operating principle of our former colleague Judge Reinhardt: the Supreme Court "can't catch 'em all." [1] In the real world, no boss would tolerate nearly two decades of repeated defiance from a subordinate. If the Supreme Court wants to do anything to ensure that the Second Amendment doesn't remain a second-class right in this country's most populous federal circuit, then something has to change.

**\*7** So, what to do? I have a suggestion. The Supreme Court should consider summarily reversing some of our wayward Second Amendment decisions. To put it more colloquially, it's time for some benchslaps.

Nothing less will give this court any pause before ultimately blessing every arms restriction it reviews. [2]

### I.

California law makes it a crime to carry, publicly possess, transfer, or sell switchblade knives—no exceptions. Cal. Pen. Code §§ 17235, 21510, 21590. [3] As Judge Tung persuasively explains, the panel opinion dodges the obvious constitutional problems with California's categorical switchblade ban by misapplying the facial challenge rule in a way that *Bruen*—a facial challenge case—doesn't support. That's bad enough. But worse, we shouldn't even be here.

### A.

Our court addressed a similar issue a few years ago in *Teter v. Lopez*, where our good colleague Judge Bea—a fantastic judge, even if he occasionally misses the target on the Second Amendment [4]—wrote an outstanding decision explaining why Hawaii's similar complete ban on butterfly knives violated the right to keep and bear arms. *See Teter v. Lopez* (*Teter I*), 76 F.4th 938, 942 (9th Cir. 2023), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024), *and vacated on reh'g en banc*, 125 F.4th 1301 (9th Cir. 2025). The original *Teter* panel's decision was right—it dealt with a similar categorical ban on similar knives, and it squarely rejected the flawed reasoning the panel employed here.

Butterfly knives are comparable to switchblades for all relevant purposes—they are a species of pocketknife with a handle split into two components and a folding blade that can be opened by "a few short, quick movements" with one hand. *Teter I*, 76 F.4th at 942; *see* Cal. Pen. Code § 17235 (defining a switchblade knife as a "knife having the appearance of a pocketknife [including] a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the

blade or by any type of mechanism whatsoever"). And just like the California switchblade ban in this case, the Hawaii law challenged in *Teter* completely banned butterfly knives. *See Teter I*, 76 F.4th at 942. Hawaii even relied on the same justification for its outright ban as California does here: it felt that butterfly knives were "associated with criminals." *Teter I*, 76 F.4th at 949; *cf. Knife Rights, Inc. v. Bonta*, 165 F.4th 1330, 1345 (9th Cir. 2026) ("California targeted switchblades specifically because of the particular danger these weapons present, and their common association with criminality.").

 **\*8**  The *Teter* plaintiffs claimed these statutes violated the Second Amendment, and a panel of our court agreed. First, the three-judge *Teter* panel recognized there was no serious debate that butterfly knives qualify as "arms" under the Second Amendment. *See Teter I*, 76 F.4th at 948–50. *Heller* made clear that the Second Amendment extends to all bearable arms: "[w]eapons of offence, or armour of defence" and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (alteration in original) (citations omitted). Obviously, any knife would meet that definition. *But see Knife Rights*, 165 F.4th at 1339 (merely assuming, and refusing to decide, that the plain text of the Second Amendment applies to the possession and carry of switchblades).

Hawaii therefore had to prove that its categorical ban on those knives was "consistent with this Nation's historical tradition of regulating weapons." *Teter I*, 76 F.4th at 950 (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17–20, 32–33, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022)). And like California here, Hawaii tried to meet that burden by arguing that antebellum or later laws banning "Bowie knives," "metal knuckles," "sword-canes," "Arkansas Toothpicks," and "slung-shots" established "an historical tradition of banning weapons associated with criminality." *Id.* at 951; *cf. Knife Rights*, 165 F.4th at 1341–45.

Judge Bea's opinion correctly explained why these statutes could not justify Hawaii's absolute ban on butterfly knives. "As *Bruen* put it, the 'how' ... [was] different"—these statutes did "not ban the possession of knives; they regulated only their *carry*." *Teter I*, 76

F.4th at 951. And the vast majority of these antebellum or later statutes "prohibited the *concealed carry*" of these weapons, or their carry by certain persons or in certain sensitive places. *Id.* at 951–52. There was no tradition of categorically prohibiting *all* "carry of pocketknives, much less their possession outright." *Id.* at 952–53. These narrow bans on *some* forms of carry could not support Hawaii's categorical ban on *all* forms of possession and carry.

So how did we get to today's decision, which holds precisely the opposite?

If you're familiar with our court, you can easily guess the answer. Like every Ninth Circuit panel decision that vindicates the Second Amendment, *Teter* proved to be yet another Pyrrhic victory for the fundamental right to keep and bear arms. As day follows night, our court "called the case en banc. And after the en banc vote played out in all-too-predictable fashion, the Chief Judge issued an administrative order not only granting en banc review, but also vacating the panel's opinion." *Teter v. Lopez* (*Teter II*), 125 F.4th 1301, 1310 (9th Cir. 2025) (en banc) (VanDyke, J., dissenting in part). No judge voted on that vacatur order, and only the Chief Judge signed it, but it proved consequential. Automatically vacating the *Teter* panel decision greenlighted Hawaii's decision to strategically moot the case and let categorical knife bans live to fight another day. And sure enough, soon after we took *Teter* en banc, Hawaii strategically narrowed its butterfly knife ban to cover everything but the conduct the *Teter* plaintiffs wanted to engage in, and argued its amendments mooted the *Teter* plaintiffs' claims. *Id.* at 1308–10. The en banc panel spotted Hawaii an assumption of good faith and agreed that the case was moot. *Id.* [5]

 **\*9**  As I explained then, our court's practice of automatically vacating panel opinions creates obvious perverse incentives for government defendants. It allows States to strategically deploy mootness by amending their challenged laws only after this court grants rehearing en banc. Through one simple move, a State can lock in the effect of our auto-vacatur and eliminate any risk of losing on the merits before the en banc court. This, in turn, gives the State—or another State with a similar law—a second bite at the apple before a more favorable panel. That perverse incentive

structure is "basically the mirror image" of the kind our *Munsingwear* precedents aim to counteract. *Id.* at 1310 (VanDyke, J., dissenting).

As I suggested then, the en banc panel in *Teter* should have vacated our prior vacatur order, thereby reinstating the precedential value of the panel's opinion, because Hawaii, the en banc petitioner, took deliberate action to moot the case after rehearing en banc was granted. *Id.* at 1317. But of course we didn't. [6] *Teter* was a Second Amendment case, after all, and our court is nothing if not militant when trying to find a way to uphold a weapons restriction. Everyone knew then, and knows now, that the entire point of allowing Hawaii to play the panel erasure game in *Teter* was to leave the way open for a decision like *Knife Rights*. Is it rude to say "I told you so"?

Today we see the full consequences of letting Hawaii game our auto-vacatur practice. The panel in this case holds that Knife Rights' challenge to California's categorical switchblade ban can be rejected if the panel can think of a single constitutional application for the law. And to give credit where it's due, this move makes some strategic (if not legal) sense—if your goal is to avoid enforcing the Second Amendment. No historical evidence supports a categorical ban on *all* forms of carrying knives. As *Bruen* explained, "history reveals a consensus that States could *not* ban public carry altogether." *Bruen,* 597 U.S. at 53, 142 S.Ct. 2111. Even our court's pre-*Bruen* case law recognized the same thing, albeit reluctantly and backhandedly. *See Peruta v. Cnty. of San Diego,* 824 F.3d 919, 942 (9th Cir. 2016) ("If there is such a right [to public carry], it is ... a right to carry a firearm openly."), *abrogated in part on other grounds*, 597 U.S. 1, 142 S.Ct. 2111. So if a panel really wants to uphold California's complete switchblade ban, this might be the only way to do it.

 *10 But we are a court after all—not a collection of policy strategists or cabal of regulators—so legal sense should matter. And that is lacking here. On the panel's view, historical statutes banning one type of carry can justify modern statutes banning *all* carry. Under this reasoning—like God's bargain with Abraham, in which just a few righteous men in Sodom would have been enough to forestall the city's destruction —a blatantly unconstitutional ban on all weapons can be upheld if it has even a single conceivable

constitutional application. This reasoning doesn't jibe with *Bruen*. We are supposed to ask if the laws have the same "how"—in other words, whether the modern regulation "operate[s] in different ways" than the historical analogues the State points to. *United States v. Hemani,* 608 U.S. ——, ——, 146 S.Ct. 1677, 1687, —— L.Ed.2d —— (2026); *accord United States v. Rahimi,* 602 U.S. 680, 711, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (Gorsuch, J., concurring). And complete bans on *all* forms of carry, transfer, and public possession don't work in remotely the same way as bans on *some* forms of carry.

At any rate, the *Knife Rights* panel could employ this gambit *only* because of Hawaii's adept maneuvering, enabled by our improper auto-vacatur practice, to moot *Teter*. The *Teter* panel unanimously held that a historical tradition of banning *some* forms of carry doesn't justify a blanket ban on *all* forms of carry. That analysis was right and consistent with *Bruen.* And had we refused to let Hawaii game our auto-vacatur practice in *Teter*, it would have controlled here and prevented this panel's errant decision to uphold California's complete switchblade ban.

**B.**

This case, like *Teter* before it, is just one more predictable chapter in our court's long campaign against the Second Amendment. While the particulars vary from case to case, that story has the simplest basic plot: the government always wins; the Second Amendment plaintiff always loses. Our court will use any judicial tool—no matter how illegitimate— to avoid enforcing the right to keep and bear arms. Second Amendment plaintiffs in the Ninth Circuit are permanently stuck in the unfortunate position of having brought a knife to a gunfight. And that has remained true despite several landmark Supreme Court decisions that *should have* corrected our case law.

Before *Heller*, the law in our circuit was that the Second Amendment "right of the *people* to keep and bear arms," U.S. Const. amend. II (emphasis added), wasn't an individual right at all, but a right that belonged to the States, *see Hickman v. Block,* 81 F.3d 98, 100–01 (9th Cir. 1996), *cert. denied,* 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996), *overruled by*

*District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

After *Heller* corrected us and made clear that the Second Amendment recognizes "an individual right to keep and bear arms," 554 U.S. at 595, 128 S.Ct. 2783, we created a "means-ends" interest balancing test where we would (1) determine whether the challenged law affected conduct historically protected by the Second Amendment; and (2) apply varying levels of scrutiny to review the constitutionality of the regulation. *See, e.g., Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021) (en banc), *vacated*, ––– U.S. ––––, 142 S. Ct. 2895, 213 L.Ed.2d 1108 (2022). We selected the level of scrutiny based on (1) how close the law came to the "core" of the Second Amendment right and (2) the severity of the law's burden on that right. *E.g., United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013), *abrogated by Bruen*, 597 U.S. at 17, 142 S.Ct. 2111. Essentially always, these steps led us to apply a form of so-called "intermediate scrutiny," under which we required "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Id.* at 1139.

That framework was so malleable that it effectively amounted to rational basis review. Guns are dangerous, after all, and we always found the government's interest in mitigating such danger to be important. *See McDougall v. Cnty. of Ventura*, 23 F.4th 1095, 1122 n.9 (9th Cir.) (VanDyke, J., concurring), *reh'g en banc granted, opinion vacated*, 26 F.4th 1016 (9th Cir. 2022), and *on reh'g en banc*, 38 F.4th 1162 (9th Cir. 2022). And we watered down the "reasonable fit" prong to such an extent that the government merely had to show that its regulation "promote[d] a substantial government interest that would be achieved *less effectively* absent the regulation." *Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016) (emphasis added) (citation omitted). As I've explained, it's hard to imagine how a law could survive even rational basis review if the State's interest would be achieved more effectively without a challenged law. *McDougall*, 23 F.4th at 1123 n.11 (VanDyke, J., concurring). So this test, labeled "intermediate scrutiny," imposed effectively *no* scrutiny. Under it, a State's regulatory concerns *always* trumped the individual plaintiff's right

to keep and bear arms. I'm not exaggerating: between *Heller* in 2008, and *Bruen* in 2022, we considered at least 50 Second Amendment challenges—significantly more than any other circuit—and ultimately denied *all of them. Duncan v. Bonta*, 19 F.4th 1087, 1165–66 (9th Cir. 2021) (en banc) (VanDyke, J., dissenting), *vacated*, ––– U.S. ––––, 142 S. Ct. 2895, 213 L.Ed.2d 1109 (2022). If you were a sports fan, and one team was literally undefeated for more than a decade, you might suspect that something was up.

**\*11** Then came *Bruen*, where the Supreme Court expressly rejected the use of such interest balancing "means-end scrutiny in the Second Amendment context" and described the two-step approach as "one step too many." 597 U.S. at 19, 142 S.Ct. 2111. Instead, we are to apply the Second Amendment's text and historical understanding. *Id.* at 26, 142 S.Ct. 2111. If the "Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct." *Id.* at 17, 142 S.Ct. 2111. The government may rebut that presumption only if it "affirmatively prove[s] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19, 142 S.Ct. 2111. This requires the government to "identify a well-established and representative historical analogue," and we must decide whether the challenged regulation and historical analogues are "relevantly similar." *Id.* at 29, 30, 142 S.Ct. 2111 (citation omitted). Our "central" consideration should be whether the modern regulation "impose[s] a comparable burden on the right of armed self-defense" and whether "that burden is comparably justified." *Id.* at 29, 142 S.Ct. 2111. Simply, the historical analogues and challenged regulation must have a similar "how" and "why." *Id.*

But since *Bruen*, we've quickly come up with a number of other analytical jukes to continue our resistance to the Second Amendment. For example, we've misread *Bruen* as creating two separate tests: what we've called the "more nuanced approach" and the "straightforward" approach. *See, e.g., Duncan v. Bonta*, 133 F.4th 852, 870–72 (9th Cir. 2025) (en banc). Seizing on a few lines from *Bruen*, we've decided that a more "nuanced" or "flexible analogical" approach applies when a modern regulation seeks to address new "societal concerns" or "dramatic

technological changes." *Id.* at 874 (citation omitted). The more "flexible analogical approach" seemingly lets us skip over rigorous application of *Bruen*'s history and tradition test and uphold a weapons regulation if we decide—which we inevitably do—that there's a difference between the technology and societal problems that existed at the Founding and those that exist today. *See id.* at 873–74.

In other cases, we've held that restrictions on "ancillary rights"—like the right to acquire firearms in the first place—do not come within the Second Amendment's plain text *at all* unless they "meaningfully constrain" the right to keep and bear arms for self-defense. *See B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117–19 (9th Cir. 2024). This language appears nowhere in the Second Amendment, *Heller*, or *Bruen*, but that didn't stop us from asserting that it "faithfully tracks the Second Amendment's plain text." *Id.* at 119. And given our track record with the Second Amendment, you might correctly expect that we'd find all sorts of weapons-related restrictions not really all that "meaningful."

The panel's decision here is another good example of how we can avoid meaningful Second Amendment scrutiny. Under the panel's view of facial challenges, virtually any categorical weapons ban could be upheld if a historical analogue justifies banning a small subset of the outlawed activity. Just enact the same ban from *Bruen* or *Heller*, include a narrow application that is constitutional and—voila!—your firearms ban is now facial-challenge-proof. Americans who want to exercise their constitutional rights will have to chip away at the law one as-applied challenge at a time. We wouldn't treat other rights this way. If California's legislature categorically banned all speech critical of the governor, we would never uphold it just because it *could* be applied to criminalize certain unprotected categories of speech like true threats or incitement. *See Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam). If Oregon's legislature passed a law permitting warrantless searches in all circumstances, we would never uphold it just because it could authorize consent searches or searches pursuant to the emergency aid exception. *See Fernandez v. California*, 571 U.S. 292, 298, 134 S.Ct. 1126, 188 L.Ed.2d 25

(2014); *Michigan v. Fisher*, 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (per curiam). And if Washington's legislature provided that no indigent criminal defendant would henceforth be appointed counsel at any stage of any criminal proceeding, we wouldn't uphold that statute because it could be constitutionally applied to deny counsel in the context of post-conviction proceedings. *See Garza v. Idaho*, 586 U.S. 232, 245, 139 S.Ct. 738, 203 L.Ed.2d 77 (2019). And so on.

**\*12** What's more, post-*Bruen*—just as before—the occasional panel decision that vindicates the Second Amendment is promptly called en banc, vacated, and ultimately replaced with more circuit precedent undermining the right to keep and bear arms. *See, e.g., Baird v. Bonta*, 163 F.4th 723 (9th Cir.), *reh'g en banc granted, opinion vacated*, 172 F.4th 1105 (9th Cir. 2026); *Rhode v. Bonta*, 145 F.4th 1090 (9th Cir.), *reh'g en banc granted, opinion vacated*, 159 F.4th 1170 (9th Cir. 2025); *Yukutake*, 130 F.4th 1077, *reh'g en banc granted, opinion vacated*, 144 F.4th 1119 (9th Cir. 2025).

The bottom line is that *Bruen*—like *Heller* before it—changed nothing here in the Ninth Circuit. We still have plenty of tricks up our sleeves to avoid vindicating the Second Amendment. And we'll come up with as many more as we need to. [7]

It's impossible to square any of this with the Supreme Court's instruction that the Second Amendment right to keep and bear arms should no longer be treated as a "second-class" right. *Bruen*, 597 U.S. at 70, 142 S.Ct. 2111 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (plurality opinion)). We would never bend over backwards to find some bespoke rationalization to avoid vindicating the constitutional rights that most of my colleagues favor. To the contrary, our court often goes out of its way to *extend* those rights far beyond their original public understanding to achieve desired policy outcomes. *See, e.g., United States v. Hansen*, 25 F.4th 1103, 1105 (9th Cir. 2022) (misconstruing a federal law prohibiting "encourag[ing] or induc[ing]" illegal immigration in order to find it unconstitutionally overbroad under the First Amendment), *rev'd*, 599 U.S. 762, 143 S.Ct. 1932, 216 L.Ed.2d 692 (2023); *United States*

*v. Sineneng-Smith*, 910 F.3d 461 (9th Cir. 2018) (injecting sua sponte into an appeal an overbreadth challenge to this same statute), *vacated and remanded* 590 U.S. 371, 375, 140 S.Ct. 1575, 206 L.Ed.2d 866 (2020) (holding that the *Sineneng-Smith* panel had "departed so drastically from the principle of party presentation as to constitute an abuse of discretion" and remanding "for an adjudication of the appeal attuned to the case shaped by the parties rather than the case designed by the appeals panel"); *Martin v. City of Boise*, 920 F.3d 584, 603 (9th Cir. 2019) (holding that the Eighth Amendment's Cruel and Unusual Punishments Clause barred a city "from prosecuting people ... for sleeping outside on public property when those people have no home or other shelter to go to"), *abrogated by City of Grants Pass v. Johnson*, 603 U.S. 520, 144 S.Ct. 2202, 219 L.Ed.2d 941 (2024); *Martinez v. City of Oxnard*, 270 F.3d 852, 857–58 (9th Cir. 2001) (holding that mere "coercive questioning" violated the Fifth and Fourteenth Amendments even when the defendant's statements were not used against him in a criminal proceeding), *rev'd sub nom. Chavez v. Martinez*, 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003); *Compassion in Dying v. Washington*, 79 F.3d 790, 816 (9th Cir. 1996) (en banc) (holding that the "Constitution encompasses a due process liberty interest in controlling the time and manner of one's death—that there is, in short, a constitutionally recognized 'right to die' "), *rev'd sub nom. Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).

**\*13** But in the courts of this country's most populous federal circuit, the right to keep and bear arms—the palladium of liberty—is effectively a dead letter. It is important that the Supreme Court Justices understand this reality: in the Ninth Circuit, things are no different after *Heller* and *Bruen* than they were before. No different.

## II.

That we work so hard to avoid following the Supreme Court's instructions—and have so often gotten away with it—might seem counterintuitive to the average person. When *your* boss tells you that you did something wrong, you might be frustrated. You might disagree. You might even vent about it off the

clock with some "vulgar barroom talk." *Olympus Spa v. Armstrong*, 169 F.4th 817, 845 (9th Cir. 2026) (statement of McKeown, J.). But when you're done kvetching, you'll probably try to fix the problem, because you know that if you don't, you'll soon be looking for a new job.

Yet strange as it may seem to the outside observer, that's not how it works on our court—at least when it comes to rights that a majority of my colleagues dislike (religious liberty and the Second Amendment, for example). When our boss, the Supreme Court, tells us we erred, we don't apologize, and we don't rush to fix the problem. We don't even feel the need to come up with some half-baked excuse for why the dog ate our homework. We persist in open defiance. Indeed, a majority of my colleagues, who see the law very differently than the Supreme Court on certain key issues, may even welcome the rare reversal from the Supreme Court in a case involving a hot-button social issue and view it as a badge of honor. *See, e.g.*, Andrew Manuel Crespo, *In Memoriam: Judge Stephen Reinhardt*, 131 Harv. L. Rev. 2101, 2102 (2018). What better way to demonstrate your bona fides to the liberal legal establishment?

What judges on our court *don't like*, however, is when they're perceived as so bad at their job that they get summarily reversed. A short summary reversal sends a message so clear and stern it could embarrass even a judge on the Ninth Circuit.

So here's my modest proposal: if the Supreme Court really wants to be serious about genuinely doing something to address the Second Amendment's uniquely disfavored status in America's most populous federal circuit, it's going to need to prescribe stronger medicine than what it's given us so far.

### A. The benchslap

I've been accused of using "vulgar barroom talk" to get my point across, *Olympus Spa*, 169 F.4th at 845 (9th Cir. 2026) (statement of McKeown, J.), so let me assuage my colleagues' selective Victorian predilections up front. Calm down. In making my recommendation today, I've chosen a word that, while evocative, would never be the punchline to a coarse

joke at your local bar, and even has an official entry in the lawyer's dictionary of choice.

Black's Law defines "benchslap" as "[a] judge's sharp rebuke of counsel, a litigant, or perhaps another judge[.]" *Benchslap, Black's Law Dictionary* (12th ed. 2024). Basically, a benchslap is a form of stern judicial correction designed to impose public shame for improper litigation or judicial conduct. *See* Joseph P. Mastrosimone, *Benchslaps*, 2017 Utah L. Rev. 331, 334 (2017). Wayward attorneys have been benchslapped for everything from engaging in the "ostrich-like tactic" of pretending that adverse precedent does not exist,[8] to citing A.I.-hallucinated cases,[9] to asking to suspend a murder trial to attend the annual Ernest Hemingway look-alike contest.[10] The deterrent effect is real. Nobody wants to become insta-famous for receiving the viral benchslap of the day.

 **\*14** The benchslap isn't just a tool for overworked judges to deal with the latest antic of unprofessional counsel. It's also a tool our nation's highest Court has sometimes deployed to correct *lower courts'* repeated refusal to follow precedent. The Supreme Court's benchslaps are more formally known as summary reversals. A summary reversal occurs when the Supreme Court grants certiorari and immediately reverses the lower-court decision, without merits briefing or argument, "rather than the more usual grant of certiorari, followed by three sets of briefs on the merits, oral argument, and a decision several months after certiorari was granted." Edward A. Hartnett, *Summary Reversals in the Roberts Court*, 38 Cardozo L. Rev. 591, 591–92 (2016).

Summary reversals serve several purposes. Commentators note that they "enforce the Court's supremacy over recalcitrant lower courts," William Baude, *Foreword: The Supreme Court's Shadow Docket*, 9 N.Y.U. J.L. & Liberty 1, 2 (2015), and "rebuke lower courts for resisting the Supreme Court's commands," Richard C. Chen, *Summary Dispositions as Precedent*, 61 Wm. & Mary L. Rev. 691, 710 (2020). Justices on the Supreme Court have likewise described summary reversal as "bitter medicine," *Spears v. United States*, 555 U.S. 261, 268, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (Roberts, C.J., dissenting), prescribed when lower courts "seek to defy" Supreme Court precedent, *Pavan v. Smith*, 582 U.S. 563, 568,

137 S.Ct. 2075, 198 L.Ed.2d 636 (2017) (Gorsuch, J., dissenting).

These sterile descriptions, while accurate, don't fully capture the stinging impact of a summary reversal. When the Supreme Court summarily reverses, it's essentially sending a clear (if harsh) message to a lower court:

> Dear lower court:
>
> Your decision sucks.... And it sucks so badly, it isn't even worth a closer look.
>
> Kindly re-do it.
>
> Regards,
>
> The Supreme Court.

I have to respectfully disagree with commentators who have criticized the benchslap as a form of inappropriate judicial bullying. *See* Mastrosimone, *Benchslaps*, 2017 Utah L. Rev. at 353, 375–76. While it's no doubt strong medicine, a benchslap can be a form of much-needed judicial correction in response to demonstrated lower court recalcitrance.

To see just how effective a series of summary reversals from the Supreme Court can be, consider an example from recent Ninth Circuit history. In the mid-2000s, the Antiterrorism and Effective Death Penalty Act (AEDPA) had been the law for nearly a decade, instructing federal courts not to grant habeas relief unless the state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Yet some federal courts of appeals (any guesses as to which?) persisted in open defiance of Congress's command. Because the Supreme Court could not realistically grant certiorari to correct every single misapplication of AEDPA, it began issuing summary reversals.

From 2005 to June 2019, the Supreme Court summarily reversed eighty-eight cases. Chen, *Summary Dispositions as Precedent*, 61 Wm. & Mary L. Rev. at 706 & n.74. *Forty-one* of those summary reversals came in federal habeas cases. *Id.* at 707 & n.81. Our court was a particularly bad offender

and therefore a frequent recipient of the Supreme Court's summary reversals during this period: by my count, fifteen (more than a third) of the Supreme Court's habeas summary reversals corrected Ninth Circuit decisions. [11] To give a flavor of these summary reversals, consider *Glebe*, where the Supreme Court summarized the improper reasoning employed by a panel of this court and then responded with one word: "No." *Glebe*, 574 U.S. at 25, 135 S.Ct. 429. When the Nation's highest Court issues the same monosyllabic correction that a frazzled parent gives her whining toddler, it's kind of embarrassing (to the toddler).

**\*15** It worked. While the process wasn't pleasant, our AEDPA decisions improved. Judges on our court now more often—although sadly not always—afford the appropriate level of deference to state-court decisions that AEDPA requires. [12] And when they're tempted to reverse simply because they would have analyzed the case differently had they been in the shoes of the relevant state court, my more "experienced" colleagues at least have the threat of a possible summary reversal in the back of their mind. That fear of a summary reversal provides a greater incentive to behave than any concern about the occasional reversal in a full Supreme Court opinion.

### B. Benchslaps for the Second Amendment

Our historical (and, sometimes, ongoing) resistance to the Supreme Court's AEDPA jurisprudence pales in comparison to our unwavering defiance of the Court's Second Amendment jurisprudence. Even before the decade of Supreme Court AEDPA summary reversals, we would at least occasionally apply the proper level of deference to state-court decisions. In contrast, we effectively *never* vindicate the right to keep and bear arms. And when a panel does, our court takes the decision en banc, vacates the panel's decision, and ultimately upholds the arms regulation. By this point, it is clear enough that a Second Amendment reversal every few years sadly does nothing to protect the particularly disfavored constitutional right to keep and bear arms. It's equivalent to the parent of a chronically delinquent child taking away TV privileges for fifteen minutes for one day every few years and hoping that will somehow put the child back on the straight and narrow. Not going to work. But a series

of good summary reversals—and given our Court's intransigence, it will take more than one—could.

As I see it, the summary reversal approach has several key advantages. First, Justices on the Supreme Court are so busy. Issuing summary reversals will save them time and allow them to address other important issues rather than correcting our blatantly errant work. Our circuit decides more Second Amendment cases than any other, and it's simply not possible for the Supreme Court to grant certiorari in every one of our wayward decisions. But summarily reversing and remanding for a second try will enable the Supreme Court to expedite the process and put an end to the "can't catch 'em all" game our court loves to play. *See* Linda Greenhouse, *Dissenting Against the Supreme Court's Rightward Shift*, N.Y. TIMES (Apr. 12, 2018).

Second, by summarily reversing, the Supreme Court won't have to develop new doctrine or waste time repeating holdings it has already made. It can just cite *Bruen* and force our court to gain some much-needed practice faithfully applying the proper Second Amendment framework. Most of my colleagues can't fathom writing a pro-Second Amendment opinion. They need to get some reps in. Forcing them to bite the bullet and make a ruling they disagree with will operate as a form of exposure therapy. The first time writing an opinion that enforces the Second Amendment will no doubt feel scary. But after doing it a few times, they'll realize it's not so bad as they thought.

Third, the threat of embarrassment on summary reversal will allow the core message of *Bruen* finally to sink in: laws that restrict the right to keep and bear arms —just like laws that restrict any other fundamental right—are presumptively *unconstitutional*. 597 U.S. at 24, 142 S.Ct. 2111. This means that, while applying the *Bruen* framework is "not *always* easy," many Second Amendment cases are simply "not hard." *Wolford v. Lopez*, 609 U.S. ——, ——, —— S.Ct. ——, —— L.Ed.2d ——, 2026 WL 1825723, at \*20 (June 25, 2026) (Barrett, J., concurring) (emphasis added).

**\*16** But you'd never know that if you follow this court's Second Amendment jurisprudence. The truth is that a majority of my colleagues treat every arms restriction as presumptively *constitutional* and then have to work really hard to confirm that presumption.

Consequently, in our circuit, the line between hard and easy cases doesn't exist. Every Second Amendment case turns into a hard one. Take the very recent case of *Wolford*, for example, where the Supreme Court easily backhanded Hawaii's attempt to justify its law prohibiting firearms on private property without the express and affirmative consent of the property owner by pointing to colonial anti-poaching laws. 609 U.S. at ⸺ – ⸺, ⸺ S.Ct. ⸺, 2026 WL 1825723, at *12–13. Could laws prohibiting unauthorized hunting on private land justify banning lawful public carry in every "gas station, coffee shop, grocery store, or other private property open to the public without express and unambiguous consent?" *Id.* at ⸺, ⸺ S.Ct. ⸺, 2026 WL 1825723 at *13. Obviously not, the Supreme Court said: "The question answers itself." *Id.* But not for us! We treated *Wolford* like an unsolvable Gordian knot that could be untied only by ... you guessed it ... deferring to the State's regulatory concerns and upholding the ban. *See Wolford v. Lopez*, 116 F.4th 959, 976–1003 (9th Cir. 2024), *cert. granted in part*, ⸺ U.S. ⸺, 146 S. Ct. 79, 222 L.Ed.2d 1241 (2025), *rev'd and remanded*, 609 U.S. ⸺, ⸺ S.Ct. ⸺, 2026 WL 1825723. And we do the same thing in every Second Amendment case. It's always complicated. There's always so much arduous analysis. And the final result is always the same: the arms restriction must win.

Our court's efforts are a crucial part of a broad and energetic campaign to deliberately overcomplicate *Bruen*. Legal academics, the mainstream media, and complicit judges are working overtime to push hard the narrative that *Bruen* is unworkable, unclear, and just too difficult to apply. Some say "[h]istory is messy," "not straightforward or fair," and that it "makes no sense for contemporary society to pledge allegiance to the founding era's ... understanding of the Constitution." *See State v. Wilson*, 543 P.3d 440, 453–54 (Haw. 2024), *abrogated in part by Wolford*, 609 U.S. at ⸺, ⸺ S.Ct. ⸺, 2026 WL 1825723, at *11. Some say *Bruen* is "insane" to require judges "to hunt down obscure, colonial-era statutes" "from the age of muskets" to justify "perfectly sensible gun laws." Ruth Marcus, *Ye olde Supreme Court? Your originalism is making America unsafe.*, Washington Post, (Feb. 4, 2023). Some, like former district court judge Kimberly J. Mueller, strangely spend 15 pages of an order trashing *Bruen* itself—cribbing from the

"greatest hits" list of *Heller* and *Bruen* critics—before purporting to apply *Bruen* faithfully to the case at hand (and, shocker, finding no Second Amendment violation). *See Baird v. Bonta*, 709 F. Supp. 3d 1091, 1093, 1103–1118 (E.D. Cal. 2023), *aff'd in part, rev'd in part*, 163 F.4th 723 (9th Cir.), *vacated*, 172 F.4th 1105 (9th Cir. 2026).[13] These, and many other, voices cry out in unison: "*Bruen* is just too hard to apply. Please! Return to interest balancing!"

As with any constitutional right, no doubt there are going to be some hard Second Amendment questions. But there is an obvious disconnect when Justices of the Supreme Court emphasize that Second Amendment questions it just reviewed "are not hard," *Wolford*, 609 U.S. at ⸺, ⸺ S.Ct. ⸺, 2026 WL 1825723, at *20 (Barrett, J., concurring)—indeed, are so easy that the government's arguments "cannot be taken seriously," *id.* at ⸺, ⸺ S.Ct. ⸺, 2026 WL 1825723, at *14—while our court, considering the same issues, murdered a small forest of trees with myriad pages of dense and opaque analysis before "taking a step back" from its final "analysis" and acknowledging its conclusion about "the lists of places where a State likely may ban ... the carry of firearms appear[s] arbitrary" and "the lack of an apparent logical connection ... is hard to explain in ordinary terms." *Wolford*, 116 F.4th at 976–1003. As *Wolford* shows, applying *Bruen* in this circuit is only hard because my colleagues are stretching their considerable analytical and imaginative powers to the limit in search of any possible way to uphold an arms restriction—effectively applying a presumption of *constitutionality.* Tell any first-year law student about a city code "that target[s] speech based on its communicative content," and they'll quickly and intuitively recognize that the law is probably unconstitutional and unlikely to survive judicial review. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). "Easy" Second Amendment cases should be similar. The fact that my court has never encountered an "easy" Second Amendment case is a huge tell of how vigorously we are collectively kicking against the goads.

**\*17** Summarily reversing—telling lower courts in unignorable and unmistakable terms: (1) you got it badly wrong; (2) this is an easy question; (3) try

again—will reinforce that laws burdening the Second Amendment right are presumptively unconstitutional—not just in theory, but in reality. That presumption should make many cases an easy call. This, in turn, will allow the Supreme Court to focus its energies on the *actually* hard cases.

Finally, a word in response to Judge Wardlaw. I agree that if we were only dealing with "differing interpretations of the law," then the stern criticism that I've employed here wouldn't be necessary. Concurrence of Wardlaw, J., at ——. But let's stop pretending: our Second Amendment jurisprudence is rooted not in "differing interpretations of the law," but in this court's consistent, long-term, demonstrated refusal to follow the law. If the results in our Second Amendment cases really reflected a diversity of views among the majority of my colleagues, you'd expect a diversity of outcomes. Instead, we have a shockingly monolithic jurisprudence: the government wins, the Second Amendment loses.

Despite this glaring track record, our court loves to give lip-service to the fiction that "all agree" the Second Amendment is not a "second-class right," and that our court's Second Amendment jurisprudence is simply the byproduct of reasonable disagreement from case-to-case. *Id.* at ——. That is precisely what I am disputing. My point—one Judge Wardlaw never addresses, instead attempting to just shoot the messenger—is that when it comes to the Second Amendment, the "exceptions" *always* win, which can only be explained by an underlying bias against the Second Amendment. *Cf. id.* And because of that, we'll continue discovering and creating as many new "exceptions" as we need to ensure that doesn't change. The content and tone of this dissent is necessary precisely because of our court's consistent attempts, like Judge Wardlaw's here, to simply wave our hands in an attempt to distract from the severity of our Second Amendment recalcitrance by strategically deployed complexity and manipulative calls for faux collegiality. At some point our court's cover-up will stop working. I'm asking the Supreme Court to help in that regard.

If we are truly concerned about the "credibility" of our court, and our reputation as judges, we should follow the law rather than contort it to reach our preferred outcomes. It should go without saying: we should care more about *being* credible than about *looking* credible.

\* \* \*

We should have taken this case en banc. But our refusal to do so surprises no one. Even after *Bruen*, we still have an arsenal of ways to avoid doing the unthinkable: applying the Second Amendment of the United States Constitution. Like a clever, spoiled child, we've successfully defied the Supreme Court's Second Amendment precedent for nearly two decades. The Supreme Court has let us get away with it. And without some stern correction, we'll continue to do so.

Until the Supreme Court takes more serious and sustained action to correct us, our court's Second Amendment case law will never improve. *Wolford*'s nice, but it literally affects nothing on my court. To paraphrase 17th-century satirist Samuel Butler, "What med'cine else can cure the fits/ Of [judges] when they lose their wits?" [14] Some benchslaps, that's what.

TUNG, Circuit Judge, joined by CALLAHAN, R. NELSON, COLLINS, LEE, BRESS, BUMATAY, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

 **\*18**  This case asks whether California's ban on the carrying of switchblade knives violates the Second Amendment. The panel rejected a facial challenge to this ban, and it did so on the basis of a tradition banning the concealed carrying of knives.

That reasoning is wrong. A tradition prohibiting only *one* form of carry (concealed) but permitting another form of carry (open) does not justify prohibiting *all* forms of carry (concealed and open), which California's ban does. In holding otherwise, the panel retreads a path that the U.S. Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), expressly foreclosed. The panel's decision also conflicts with a State Supreme Court decision concluding that the Second Amendment protects the carrying of switchblade knives.

The panel's reasoning is not just wrong. It should set off alarm bells. If accepted, it would upend *Bruen*

and essentially shield from constitutional scrutiny any law that categorically and totally bans the carrying of arms. Never would our court have tolerated, with respect to any other constitutional right, the sort of analytical move that the panel made here. The Supreme Court even reminded us just last month that "[t]he right protected by the Second Amendment is entitled to no less protection than other constitutional rights." *Wolford v. Lopez*, 609 U.S. ——, —— n.13, —— S.Ct. ——, —— L.Ed.2d ——, 2026 WL 1825723 (2026). We should have granted en banc review to fix the panel's obvious error and its open circumvention of the Supreme Court's instructions. I dissent.

## I.

### A.

Perhaps no tool has been more important to man's survival than the knife. Since the Stone Age, knives have been used for all sorts of purposes, including as weapons and cutting tools. Harold L. Peterson, *Daggers and Fighting Knives of the Western World, from the Stone Age till 1900* 1–2 (1968) ("Daggers and Fighting Knives"). When Viking explorers reached American shores a millennium ago, they carried scramasaxes on their persons—bladed "weapons so highly prized, it is said, that they never left their owner's side day or night." Harold L. Peterson, *American Knives: The First History and Collectors' Guide* 6 (1958) ("American Knives"). In the 1600s, English settlers in the colonies carried knives too— most popularly, the "kidney" knife, with lobes that formed its hilt. *Id.* at 14. In the 1700s, frontiersmen (including those who later fought in the American Revolution) could not do without knives, which were used for scavenging, hunting, and defense. *Id.* at 21; *see also* George C. Neumann, *Swords and Blades of the American Revolution* 14 (1973) ("Swords and Blades") ("Belt and pocket knives, too, accompanied him in the developing eastern settlements and on the western frontier.").

Simply put, "[k]nives and daggers were personal necessities to the early American." Swords and Blades at 227. "Everyone had a knife" during the colonial period, and "[a]s long as a man was required to defend his life," a "knife was a constant necessity." American

Knives at 6. Well into the 1800s, too, "men of all walks of life" were "accustomed to wear a knife as a necessary part of their garb." Daggers and Fighting Knives at 68. By the Civil War, "knife manufacture" in the United States "was in full swing"—as "an age of specialization in pocketknives" (of which the switchblade knife was a species) "set in." American Knives at 133, 137.

**\*19**  The switchblade knife, in particular, has had a storied history. Generally defined, a switchblade is a type of pocketknife that releases a folding or sliding blade upon the pressing of a button or lever. "Springblade knives" (a precursor to the modern switchblade) "have been made for hundreds of years because there has always been a need for a pocketknife that can be opened easily when the hands are wet, cold, or covered with gloves." Ben Myers & Lowell Myers, *An Introduction to Switchblade Knives* 6 (1982) ("An Introduction to Switchblade Knives"). In the 1700s, for example, certain types of flint-lock pistols incorporated such knives; "[i]f the pistol mis-fired (which frequently happened) the person would touch the release button and the blade would open up, and be available for use." *Id.*; *see also* H. Gordon Frost, *Blades and Barrels* 230–32 (1972); *Knife Rights, Inc. v. Bonta*, 165 F.4th 1330, 1333 (9th Cir. 2026) ("Primitive switchblades date back to at least the eighteenth century[.]").

Patents for switchblade knives proliferated immediately after the Civil War. The "gravity knife" (the blade of which is released by gravity as opposed to a spring or other mechanism) was patented in 1862. *See* An Introduction to Switchblade Knives at 94; U.S. Patent No. 35,964 ("This device is particularly intended for carpenters' use, and its principal advantage is that it can be opened and closed with one hand. It is a very simple instrument, which can be used in place of the ordinary pocket-knife, and which can be made at a trifling cost."). Patents for other variants quickly followed—the "compressed spring straight-line knife" (1866); the "coiled-spring side-opening knife" (1878); the "curved-spring side-opening knife" (1883); the "pull-spring knife" (1895); the "compressed spring side-opening knife" (1922); the "pin-pull" knife (1944); and many more. *See* An Introduction to Switchblade Knives at 23–25, 28–29; U.S. Patent No. 57,902; U.S. Patent No. 199,766; U.S.

Patent No. 273,858; U.S. Patent No. 551,052; U.S. Patent No. 1,412,373; U.S. Patent No. 2,360,165.

The large-scale production of "switchblades in the United States began in the 1880s, shortly after the first switchblade patents were granted in this country." Mark Erickson, *Antique American Switchblades: Identification & Value Guide* 6 (2004) ("Antique American Switchblades"). "Over a 50 year period from the mid 1890s to the mid 1940s there had been approximately 20 different companies who had manufactured switchblade knives in this country." *Id.*; *cf. Knife Rights*, 165 F.4th at 1333 ("[M]odern switchblades did not become popularized in the United States until after World War II.").

Switchblade knives served many useful purposes other than as a weapon. For instance, such knives "were extremely handy for the fisherman and there was a time when most tackle boxes were not complete without a switch blade knife inside." Antique American Switchblades at 6. "There were switchblades specifically designed for hunters, fishermen, soldiers, farmers, veterinarians, mechanics, office workers, seamstresses, high school girls, Boy Scouts and also for Girl Scouts." *Id.* The automatic-release feature of the switchblade "save[d] many broken fingernails." *Id.*; *see also* 13-ER-3219 ("Automatic Push Button Knife by Edgemaster").

The switchblade, the Department of Justice had opined, "is not inherently dangerous but requires the introduction of a wrongful human element to make it so." Letter from Deputy Attorney General William P. Rogers to Representative Oren Harris (Apr. 12, 1957), *in* Senate Report No. 1980 (July 28, 1958) (responding to a congressional request for the Department's view concerning a bill that would "prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives"). "Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons." *Id.* But "they serve useful and even essential, purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits[.]" *Id.*; *see also* Paul Clark, *Criminal Use of Switchblades: Will the Recent Trend Towards Legalization Lead to Bloodshed?*, 13 Conn. Pub. Int. L.J. 219, 233 (Spring-Summer 2014) (detailing "numerous" examples of "useful" purposes

that switchblades serve including a "medical provider" "need[ing] to use one hand to push pressure on a wound" and "us[ing] the other hand to cut away clothing or restraints").

**\*20** It was not until the 1950s that legislatures sought to ban a person from carrying a switchblade knife. Motion-picture films made during this period portrayed the phenomenon of teenage gang violence, linked such violence with the switchblade knife, and galvanized support for switchblade bans. *See* An Introduction to Switchblade Knives at 9; Clark, *Criminal Use of Switchblades*, 13 Conn. Pub. Int. L.J. at 236 ("Some of the most famous movies of the 1950s prominently featured switchblades Switchblades came to be associated with crime, and especially juvenile delinquency in New York."); *see also* Jack H. Pollack, *The Toy that Kills*, Woman's Home Companion, Nov. 1950, at 38.

In 1957, the State of California banned a person from carrying "concealed upon his person" a "switch-blade knife having a blade over two inches in length." Cal. Stats. 1957, c. 355, p. 999, § 1. That statute did not ban, however, the open carrying of a switchblade knife. Thirty years later, the California legislature amended the law to prohibit not only the concealed carry of the switchblade knife, but also the open carrying of that knife. Cal. Stats. 1986, c. 1422, p. 5116, § 1. The current version of the prohibition remains materially unchanged. As relevant here, the statute makes it a crime for a person to carry a switchblade knife (whether openly or in a concealed manner in public). *See* Cal. Pen. Code §§ 21510, 17235.[1]

### B.

Plaintiffs brought a challenge, under the Second and Fourteenth Amendments, to the California statute banning the carrying of switchblade knives. The Second Amendment (incorporated by the Fourteenth Amendment to the States) provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has instructed us to follow a two-step test in assessing whether a challenge under the Second Amendment is valid—first, "when the

Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; and second, "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17, 142 S.Ct. 2111. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only if an arms "regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961)).

**\*21** Before the district court, Plaintiffs argued that, under *Bruen*, California's ban on the carrying of switchblade knives is unconstitutional. Plaintiffs claimed that the conduct of carrying such knives fell within the scope of the Second Amendment's plain text (step one of *Bruen*) and that the State of California failed to shoulder its burden of demonstrating (at step two) that its ban was consistent with this Nation's historical tradition of arms regulation. 5-ER-1055–74.

The district court granted summary judgment against Plaintiffs. It reasoned that Plaintiffs failed to satisfy step one of the *Bruen* test because Plaintiffs failed to show that switchblade knives were "arms" in common use today. *Knife Rights, Inc. v. Bonta*, No. 3:23-cv-00474-JES-DDL, 2024 WL 4224809, at \*7 (S.D. Cal. Aug. 23, 2024). The district court also concluded that the State had not met its burden at step two, but because in the court's view Plaintiffs failed at step one, the district court upheld the ban. *Id.* at \*8–9.

The panel sustained the ban on different grounds. It assumed (without deciding) that, at step one of *Bruen*, switchblades were "arms" presumptively protected under the Second Amendment. *Knife Rights,* 165 F.4th at 1339. But the panel held that the State satisfied step two (thus rebutting the presumption) by demonstrating a national tradition analogous to California's ban. *Id.* at 1345.

The panel conducted the step-two analysis in the following way. First, the panel construed Plaintiffs' challenge as a facial challenge and required Plaintiffs to show that the ban was unconstitutional "in all

of its applications." *Id.* at 1335. Next, the panel asserted that one of those applications is a prohibition on the *concealed* carrying of switchblade knives— even though the statute does not distinguish between concealed carry and open carry, but criminalizes, on its face, any carrying of switchblade knives. *Id.* at 1341–45. The panel then found that there was a historical tradition banning the concealed carrying of weapons, including knives, and therefore there was an application of the ban that was lawful. *Id.* at 1341. Critical to its analysis, the panel relied on the Supreme Court's statement in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), that "prohibitions on carrying concealed weapons were lawful under the Second Amendment[.]" *Knife Rights,* 165 F.4th at 1341 (quoting *Heller*, 554 U.S. at 626, 128 S.Ct. 2783). Accordingly, the panel concluded, Plaintiffs' facial challenge could not succeed.

## II.

The panel's opinion is flawed. In sustaining California's total ban on public carry, the panel invoked a historical tradition of laws banning the carrying of *concealed* weapons (including firearms and knives) while ignoring that those same laws also allowed for the *open* carrying of those weapons. The panel's reasoning runs directly counter to *Bruen.* As the Supreme Court made clear in that case, a tradition of concealed-carry bans is not enough to justify a *total* ban like the one that California imposes on its citizens. *Bruen*, 597 U.S. at 53, 142 S.Ct. 2111.

To justify California's total ban, the panel cites *Heller*'s statement that "prohibitions on carrying concealed weapons were lawful under the Second Amendment." *Knife Rights,* 165 F.4th at 1341 (quoting *Heller, 554 U.S. at 626, 128 S.Ct. 2783*). But that statement cannot bear the weight that the panel places on it. Addressing the very same quotation that the panel cites, *Bruen* concluded that "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." 597 U.S. at 53, 142 S.Ct. 2111 (emphasis in original). In other words, concealed-carry prohibitions would *not* be constitutional if they *also* banned open carry. *Id.* at 54, 142 S.Ct. 2111 ("[I]t was considered beyond the constitutional pale in antebellum America to altogether prohibit public

carry."). Here, California bans both concealed and open carry of switchblades, and hence it is not proper for the panel to invoke laws that ban only concealed carry as historical support for a ban on public carry altogether.

**\*22** The relevant passage from *Bruen* is worth quoting in full, not only because the panel disregarded it entirely, but also because it shows that the Supreme Court expressly rejected the exact reasoning that the panel employs here:

> In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. As we recognized in *Heller*, "the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." Respondents unsurprisingly cite these statutes—and decisions upholding them—as evidence that States were historically free to ban public carry.
>
> In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents' cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. All told, these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of "arms" protected by the Second Amendment or state analogues.

*Id.* at 52–55, 142 S.Ct. 2111 (emphasis in original) (citations omitted).

The import of all this is plain. Just like the government parties in *Bruen*, the panel here mistakenly relies on laws that contain a concealed-carry prohibition but *not* a similar prohibition on open carry. As far as I can gather, there is no historical tradition of totally banning the public carrying of knives (including switchblades).

Indeed, the opposite appears to be true. The vast majority of laws the panel itself cites *allowed* some sort of public carry (usually open carry). *See* Appendix A. Even today, it appears that only seven States (including California) and the District of Columbia expressly ban the possession or carrying of switchblade knives.[2]

Doubtless, a small handful of territorial laws cited by the panel banned the carrying of knives (*see* Appendix B), but *Bruen* already explained that the government's reliance on such territorial laws was misplaced (*e.g.*, they were "rarely subject to judicial scrutiny," the populations living under them were "miniscule," and they were "short-lived"), and those scattered laws could not, in any event, displace the overwhelming historical evidence permitting some form of public carry. *See* 597 U.S. at 67–69, 142 S.Ct. 2111. A few other laws cited by the panel are irrelevant—either because those laws did not prohibit knives at all or because they prohibited the carrying of knives *with intent to harm* or *in sensitive places* (qualifications that California's total ban lacks). *See* Appendix C. The few remaining laws that the panel cites did ban public carry of knives altogether (*see* Appendix D (fewer than ten)), but those are limited "outliers" in relation to the far more widespread tradition permitting some form of public carry. *Bruen*, 597 U.S. at 70, 142 S.Ct. 2111.[3] Contrary to the panel's conclusion, then, there is no national tradition that is analogous to California's total ban on the public carrying of switchblades.[4] That alone provides grounds to vacate the panel's opinion.

**\*23** The panel cannot point to its "facial" analysis to salvage its opinion. It is true (as the panel says) that a facial challenge can succeed only if the plaintiff shows that there exists "no set of circumstances" under which the law would be valid. *United States v. Rahimi*, 602 U.S. 680, 693, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). But beyond that, the panel's analysis veers off track: one "application" of the *total* ban, the panel says, is a ban on the *concealed* carrying of the knife; the panel then narrows its historical inquiry to ask if there was a tradition banning such concealed carrying. *Knife Rights*, 165 F.4th at 1341. But that "facial" analysis is improper. The challenged statute is a *total* ban—*not* a concealed-carry ban. And so, any historical analysis (under the second step of *Bruen*) must be conducted with respect to *that* ban—not some other, narrower ban that the legislature did not enact. The proper historical comparator, therefore, would be a tradition banning public carrying altogether (like California's law). If (as here) no such tradition exists, the total ban cannot be constitutional under any circumstance.

It is hard to see how the analysis could proceed otherwise. If a total ban could always be reconceived as a narrower ban (as the panel would allow), then a total ban would survive any Second Amendment facial challenge. On the panel's logic, one "application" of a total ban could be to prohibit a violent felon from carrying a firearm. Another "application" could be prohibiting a person from carrying that firearm with the intent to terrify surrounding passers-by. Because such "applications" would likely be permissible, a facial challenge to a total ban would always fail, if we followed the panel's logic. That is not the law. *Bruen* and *Heller* invalidated certain gun bans on their face. [5] The Court did not reconceptualize the bans in a narrow way to see if those narrower, imagined versions of the law could withstand constitutional scrutiny. If the panel were right, courts could maneuver with ease around *Bruen* and *Heller* merely by reconceiving the bans as something narrower. But a court must take the ban as it comes. And it must assess the government's proffered historical analogues against *that* ban, not some other ban. A court is not allowed, by clever craft, to immunize total bans from facial constitutional scrutiny and reduce our "palladium of liberty" to a near nullity. *Heller*, 554 U.S. at 606, 128 S.Ct. 2783 (quoting 1 Tucker's Blackstone at App. 300).

Invoking *Rahimi* does not help the panel. There, the Court rejected the plaintiff's facial challenge to 18 U.S.C. § 922(g)(8). That statute prohibits the carrying of a firearm by any person who is subject to a "court order" (issued after notice and opportunity for a hearing) that restrains the person from threatening an intimate partner or child, and that either (1) "includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child" or (2) "by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury[.]" 18 U.S.C. § 922(g)(8)(C)(i), (C)(ii). The two ways described above in which the "court order" could subject a person to criminal liability under section 922(g)(8) are contained, respectively, in sub-provisions (C)(i) and (C)(ii). The Court in *Rahimi* held that, in order for the plaintiff to prevail in his facial challenge to section 922(g)(8), he needed to show that *both* sub-provisions were unconstitutional and, because he could not do that with respect to sub-provision (C)(i), his challenge to

section 922(g)(8) necessarily failed. 602 U.S. at 693, 144 S.Ct. 1889.

**\*24** That analysis has no bearing here on California's total carry ban. To start, California prohibits any law-abiding citizen from carrying a tool that has been used and carried for hundreds of years. It does not just impose a ban on persons, deemed dangerous by a court, from possessing arms. California's law is thus completely different from section 922(g)(8). Key to the Court's facial analysis in *Rahimi*, too, section 922(g)(8) "provides two independent bases for liability." 602 U.S. at 693, 144 S.Ct. 1889. Thus, if one basis was constitutionally permissible (as the Court found), then the plaintiff's facial challenge to section 922(g)(8) would not succeed.

But that is just *not* the sort of challenge that Plaintiffs mount here. Plaintiffs challenge a *total* ban on public carry; it is the *combined effect* of banning both concealed carry and open carry that works the constitutional violation. For the panel to disaggregate one effect (a ban on concealed carry) from the other effect (a ban on open carry), and then to find that the former is permitted and conclude that Plaintiffs' challenge fails, is to misconstrue the nature of Plaintiffs' claim altogether.

Perhaps it is easier to see the fallacy in the panel's logic if we removed ourselves from the often-fraught Second Amendment context. A facial challenge to a *complete* prohibition on a litigant's access to the courts is not defeated simply because it would be permissible to deny access *some of the time* (e.g., non-business hours and federal holidays). Nor would a facial challenge to a complete ban on protesting be defeated merely because protesting could lawfully be restricted by time, place, and manner. So too here: a facial challenge to a *complete* prohibition on carrying cannot be nixed just because the State could permissibly prohibit *some form* of carrying. The State cannot ban *all* forms of carrying (as *Bruen* teaches). That is what Plaintiffs are challenging.

Even if the ban here could be conceived more narrowly, the panel's conclusion would still be wrong. *Bruen* again tells us why. The case addressed a facial challenge to a concealed-carry restriction, and even in the context of that narrow challenge (not a challenge to

a total ban), the Court held that the government could not justify the concealed-carry restriction by pointing to a history of concealed-carry prohibitions, which (again) "were constitutional" only because "they did not similarly prohibit *open* carry." 597 U.S. at 53, 142 S.Ct. 2111 (emphasis in original). [6] The upshot is this: if reliance on historical concealed-carry bans could not defeat a challenge to a modern concealed-carry restriction in *Bruen*, then surely it cannot defeat a challenge to a narrowed conception of California's ban as "applied" to concealed carry here.

En banc review was warranted not only because the panel's analysis is wrong. It was warranted also because the panel's decision produces a conflict with the decision of at least one State Supreme Court. [7] In *Commonwealth v. Canjura*, the Supreme Judicial Court of Massachusetts held that a state law prohibiting people from carrying switchblade knives violated the Second Amendment. 494 Mass. 508, 509, 240 N.E.3d 213 (2024). The court concluded that a switchblade is an "arm" under "the plain text of the Amendment" and that the government failed to demonstrate that the state "prohibition is consistent with this nation's historical tradition of arms regulation." *Id.* at 511, 240 N.E.3d 213. The court also ruled that switchblades are in "common use" today for self-defense and are not "dangerous and unusual" weapons. *Id.* at 515–16, 240 N.E.3d 213; *see also* *State v. Delgado*, 298 Or. 395, 403–04, 692 P.2d 610 (1984) (holding that the prohibition on the carrying of a switchblade knife violated the defendant's right to bear arms under the Oregon Constitution). The Supreme Judicial Court of Massachusetts has the better view, and we should have taken this case en banc to correct the panel's plain error.

\* \* \*

 **\*25**  I do not deny that the switchblade has been "associated" in the public imagination "with criminal activity." *Knife Rights*, 165 F.4th at 1333. The spate of laws passed to prohibit the carrying of such a device may have had its impetus in films released in the 1950s, after which the switchblade became the symbol of teenage crime and gang violence. But the constitutional validity of such laws depends not on modern fads or Hollywood vibes, but on what the Second Amendment protects as a matter of original meaning. Sound constitutional adjudication requires,

then, a fair assessment of what our Nation's history and traditions proscribed. The panel failed in that task when it rejected Plaintiffs' constitutional challenge. Even on the panel's own evidence, no historical tradition exists in our country of completely banning the public carry of knives. Just the reverse—"the history reveals a consensus that States could *not* ban public carry altogether." *Bruen*, 597 U.S. at 53, 142 S.Ct. 2111 (emphasis in original). Yet that is just what California has done. I respectfully dissent.

### Appendix A

Laws that are cited by the panel and that prohibit concealed carry but allow open carry. These laws appear in alphabetical order by jurisdiction.

| Number | Law | Text |
| --- | --- | --- |
| 1 | Act of Feb. 1, 1839, No. 77, § 1, 1839 Ala. Acts 67, 67 | That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending, shall on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court. |
| 2 | Act of Apr. 8, 1873, No. 87, § 1, 1872–1873 Ala. Laws 130, 130–31 | That any person who carries concealed about his person brass knuckles, slung shot, or either weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for |

| No. | Citation | Text |
| --- | --- | --- |
|  |  | the county for a term not exceeding six months. |
| 3 | ARIZ. REV. STAT. § 662 (1887) | Any person in this territory having or carrying concealed any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol, or other weapon within any city, village or town in this territory, shall be fined in any sum not more than three hundred dollars, or be imprisoned in the county jail not more than six months, or be punished by both such fine and imprisonment. |
| 4 | Act of Mar. 6, 1891, No. 2, § 1, 1893 Ariz. Sess. Laws 3, 3 (brackets in original) | It shall be unlawful for any person [except a peace officer in actual service and discharge of his duty] to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense. |
| 5 | Act of Apr. 27, 1863, ch. 485, § 1, 1863 Cal. Stat. 748, 748 | Every person, not being a peace officer or traveler, who shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed, shall, |
|  |  | upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the County Jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. |
| 6 | Act of Mar. 1, 1864, ch. 128 § 1, 1863–1864 Cal. Stat. 115, 115–16 | Every person not being peace officer, Provost Marshal, enrolling officer, or officer acting under the laws of the United States in the Department of the Provost Marshal of this State, State and Federal Assessors, Collectors of Taxes and Licenses while in the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any Court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the County Jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. |
| 7 | Oakland, Cal., Ordinance No. | It shall be unlawful for any person in the City of Oakland, not being a |
|  | 1141, § 1 (May 15, 1890), reprinted in City Charter of the City of Oakland, Cal., also General Municipal Ordinances of Said City in Effect October 1, 1898, at 332–33 (Oakland, Enquirer Publ'g Co. 1898) | public officer or a traveler actually engaged in making a journey, to wear or carry concealed about his person without a permit, as hereinafter provided, any pistol, slung-shot, brass or iron knuckles, sand club, dirk or bowie knife, or iron bar or other dangerous or deadly weapon, or any sling or other contrivance by which shot or other missiles are or may be hurled or projected. A written permit may be granted by the Mayor for a period of not to exceed one year to any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person. |
| 8 | Stockton, Cal., Ordinance No. 53, § 1 (Being originally No. 324, approved Mar. 31, 1891, as amended), reprinted in Charter and Ordinances of the City of Stockton 240 (Stockton, | It shall be unlawful and a misdemeanor . . . [f]or any person not being a peace officer or actually prosecuting a journey to or from the town, city or county of his residence, to wear or carry concealed about his person any pistol, dirk, bowie-knife, slungshot, sand-club, metallic knuckles or any other deadly or dangerous weapon, except he first have a written permit to so do from the Mayor of the City of Stockton. |
|  | Stockton Mail, Printers & Bookbinders 1908) |  |
| 9 | Act of Apr. 10, 1891, § 1, 1891 Colo. Sess. Laws 129, 129 | If any person, or persons shall within any city, town or village in this State, whether the same is incorporated or not carry concealed upon his, her or their person any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon, such person, or persons shall upon conviction thereof before any police magistrate or justice of the peace, be punished by imprisonment in the county jail for a term not exceeding thirty days, or by a fine of not more than fifty dollars with costs or by both such fine and imprisonment, in the discretion of the court; and in case any such fine is not paid, the offender may be committed to, and confined in the county, or city jail one day for each two dollars of such fine, or until such fine is paid in money or by such confinement. |
| 10 | Washington, D.C., Act Against the Carrying of | It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such |

| # | Citation | Text |
|---|---|---|
|  | Concealed Weapons (Nov. 18, 1858), *reprinted in* William B. Webb, The Laws of the Corporation of the City of Washington 418 (1868) | as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: *Provided*, That the Police officers when on duty shall be exempt from such penalties and forfeitures. |
| 11 | Georgetown, D.C., An Ordinance Prohibiting the Carrying of Firearms, &c. (Apr. 2, 1859), *reprinted in* Ordinances of the Corporation of Georgetown 22–23 (1860) | That from and after the 1st of April, 1859, it shall not be lawful for any person or persons to have about their persons any concealed deadly or dangerous weapons, such as daggers, pistols, bowie-knives, dirk-knives, colt, slung-shots, or brass or other metallic knuckles, within the limits of this Corporation; and any person or persons who shall be duly convicted of so carrying or having on their persons any such weapons, shall forfeit and pay upon such conviction not less than five dollars |
|  |  | nor more than twenty dollars, which fine shall be prosecuted and recovered in the same manner as other fines and forfeitures according to this Corporation are sued for and recovered: *Provided*, That the police officers and military, when on duty, shall be exempt from such fines and forfeitures. *And be it further enacted*, That all such weapons named above shall be taken away from the persons on whom they may be found, and deposited with the Mayor. |
| 12 | Act of Aug. 10, 1871, ch. 25, § 1, 1871–1872 D.C. Laws 33, 33 (1872) | That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the |
|  |  | same manner as other penalties and forfeitures are sued for and recovered: *Provided*, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures. |
| 13 | Act of Jan. 30, 1835, ch. 860 § 1, 1835 Fla. Acts 318, 318 | That from and after the passage of this Act, it shall not be lawful for any person in this Territory, to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending, shall on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the |
|  |  | superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several Counties in this Territory, at every session of the Courts. |
| 14 | BOISE CITY, IDAHO, CHARTER AND REV. ORDINANCES ch. 1, § 36, approved May 1, 1879 (1894) | Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or othe[r] dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment. |
| 15 | HYDE PARK, ILL., LAWS AND ORDINANCES ch. 27, § 39 (1876) | No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except |

| | | |
|---|---|---|
| | | by written permission of the Captain of Police. |
| 16 | Sioux City, Iowa, Ordinance on Public Safety, § 4 (June 16, 1882) | No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife, or dagger, or any knife resembling a dirk-knife or bowie knife, or other dangerous weapon. *Provided*, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties. |
| 17 | LEAVENWORTH, KAN., CHARTER AND ORDINANCES No. 32, § 23, approved Mar. 28, 1862 (1863) | For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars. |
| 18 | Act of Mar. 10, 1854, ch. 1020 | § 1. . . . That if any person shall hereafter carry concealed any deadly |
| 19 | §§ 1–2, 1853 Ky. Acts 186, 186 | weapons, other than an ordinary pocket knife, except as provided in the next section, he shall be fined on the first conviction not less than fifty nor more than one hundred dollars, and on any subsequent conviction not less than one hundred nor more than five hundred dollars. § 2. That the carrying of concealed deadly weapons shall be legal in the following cases: 1. Where the person has reasonable grounds to believe his person, or the person of some of his family, or his property, is in danger from violence or crime. 2. Where sheriffs, constables, marshals, and policeman carry such weapons as are necessary to their protection in the efficient discharge of their duty. 3. Where persons are required by their business or occupation to travel during the night, the carrying concealed deadly weapons during such travel. |
| 19 | Act of Mar. 25, 1813, § 1, 1812 La. Acts 172, 172–75 | That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any |

| | | |
|---|---|---|
| | | person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . . |
| 20 | Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 130, 148 | That whoever shall carry a weapon or weapons concealed on or about his person, such as pistols, bowie knife, dirk, or any other dangerous weapon, shall be liable to prosecution by indictment or presentment, and on conviction for the first offence shall be fined not less than two hundred and fifty dollars nor more than five hundred dollars, or imprisonment for one month; and for the second offence not less than five hundred dollars nor more than one thousand dollars, or imprisonment in the parish prison at the discretion of the court, not to exceed three months, and that it shall be the duty of the Judges of the District Courts in this State to charge the Grand Jury specially as to this section. |
| 21 | Act of Feb. 26, 1872, ch. 42 § 1, 1872 Md. Laws 56, 57 | It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other |
| | | deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected . . . . |
| 22 | Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144, 144 | That it shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air-gun, stiletto, metallic knuckles, pocket-billie, sand-bag, skull-cracker, slung-shot, razor, or other offensive and dangerous weapon or instrument concealed upon his person. |
| 23 | Act of Mar. 28, 1891, No. 257, § 15, 1891 Mich. Pub. Acts 388, 409 | And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned. . . . |

| | | |
|---|---|---|
| 24 | Act of June 2, 1897, No. 465, § 15, 1897 Mich. Pub. Acts 962, 1030 | And all persons who shall carry, concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles or other dangerous weapon; . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution; and in the imposition of any such fine and costs, the court may make a further sentence that in default of the payment thereof, such offender be imprisoned  . . . . |
| 25 | SAINT PAUL, MINN., MUNICIPAL CODE art. 18, § 308, passed Jan. 17, 1882(1884) | It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. |
| 26 | Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175, 175 | That any person not being threatened with, or having good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a journey, or peace officers, or deputies in discharge of |
| | | their duties, who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description, shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . . . |
| 27 | Act of Mar. 11, 1896, ch. 104, § 1, 1896 Miss. Laws 109, 109–10 | Any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, sling shot, sword or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and on conviction, shall be punished by a fine of not less than ten dollars nor more than one hundred dollars, and be imprisoned in the county jail not less than one month nor more than three months. |
| 28 | Act of Feb. 11, 1898, ch. 68, § 1, 1898 Miss. Laws 88, 88 | Any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, slingshot, sword or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and on conviction shall be punished, unless |
| | | the jury shall say in its verdict there shall be no imprisonment, by a fine of not less than twenty-five dollars ($25) nor more than one hundred dollars ($100), or by imprisonment in the county jail not more than three months, or both, in the discretion of the court; but the jury may return a verdict that there shall be no imprisonment, and in such case the court shall impose a fine only. |
| 29 | LINCOLN, NEB., ORDINANCES AND RULES, ch. 14, art. 16, § 782 (1895) | It shall be unlawful for any person within [Lincoln] to carry about the person any concealed pistol, revolver, dirk, bowie knife, billy, sling-shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge of their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be subject to the penalty hereinafter provided. |
| 30 | Act of Feb. 27, 1867, ch. 30 § 1, 1867 Nev. Stat. 66, 66 | Every person, not being a peace officer or traveler, who shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any Court of competent jurisdiction, be |
| | | deemed guilty of misdemeanor, and shall be imprisoned in the County Jail for not less than thirty, nor more than ninety days, or fined in any sum not less than twenty, nor more than two hundred dollars. |
| 31 | Act of Apr. 19, 1686, ch. 9, *reprinted in* The Grants, Concessions, and Original Constitutions of the Province of New Jersey 289 (1758) | Whereas there hath been great complaint by the Inhabitants of this Province, that several Persons wearing Swords, Daggers, Pistols, Dirks, Stilladoes, Skeines, or any other unusual or unlawful Weapons, by reason of which several Persons in this Province, receive great abuses, and put in great Fear and Quarrels, and Challenges made, to the great abuse of the Inhabitants of this Province . . . . AND BE IT FURTHER ENACTED by the Authority aforesaid, that no Person or Persons after Publication hereof, shall presume privately to wear any Pocket Pistol, Skeines, Stilladers, Daggers or Dirks, or other unusual or unlawful Weapons within this Province, upon Penalty for the first Offence *Five Pounds*, and to be committed by any Justice of the Peace, his Warrant before whom Proof thereof shall be made, who is here by authorized to enquire of and proceed in the same, and keep in |

| | | | | | |
|---|---|---|---|---|---|
| | | Custody till he hath paid the said *Five Pounds*, one half to the publick Treasury for the use of this Province, and the other half to the Informer: And if such Person shall again Offend against this Law, he shall be in like manner committed (upon proof thereof before any Justice of the Peace) to the common Gaol, there to remain till the next Sessions, and upon conviction thereof by Verdict of twelve Men, shall receive Judgment to be in Prison six Month, and pay *Ten Pounds* for the use aforesaid. AND BE IT FURTHER ENACTED by the Authority aforesaid, that no Planter shall Ride or go Armed with Sword, Pistol or Dagger, upon the penalty of *five Pounds*, to be levied as aforesaid, excepting all Officers, Civil and Military, and Soldiers while in actual Service, as also all Strangers, Travelling upon their lawful Occasions thro' this Province, behaving themselves peaceably. | | the City of Hoboken 240-41 (1892) | pocket knife, and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense, provided nevertheless that this and the following section shall not apply to any person or persons who shall have made an application to and received a written permit therefor from the board of police commissioners on recommendation of the chief of police of said city of Hoboken, or in his absence from the acting chief of police of said city. |
| 32 | Jersey City, N.J., Ordinance to Prevent the Carry of Loaded or Concealed | That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her | 35 | Act of Jan. 14, 1853, § 1, 1852 N.M. Laws 67, 67 | That each and every person is prohibited from carrying short arms, such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act, shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days. |
| | Weapons § 1, (June 20, 1873) *reprinted in* Ordinances of Jersey City 41 (1874) | person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. | 36 | Act of Feb. 16, 1877, ch. 104, § 1, 1876–1877 N.C. Sess. | If any person shall be found off of his own premises, within the county of Alleghany, having concealed about his person a pistol, bowie-knife, dirk, dagger, slung-shot, |
| 33 | Jersey City, N.J., Ordinance in Relation to the Carrying of Dangerous Weapons § 1, (June 20, 1873) *reprinted in* Ordinances of Jersey City 41 (1874) | That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. | | Laws 162, 162-63 | loaded cane, or brass or iron knuckles, or other deadly weapon of a like kind, such person shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined or imprisoned at the discretion of the court. |
| | | | 37 | Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Sess. Laws 231 | That it shall be unlawful for any person in this state, except when upon his own premises, to carry concealed about his person any pistol, bowie-knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or other deadly weapon of like kind. |
| 34 | Hoboken, N.J., Ordinance to Prevent the Carry of Loaded or Concealed Weapons § 1 (Oct. 17, 1885) *reprinted in* Ordinances of | That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of the city of Hoboken, to carry, have or keep concealed on his or her person any instrument or weapon commonly known as slung shot, stilletto, billy, sand-club or metal knuckles, and any dirk or dagger not contained as a blade of a | 38 | Terr. Dak. Rev. Pen. Code § 457 (1877) | Every person who carries concealed about his person any description of fire-arms, being loaded or partly loaded or any sharp or dangerous weapon such as is usually employed in attack or defense of the person, is guilty of a misdemeanor. |
| | | | 39 | Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56, 56 | That whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or |

| No. | Act | Text |
|---|---|---|
| | | imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. |
| 40 | Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33, 33 | It shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or any knife (other than an ordinary pocket-knife), or any dirk or dagger, slungshot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person. |
| 41 | Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231, 231-32 | No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description, concealed upon his person: *Provided*, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such |

| No. | Act | Text |
|---|---|---|
| | | officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. |
| 42 | Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447, 448 | That any person carrying a pistol, dirk, dagger, slung shot, metal knuckles, razors, or other similar deadly weapon usually used for the infliction of personal injury, concealed about his person, shall be guilty of a misdemeanor, and, upon conviction thereof, before a Court of competent jurisdiction, shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court. |
| 43 | Act of Feb. 17, 1897, No. 251, § 1, 1897 S.C. Acts 423, 423 | Any person carrying a pistol, dirk, dagger, slingshot, metal knuckles, razor or other deadly weapon usually used for the infliction of personal injury concealed about his person shall be guilty of a misdemeanor, and upon conviction thereof before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum of not more than one hundred |

| No. | Act | Text |
|---|---|---|
| | | dollars and not less than twenty dollars or be imprisoned not more than thirty nor less than ten days, in the discretion of the Court. |
| 44 | Act of Jan. 27, 1838, ch. 137, § 2, 1838 Tenn. Acts 200 | That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months. |
| 45 | Act of Mar. 6, 1882, ch. 219, 1881–1882 Va. Acts 233, 233 | If a person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, or any weapon of the like kind, he shall be fined not more than fifty dollars, nor less than fifteen dollars. |
| 46 | Act of Feb. 22, 1884, ch. 148 § 1, 1883–1884 Va. Acts 180, 180 | If a person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than |

| No. | Act | Text |
|---|---|---|
| | | twenty dollars nor more than one hundred dollars . . . . |
| 47 | Act of Mar. 4, 1896, ch. 745 § 1, 1895–1896 Va. Acts 826, 826 | If a person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars, *or be committed to jail not more than thirty days, or both in the discretion of the court or jury trying the case*, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind shall be forfeited to the commonwealth and may be seized by an officer as forfeited. |
| 48 | Act of Jan. 20, 1886, § 1, 1885–1886 Wash. Sess. Laws 81, 81-82 | If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other firearms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than twenty dollars, nor more than one hundred dollars, or |

| Number | Law | Text |
|---|---|---|
| 49 | Act of Feb. 14, 1872, ch. 7, 1872 Wis. Sess. Laws 17, 17–18 | imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court[.]<br><br>If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: *provided*, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or |
| 50 | Act of Apr. 10, 1883, ch. 183(6) § 3, 1883 Wis. Sess. Laws 704, 713 (City of Oshkosh) | property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent.<br><br>The common council . . . shall have authority by ordinances, resolutions or by-laws: . . . To regulate or prohibit the carrying or wearing by any person under his clothes, or concealed about his person, of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other<br><br>provide for the confiscation and sale of such weapon. |
| 51 | Act of Apr. 11, 1887, ch. 409(4), § 36(53), 1887 Wis. Laws 1284, 1308 (City of Berlin) | The common council . . . shall have authority, by ordinances, resolutions, by-laws or vote: . . . To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person of any pistol, slingshot, knuckles of lead, brass or other metal, or bowie knife, dirk knife, dagger, or other dangerous or deadly weapon; and to<br><br>provide for the confiscation and sale of such weapon. |

This list does not include any laws in Appendix A.

| Number | Law | Text |
|---|---|---|
| 1 | Act of Mar. 18, 1889, No. 13, § 1, 1889 Ariz. Sess. Laws 30, 30 | If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried. |
| 2 | Act of Feb. 2, 1860, §§ 1–2, N.M. Laws 94, 94–99 | Section 1.  That, from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or |
| 3 | Act of Jan. 29, 1869, ch. 32, §§ 1–2, 1868-1869 N.M. Laws 72, 72–73 | called, under the penalties and punishment which shall hereinafter be described.<br><br>Sec. 2.  Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.<br><br>Section 1.  From and after the passage of this act it shall be unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory, except it be in the lawful defence of themselves, their families or their property, and the same being then and there threatened with danger, or by order of legal authority, or on their own landed |

**Appendix B**

Laws that are cited by the panel and that governed territories and prohibited public carry. These laws appear in alphabetical order by territory.

| | | |
|---|---|---|
| | | property, or in the execution of an order of court.<br><br>Sec. 2. Deadly weapons, in the meaning of this act, shall be construed to mean all kinds and classes of pistols whether the same be a revolver, repeater, derringer, or any other kind or class of pistol; any and all kinds of bowie knives, daggers, poniards, butcher knives, dirk knives, and all such weapons with which cuts can be given, or by which wounds can be inflicted by thrusting, including sword canes and such sharp pointed canes with which deadly thrusts can be given, and all kinds of slung shots, and any other kinds of deadly weapon, by whatever name it may be called, by which a dangerous wound can be inflicted. |
| 4 | Act of Feb. 18, 1887, ch. 30, §§ 1, 8, 1886 N.M. Laws 55, 55, 57 | SECTION 1. That any person who shall hereafter carry a deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not |
| | | less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.<br><br>SEC. 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. |
| 5 | OKLA. STAT. PEN. CODE §§ 2294– 95, 2432–33, 2438–39 (1890) | (2294) § 19. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.<br><br>(2295) § 20. Every person who carries concealed about his person and description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in |

| | | |
|---|---|---|
| | | attack or defense of the person, is guilty of a misdemeanor.<br><br>(2432) § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.<br><br>(2433) § 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.<br><br>(2438) § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are |
| | | sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.<br><br>(2439) § 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. |
| 6 | OKLA. STAT. PEN. CODE §§ 2404– 05, 2410– 11 (1893) | (2404) § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.<br><br>(2405) § 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.<br><br>(2410) § 7. It shall be unlawful for any person, except a peace officer, to carry |

| Number | Law | Text |
| --- | --- | --- |
|  |  | into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.<br><br>(2411) § 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. |

**Appendix C**

Laws that are cited by the panel and that prohibit the carry of (1) weapons besides knives, (2) knives with an intent to harm, or (3) knives into sensitive places/ on sensitive times.

These laws appear in alphabetical order by jurisdiction.

This list does not include any laws in Appendix A or B.

| Number | Law | Text |
| --- | --- | --- |
| 1 | Act of July 13, 1892, ch. 159 §§ 1–2, 27 Stat. 116, 116–17 (District of Columbia) | Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.<br><br>SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court[.] |
| 2 | Act of Apr. 16, 1881, §§ 1, 4, 1881 Ill. Laws 73, 73–74 | SECTION 1. . . . That whoever shall have in his possession . . . any slung-shot or metallic knuckles, or other deadly weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor, and upon conviction shall be fined in any sum not less than ten dollars ($10) nor more than two hundred dollars ($200).<br><br>§ 4. Whoever shall carry a concealed weapon upon or about his person of the character in this act specified, or razor as a weapon, or whoever, in a threatening or boisterous manner, shall display or flourish any deadly weapon, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25) nor more than two hundred dollars ($200). |
| 3 | Act of Feb. 23, 1859, ch. 79, § 1, 1859 Ind. Acts 129, 129 | That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars. |
| 4 | Act of Apr. 6, 1874, ch. 250, § 1, 1874 Md. Laws 366, 366–67 | That from and after the passage of this act, it shall not be lawful for any person in Kent, Queen Anne's or Montgomery counties, to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this act shall be deemed guilty of a misdemeanor, and on conviction thereof, before any justice of the peace in either of said counties, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county, until the same is paid. |
| 5 | Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602, 602 | Every person not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted) concealed upon or about his person, and every person who |

| | | |
|---|---|---|
| 6 | Act of Apr. 8, 1890, ch. 534, § 1, 1890 Md. Laws 606, 606–07 | shall carry or wear any such weapon openly with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars or be imprisoned not more than six months in jail or the House of Correction.<br><br>Every person in said city of Baltimore not being a conservator of the peace entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, slung-shot, billey, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen-knives excepted,) concealed upon or about his person; and every person who shall carry or wear such weapons openly with the intent or purpose of injuring any person, shall upon a conviction thereof be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the |
| 7 | Act of Apr. 6, 1894, ch. 547, § 30, 1894 Md. Laws 833, 834. | general law of this State as if this act had not been passed.<br><br>Every person not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, and not carrying such weapon as a reasonable precaution against apprehended danger, who shall wear or carry any pistol, dirk knife, bowie knife, slung shot, billy, sand club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever (penknives excepted,) concealed upon or about his person, and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person in any unlawful manner, and not for any proper purpose of self-protection, shall, upon conviction thereof, be fined not more than one thousand dollars, or be imprisoned not more than two years in jail or in the house of correction; and the court or jury before whom any such case may be tried shall in all cases have the right to judge of the reasonableness of the carrying of any such weapon, and of the proper occasion therefor, upon satisfactory proof; and in case, upon conviction of any offender, the court, in view of the evidence, shall be of the opinion that such weapon was carried |

| | | |
|---|---|---|
| 8 | MINN. PEN. CODE §§ 334–35 (1886) | with the deliberate purpose of inflicting grievous and unlawful injury to the life or person of another, it shall in that case be the duty of the court to impose the highest sentence of imprisonment hereinbefore prescribed.<br><br>SEC. 334. **Carrying, using, etc., certain weapons.**— A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as slung-shot, sand-club or metal knuckles, or a dagger, dirk, knife, pistol or other firearm, or any dangerous weapon, is guilty of a misdemeanor.<br><br>SEC. 335. **Possession, presumptive evidence.**— The possession by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. |
| 9 | MINN. STAT. §§ 6290, 6292 (1891) | SEC. 6290. **Carrying, using, etc., certain weapons.**— A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as slung- |
| 10 | MO. REV. STAT. § 1862 (1899) | shot, sand-club or metal knuckles, or a dagger, dirk, knife, pistol or other firearm, or any dangerous weapon, is guilty of a misdemeanor.<br><br>SEC. 6291. **Same—Possession, presumptive evidence.**— The possession by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.<br><br>If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage or persons met for any lawful purpose other than for militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such |

| | | |
|---|---|---|
| | | weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, . . . he shall, upon conviction, be punished by a fine of not less than fifty nor more than two hundred dollar, or by imprisonment in the county jail not less than five days nor more than six months, or by both such fine and imprisonment. |
| 11 | Act of Apr. 20, 1866, ch. 716, §§ 1–2, 1866 N.Y. Laws 1523, 1523 | SECTION 1. Every person who shall within this State use, or attempt to use or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun, shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the State prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.<br><br>§ 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public |

| | | |
|---|---|---|
| | | officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act. |
| 12 | SYRACUSE, N.Y., REV. CHARTER ch. 27, § 7 (1885) | Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment. |
| 13 | Act of Apr. 15, 1889, ch. 140, § 2, 1889 N.Y. Laws 167, 167 | A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slungshot, billy, sand-club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years, who shall have, carry or have in his possession in any public |

| | | |
|---|---|---|
| | | street, highway or place in any city or incorporated village in this State, without a written license from a police magistrate of such city or incorporated village, any pistol or other firearm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of firearms as merchandise, or for use without the city or village limits. |
| 14 | N.Y. REV. STAT., Weapons §§ 2–3 (1890) | **2 Carrying, using, etc., certain weapons.** A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slungshot, billy, sand-club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years, who shall have, carry or have in his possession in any public street, highway or place in any city or incorporated village in this State, without a written license from a police magistrate of such city or incorporated village, any pistol or other firearm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of firearms as |

| | | |
|---|---|---|
| | | merchandise, or for use without the city or village.<br><br>**3 Possession, presumptive evidence.** The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. |
| 15 | Act of Nov. 12, 1849, No. 36 § 2, 1849 Vt. Acts & Resolves 26, 26 | Any person who shall, within this State, hereafter carry, or be found in the possession of, use or attempt to use, as against any other person, any instrument, or weapon, of the kind usually known as slung shot, or of any similar kinds, shall be deemed guilty of felony, and be punished therefor by imprisonment in the State prison for a term not exceeding five years. |

### Appendix D

Laws that are cited by the panel and that ban the public carry of knives.

| Number | Law | Text |
|---|---|---|
| 1 | Act of Feb. 16, 1875, § 1, 1874–1875 Ark. Acts 156, 156 | That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-five nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; *Provided*, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of |
|  |  | any legal process, or any private person legally authorized to execute any legal process to him directed. |
| 2 | Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191, 191 | That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor; *Provided*, That officers, whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises. |
| 3 | Act of Dec. 25, 1837, § 1, 1837 | [I]t shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: |
|  | Ga. Acts 90, 90[8] | Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c. |
| 4 | NEBRASKA CITY, NEB., Ordinance No. 7, § 136, (1872) | That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy, slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb.; *Provided*, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another. |
| 5 | Act of Apr. 12, 1873, No. 810, 1873 Pa. | That any person who shall carry any pistol, dirk-knife, slung-shot or deadly weapon within the city limits of Harrisburg, except police officers, shall |
|  | Laws 735, 735–36 (City of Harrisburg) | be deemed guilty of misdemeanor, and being convicted thereof, shall be sentenced to undergo an imprisonment or be fined in any sum of not less than fifty dollars, or both, at the discretion of the court, and in case of non payment of the fine so imposed, shall be imprisoned for a period of not less than three months, and be required to give security for future good behavior. |
| 6 | Act of Mar. 27, 1879, ch. 186, § 1, 1879 Tenn. Pub. Acts 231, 231 | [I]t shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand, or loaded cane, slung-shot, brass knucks[.] |
| 7 | Act of Apr. 12, 1871, ch. 34, §§ 1-2, 1871 Tex. Gen. Laws 25, 25 | SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that |

[**Editor's Note:** The preceding image contains the reference for footnote [8]

| | | |
|---|---|---|
| | | such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further*, that members of the |
| | | Legislature shall not be included under the term "civil officers" as used in this act.<br><br>SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense. |
| 8 | Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421–22 | If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; . . . but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling |

| | | |
|---|---|---|
| | | house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife. |

**Appendix E**

Laws cited by Dr. Spitzer for the proposition that "15 states banned all carrying of Bowie knives."

| Number | Law | Text | Response |
|---|---|---|---|
| 1 | Act of Mar. 18, 1889, No. 13, § 1, 1889 Ariz. Sess. Laws 30, 30 | If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried. | This law governed a territory and is addressed in Appendix B. |

| | | | |
|---|---|---|---|
| 2 | Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191, 191 | That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor; *Provided*, That officers whose duties require them to make arrests, or to keep and guard prisoners, together with the persons summoned by such officers, to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises. | This statute is addressed in Appendix D. |
| 3 | COLO. STAT. ch. 35 § 1830 (1911)[9] | No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any fire arms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles, or other deadly weapon. | Dr. Spitzer is mistaken. As he conceded in deposition, this statute banned concealed carry but not open carry. *See* 10-ER-2552. |
| 4 | Act of May 15, 1852, § 1, 1852 Haw. Sess. Laws 19, 19 | Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less | This law governed a territory. Hawaii did not become a state until 1959. |

[**Editor's Note:** The preceding image contains the reference for footnote [9]

| | | | |
|---|---|---|---|
| | | than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons; and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate. | |
| | Act of Mar. 19, 1913, No. 23, § 1, 1913 Haw. Sess. Laws 26, 26 | Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment for a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person. | This law governed a territory. Hawaii did not become a state until 1959. This law was also enacted decades after the 14th Amendment's ratification. |
| 5 | BOISE CITY, IDAHO, CHARTER AND REV. ORDINANCES ch. 1, § 36, approved May 1, 1879 (1894) | Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, | Dr. Spitzer is mistaken. As he conceded in deposition, this city ordinance banned concealed carry but not open carry. *See* 10-ER-2553. This ordinance is |

| # | Citation | Statute Text | Commentary |
|---|---|---|---|
| | | unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment. | addressed in Appendix A. |
| 6 | Act of Feb. 23, 1859, ch. 79, § 1, 1859 Ind. Acts 129, 129 | That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars. | This statute banned carrying with intent to harm and is addressed in Appendix C. |
| 7 | Act of Mar. 16, 1870, No. 100, § 73, 1870 La. Acts 145, 159 | That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the parish jail for not less than one month; provided, that the provisions of this section shall not apply to any commissioner or officer of the election or supervisor or assistant | This statute banned the carrying of bowie knives on election days and is addressed in Appendix C. |

| # | Citation | Statute Text | Commentary |
|---|---|---|---|
| | | supervisor of registration, police officer or other person authorized to preserve the peace on days of registration or election. | |
| 8 | JOPLIN, MO., JOPLIN CODE, art. 67, § 1201 (1917) | If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having | This city ordinance banned concealed carry, public carry in sensitive places, and brandishing. The ordinance was also enacted decades after the 14th Amendment's ratification. |
| | | upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, billy, sword cane, dirk, dagger, slung shot or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. | |
| | Act of Apr. 3, 1923, § 17, 1923 Mo. Laws 236, 241–42 | Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or | This statute banned public carry in sensitive places. This |

| # | Citation | Statute Text | Notes |
|---|---|---|---|
| | | about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or other vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club, or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury, or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than | statute was also enacted decades after the 14th Amendment's ratification. |
| | | two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes. | |
| 9 | NEBRASKA CITY, NEB., Ordinance No. 7, § 136, (1872) | That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy, slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb.; *Provided*, that nothing herein contained shall | This ordinance is addressed in Appendix D. This is a city ordinance, not a state statute. |
| | | prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another. | |
| 10 | SYRACUSE, N.Y., REV. CHARTER ch. 27, § 7 (1885) | Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to | This ordinance banned carry with intent to harm and is addressed in Appendix C. |
| | | both such fine and imprisonment. | |
| | N.Y. STAT. PEN. CODE §§ 410–411 (1885) | § 410. A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand–club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as | This law banned the carrying of bowie knives with an intent to harm. |

| # | Citation | Text | Commentary |
|---|---|---|---|
| | | merchandise, or for use without the city limits. § 411. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. | |
| 11 | OKLA. STAT. PEN. CODE §§ 2294–95, 2432–33, 2438–39 (1890) | (2294) § 19: Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony. (2295) § 20: Every person who carries concealed about his person and [sic] description of firearms, | This law is addressed in Appendix B. |
| | | being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor. (2432) § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. (2433) § 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, | |
| | | billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided. (2438) § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article. | |
| | | (2439) § 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. | |
| 12 | Act of Dec. 1, 1869, § 2, 1869–70 Tenn. Pub. Acts 108, 108 (1869) | That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas tooth-pick, or weapon in form, shape, or size resembling a Bowie-knife or Arkansas tooth-pick, or other deadly or dangerous weapon. | This statute only banned the carry of bowie knives in sensitive places. |
| | NASHVILLE, TENN., | That every person found carrying a pistol, bowie- | This is a city ordinance, |

| No. | Citation | Statute Text | Commentary |
|---|---|---|---|
| | ORDINANCES, ch. 108, § 1 (1881) | knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; *Provided, however,* That no ordinary pocket-knife and common walking-canes shall be construed to be deadly weapons. | not a state statute. |
| | NASHVILLE, TENN., ORDINANCES, ch. 11, § 738(742) (1893) | Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; *Provided, however,* That no ordinary pocket-knife and common walking-canes shall be construed to be deadly weapons. | This is a city ordinance, not a state statute. |
| 13 | Act of Apr. 12, 1871, ch. 34, §§ 1–2, 1871 Tex. Gen. Laws 25, 25 | SECTION 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided,* that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further,* that members of the Legislature shall not be included under the term "civil officers" as used in this act. SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or | This statute is addressed in Appendix D. |

| # | Citation | Statute | Note |
|---|---|---|---|
| | | unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense. | |
| 14 | PROVO CITY, UTAH, ORDINANCES, ch. 6, § 182 (1877) | Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowieknife, dagger, or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; *Provided*, that | This law governed a territory. Utah did not become a state until 1896. |
| | | nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city. | |
| 15 | Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421–22 | If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, | This statute is addressed in Appendix D. |

| # | Citation | Statute | Note |
|---|---|---|---|
| | | from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing | |
| | | in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife. | |
| | W. VA. CODE ch. 148, § 7 (1891) | If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, | |

| | | metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided[.] | |
| Act of June 5, 1925, ch. 3, § 7(a), 1925 W. Va. Acts 24, 25 | If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie- | |

| | | knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense[.] | |

## All Citations

--- F.4th ----, 2026 WL 2054987 (Mem)

---

## Footnotes

1    *See, e.g. United States v. Diaz*, 116 F.4th 458, 471–72 (5th Cir. 2024) (The Fifth Circuit rejected a facial challenge to 18 U.S.C. § 922(g)(1) because "[t]o sustain a facial challenge, the challenger must establish that no set of circumstances exists under which the statute would be valid. This Diaz cannot do because *the statute is constitutional as applied to the facts of his own case.*" (citation modified)); *Antonyuk v. James*, 120 F.4th 941, 999–1000 (2d. Cir. 2024) (The Second Circuit rejected a facial challenge to various firearm licensing requirements under New York law. It explained that "[f]ederal courts generally should be wary about granting facial challenges, which deny the opportunity for agency officials and state courts to interpret, apply, or limit state laws.... As-applied challenges to particular [applications] ... remain viable. There surely exist some possible [applications] which would unconstitutionally burden the right to bear arms: the reader can no doubt conceive of apt hypotheticals." But where a plaintiff chooses "to challenge [a] law on its face," he must establish that no set of circumstances exists under which the law would be valid.); *United States v. Ogilvie*, 153 F.4th 1098, 1103 (10th Cir. 2025) (The Tenth Circuit rejected a facial challenge to 18 U.S.C. § 922(n). It explained that a plaintiff's "facial challenge fails so long as the government shows that" the law "is constitutional in some of its applications[,] [a]nd when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." (internal quotation marks and citations omitted)); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 226 (4th Cir. 2024) ("[I]n a facial constitutional challenge a plaintiff asks the court to declare that the statute is invalid. As the Supreme Court has explained, facial challenges are disfavored because they often rest on speculation, short circuit the democratic process, and run contrary to the fundamental principle of judicial restraint. So to succeed in a facial constitutional challenge, a plaintiff confronts a much more difficult task, namely, to establish that there is no set of circumstances under which the law

would be valid. The stakes are higher in a facial challenge, so the bar goes up as well." (internal quotation marks and citations omitted)).

2    The dissent suggests that any law could be construed narrowly enough to withstand a facial challenge. For example, says the dissent, "one 'application' of a total ban could be to prohibit a violent felon from carrying a firearm." Dissent of Tung, J., at ——. Set aside for a moment that violent felons are already prohibited from carrying firearms by a federal statute. *See* 18 U.S.C. § 922(g)(1). Courts across the country have rejected facial challenges to complete possession bans, like § 922(g)(1), on the grounds that the application of the law to a single factual circumstance was constitutional. *See, e.g., United States v. Williams,* 113 F.4th 637, 643 (6th Cir. 2024) (rejecting a facial challenge to § 922(g)(1) and noting that such a challenge "fail[s] if [the law] is constitutional in even just one of its applications"); *Diaz,* 116 F.4th at 471–72. Regardless, we did not read California's switchblade regulations so narrowly. It is obvious to everyone that courts are "struggl[ing] with ... [the] level of generality problem" at *Bruen*'s second step. *See Rahimi,* 602 U.S. at 739, 144 S.Ct. 1889 (Barrett, J., concurring). The dissent's arguments do no more than repackage this debate in the facial challenge context. But in so doing, it attacks a straw man. We did not read California's switchblade regulations as narrowly as the dissent suggests, and we did not need to prognosticate about niche or unlikely factual applications of the challenged law to reach our conclusion. California's switchblade regulations constitutionally prohibit concealed carry. We need not say any more to reject this challenge.

3    The dissent suggests that en banc review is warranted because our opinion "produces a conflict with the decision of at least one State Supreme Court." Dissent of Tung, J., at ——. At the outset, we note that a conflict with a state supreme court decision is insufficient as a matter of law to justify en banc review. *See* Fed. R. App. P. 40(b)(2). But even if that were not the case, *Commonwealth v. Canjura,* 494 Mass. 508, 240 N.E.3d 213 (2024), is deeply flawed. For example, the Supreme Judicial Court of Massachusetts rejected nearly all of the historical analogues proffered by the state, including laws regulating the carrying of dirks and bowie knives, on the ground that "none [of those laws] involved regulations of folding pocketknives, let alone switchblades." *Id.* at 514, 240 N.E.3d 213. The court explained that these laws were "inapposite because they involve historical regulations of categorically different types of bladed weapons" and Massachusetts failed to "identify any laws regulating bladed weapons akin to folding pocketknives generally, or switchblades particularly, in place at the time of the founding or ratification of the Fourteenth Amendment." *Id. Canjura* eschewed *Bruen*'s guidance that "the government [must] identify a well-established and representative historical *analogue*, not a *historical twin.*" 597 U.S. at 30, 142 S.Ct. 2111. The district court made the same error here, which we corrected on appeal. *See Knife Rights,* 165 F.4th at 1341. The remainder of *Canjura*'s analysis is unconvincing, but its wholesale rejection of representative historical analogues—an argument that the dissent does not defend—is all that matters for our purposes. Our conflict with *Canjura* exists for a reason.

4    There is no guidance as to how we should assess whether a set of historical regulations constitutes "outliers" as opposed to a sufficient historical tradition. *See Bruen,* 597 U.S. at 65, 142 S.Ct. 2111. *Bruen* rejected one of New York's proffered historical analogues for its proper cause requirement on the grounds that the analogues, one Texas and one West Virginia statute, were "outliers." *Id.* at 65–66, 142 S.Ct. 2111. By contrast, the dissent's Appendix D alone catalogues eight laws from seven different states: Arkansas, Georgia, Nebraska, Pennsylvania, Tennessee, Texas, and West Virginia. *See* Dissent of Tung, J., Appendix D. Are eight laws across seven different states (one of which, concededly, was struck down), a sufficient analogue or an outlier?

We should be hesitant to answer this question without clearer guidance from the Supreme Court or a good reason to do so. We have neither here.

5    Our General Orders provide that "[i]f a majority of the judges eligible to vote on the en banc call votes in favor of en banc consideration, the Chief Judge *shall* enter an order taking the case en banc pursuant to Circuit Rule 40-3 and vacating the three-judge panel opinion." 9th Cir. Gen. Ord. 5.5(d) (Dec. 2024) (emphasis added). This General Order thus imposes a mandatory duty on the Chief to vacate the three-judge panel opinion. Contrary to Judge VanDyke's assertion, *see* Dissent of VanDyke, J., at —— (VanDyke, J., dissenting), the Chief Judge was not somehow skirting our internal procedures in *Teter v. Lopez*, but simply following them. As Judge Miller noted in his concurrence in *Teter v. Lopez*, 135 F.4th 1176, 1178 (9th Cir. 2025): "Judge VanDyke believes that this court should not vacate panel opinions when we grant rehearing en banc. Whether or not that *should* be our practice, there is no denying what our practice *is*[.]" While Judge VanDyke is correct that the language in our General Orders has varied over the years, *see* Dissent of VanDyke, J., at —— n.6, the import has always been the same: once en banc rehearing is granted, a panel decision has no precedential weight and binds no one in our Circuit. *See* 9th Cir. Gen. Ord. 5.5(d) (Jan. 1999) ("If a majority of the non-recused active judges votes in favor of en banc consideration, the Chief Judge shall enter an order withdrawing the case from the panel, taking the case en banc, and vacating the panel decision."); *id.* (July 2000) ("If a majority of the non-recused active judges votes in favor of en banc consideration, the Chief Judge shall enter an order taking the case en banc pursuant to Circuit Rule 35-3. The three-judge panel opinion shall not be cited as precedent by or to this court or any district court of the Ninth Circuit, except to the extent adopted by the en banc court."); *id.* (Dec. 2024) (requiring vacatur).

1    That's how "the famously liberal judge," Stephen Reinhardt, justified his "open resistance, defiance even" to the Supreme Court. Linda Greenhouse, *Dissenting Against the Supreme Court's Rightward Shift*, N.Y. TIMES (Apr. 12, 2018), https://www.nytimes.com/2018/04/12/opinion/supreme-court-right-shift.html [https://perma.cc/H473-3MRD].

2    There is, of course, one notable post-*Bruen* exception to the otherwise hard-and-fast rule that the Second Amendment always loses in the Ninth Circuit. *See Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025). It is literally the one exception that proves the rule. My colleagues are well aware of our court's reputation, and the majority of our court is thus understandably on the lookout for some inconsequential Second Amendment case where they can chalk up the extraordinary win —similar to how most law schools try to have at least one "conservative" faculty member so they can tout their intellectual diversity. Anybody who falls for such a weak charade is, to quote our Chief Justice, a chump. *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 825, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015) (Roberts, C.J., dissenting).

3    One California state court has construed these statutes to criminalize all possession of switchblades—even inside *private* spaces. *In re S.C. v. S.C.*, 179 Cal. App. 4th 1436, 1438, 1441, 102 Cal.Rptr.3d 541 (2009) (holding that the identical, prior version of Cal. Pen. Code § 21510 "is violated any time a person carries a switchblade knife on his or her person, regardless of where the possession occurs," including in a nonpublic area).

4    *See, e.g., Yukutake v. Lopez*, 130 F.4th 1077, 1108–24 (9th Cir. 2025) (Bea, J., dissenting), *reh'g en banc granted, opinion vacated*, 144 F.4th 1119 (9th Cir. 2025).

5    Hawaii seems fond of amending its laws in an attempt to moot Second Amendment cases once our court takes them en banc. *See, e.g.*, Hawaii State Senate, *JDC Public Hearing 03-29-2022 9:30 a.m.*, https://www.youtube.com/live/KMpT6JngXG8?t=5301s [https://

perma.cc/8URU-GCJR], at 1:28:21–1:28:43 (YouTube, Mar. 29, 2022) (testimony of Hawaii deputy attorney general, testifying "on behalf of the department of the Attorney General" "who supports this bill" to "address a recent federal court ruling ... that invalidated two Hawaii statutes").

6    Judge Wardlaw claims that this vacatur was "mandatory" under our General Orders. *See* Concurrence of Wardlaw, J., at —— n.5. But this is historical revisionism. As Judge Wardlaw acknowledges, the version of General Order 5.5(d) that Judge Wardlaw cites is not the version that existed when the Chief Judge vacated the *Teter* panel opinion. *See Teter*, 125 F.4th at 1313–14 (VanDyke, J., dissenting). When the *Teter* panel opinion was vacated, the relevant provision from our General Orders said nothing about vacatur and provided only that, after a successful en banc call, "[t]he three-judge panel opinion *shall not be cited as precedent* ...." *Id.* at 1313. Judge Wardlaw, like Judge Miller before her, suggests that the *Teter* vacatur simply followed what had always been our consistent practice. *See* Concurrence of Wardlaw, J., at —— n.5 (citing *Teter v. Lopez*, 135 F.4th 1176, 1178 (9th Cir. 2025) (Miller, J., concurring)). But this isn't accurate. *See Teter*, 125 F.4th at 1312–14 (VanDyke, J., dissenting). The panel opinion was thus vacated ultra vires. The most that can be said to support the vacatur in *Teter* is that it was not the only panel opinion vacated this way before we amended our rules to authorize it. But as everyone knows, the mere fact that our court has maintained an unwritten practice of doing something is hardly evidence of its lawfulness. *See, e.g., Rojas-Espinoza v. Bondi*, 167 F.4th 1069–79 (9th Cir. 2026) (VanDyke, J., dissenting).

7    That's not to say that Second Amendment litigation in the Ninth Circuit is necessarily boring. It's a lot like watching a Harlem Globetrotters game: you know the Globetrotters are going to win, but the acrobatics involved in getting to that foregone conclusion can still make for a fascinating spectacle—as long as you don't mind that the Washington Generals never win.

8    *Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011) (Posner, J.) (noting that the "ostrich is a noble animal, but not a proper model for an appellate advocate" and then helpfully including a picture of an ostrich burying its head in the sand).

9    *See, e.g., Payne v. State*, —— Ga. ——, 929 S.E.2d 776 (2026). Here's a related practice tip: if you're a lawyer and you find yourself citing a Ninth Circuit decision that seems to vindicate the Second Amendment right, you should definitely double-(and triple-) check that it's not an A.I.-hallucinated case.

10   This actually happened. *See United States v. Bottorff*, No. 8:11-cr-269-T-23AEP, 2012 WL 2449858, at *1 (M.D. Fla. June 22, 2012) ("Between a murder-for-hire trial and an annual look-alike contest, surely Hemingway, a perfervid admirer of 'grace under pressure,' would choose the trial.... Best of luck to counsel in next year's contest. The motion ... is DENIED.").

11   *Schriro v. Smith*, 546 U.S. 6, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005) (per curiam); *Kane v. Garcia Espitia*, 546 U.S. 9, 126 S.Ct. 407, 163 L.Ed.2d 10 (2005) (per curiam); *Wong v. Belmontes*, 558 U.S. 15, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (per curiam); *Swarthout v. Cooke*, 562 U.S. 216, 131 S.Ct. 859, 178 L.Ed.2d 732 (2011) (per curiam); *Felkner v. Jackson*, 562 U.S. 594, 131 S.Ct. 1305, 179 L.Ed.2d 374 (2011) (per curiam); *Cavazos v. Smith*, 565 U.S. 1, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (per curiam); *Ryan v. Schad*, 570 U.S. 521, 133 S.Ct. 2548, 186 L.Ed.2d 644 (2013) (per curiam); *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 185 L.Ed.2d 540 (2013) (per curiam); *Nevada v. Jackson*, 569 U.S. 505, 133 S.Ct. 1990, 186 L.Ed.2d 62 (2013) (per curiam); *Lopez v. Smith*, 574 U.S. 1, 135 S.Ct. 1, 190 L.Ed.2d 1 (2014) (per curiam); *Glebe v. Frost*, 574 U.S. 21, 135 S.Ct. 429, 190 L.Ed.2d 317 (2014) (per curiam); *Johnson v. Lee*, 578 U.S. 605, 136 S.Ct. 1802, 195 L.Ed.2d 92 (2016) (per curiam*); Kernan v. Hinojosa*, 578 U.S. 412,

136 S.Ct. 1603, 194 L.Ed.2d 701 (2016) (per curiam); *Kernan v. Cuero*, 583 U.S. 1, 138 S.Ct. 4, 199 L.Ed.2d 236 (2017) (per curiam); *Sexton v. Beaudreaux*, 585 U.S. 961, 138 S.Ct. 2555, 201 L.Ed.2d 986 (2018) (per curiam).

12 When the Supreme Court cited a list of recent AEDPA summary reversals, there was no decision from our court on the list. *See Klein v. Martin*, 607 U.S. 213, 214, 146 S.Ct. 589, 223 L.Ed.2d 484 (2026) (citing cases). Of course, that doesn't mean we're guaranteed to avoid future AEDPA summary reversals—especially if we regress. *See, e.g., Doyle v. Royal*, 161 F.4th 570 (9th Cir. 2025).

13 These are just a few examples to illustrate the common refrains in this "*Bruen*-is-too-hard" pressure campaign. *See also* Tonja Jacobi & Cory Conley, *Is* Bruen *The New* Usery*?*, 67 Wm. & Mary L. Rev. Online 1529 (2026); Brandon P. Denning & Glenn H. Reynolds, *Essay: Trouble's* Bruen*: The Lower Courts Respond*, 108 Minn. L. Rev. 3187 (2024); Jacob D. Charles, *The Dead Hand of a Silent Past:* Bruen*, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67 (2023); Clara Fong, et al., *Judges Find Supreme Court's* Bruen *Test Unworkable*, Brennan Ctr. for Justice (June 26, 2023), https://www.brennancenter.org/our-work/research-reports/judges-find-supreme-courts-bruen-test-unworkable [https://perma.cc/CW35-AC3M].

14 Samuel Butler, *Hudibras*, Part II, Canto I, line 841 (Hartford, S. Andrus & Son 1845) (1664).

1 California's Penal Code § 21510 states: "Every person who does any of the following with a switchblade knife having a blade two or more inches in length is guilty of a misdemeanor: (a) Possesses the knife in the passenger's or driver's area of any motor vehicle in any public place or place open to the public; (b) Carries the knife upon the person; (c) Sells, offers for sale, exposes for sale, loans, transfers, or gives the knife to any other person." Cal. Pen. Code § 17235 defines a switchblade knife as "a knife having the appearance of a pocketknife and includes a spring-blade knife, snap-blade knife, gravity knife, or any other similar type knife, the blade or blades of which are two or more inches in length and which can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or by any type of mechanism whatsoever." This definition "does not include a knife that opens with one hand utilizing thumb pressure applied solely to the blade of the knife or a thumb stud attached to the blade, provided that the knife has a detent or other mechanism that provides resistance that must be overcome in opening the blade, or that biases the blade back toward its closed position." *Id.*

2 *See* Cal. Pen. Code § 21510; Conn. Gen. Stat § 53-206; D.C. Code § 22–4514(a); Minn. Stat. § 609.66 subd. 1(a)(4); N.J. Stat. § 2C:39-3(e); N.M. Stat. § 30-7-8; N.Y. Penal L. § 265.01(1); Wash. Rev. Code § 9.41.250(1)(a). Delaware had a switchblade prohibition that was repealed in 2025. *See* 2025 Del. L. Ch. 119 (S.B. 108) (repealing 11 Del. C. § 1446). Another provision does state that "[n]o person licensed or unlicensed shall possess, sell, or offer for sale any switchblade knife," but that provision appears to apply only to dealers. 24 Del. C. § 901.

3 Indeed, as *Bruen* discusses, one of the statutes the panel cites—1837 Ga. Acts. 90, § 1—was held to be unconstitutional to the extent the statute banned "bearing arms openly." *Bruen*, 597 U.S. at 54, 142 S.Ct. 2111 (citing *Nunn v. State*, 1 Ga. 243, 251 (1846)).

4 The panel notes that "Dr. Spitzer" (the State's expert) "found that at least '15 states banned all carrying of Bowie knives[.]' " *Knife Rights*, 165 F.4th at 1344. But Dr. Spitzer himself conceded in deposition that this tally was inaccurate—two of the cited laws, he admitted, did not ban "all carrying" but banned concealed carrying. 10-ER-2551–53; *see also* 10-ER-2556 (Q: "[W]ould

you state that 15 states banned all carrying of Bowie knives?" A: "No I may have simply been mistaken."); *see also* Appendix E. Moreover, a few of the other "states" he cited were, in fact, *territories*, which *Bruen* already instructed us to discount. *See* Appendix E. Still other laws he cited prohibited only carry with intent to harm or in sensitive places—they did not ban public carry altogether. *See id.*; *see also* 10-ER-2555. Despite the expert's confessed errors, the State continued to represent (wrongly) that "15 states" "banned both open and concealed carry[.]" Ans. Br. at 35. The State's (and the panel's) reliance on a report admitted by its own author as inaccurate is, to put it mildly, misguided.

5    *Compare* Amended Complaint ¶ 46, *New York State Rifle & Pistol Ass'n v. Beach* (*Bruen* Complaint), No. 18-cv-134-BKS-ATB (N.D.N.Y. filed May 16, 2018) ("facially" attacking New York's law requiring "proper cause" to conceal-carry firearms while also banning open carry), *with Bruen*, 597 U.S. at 71, 142 S.Ct. 2111 (holding that New York's law "violates the ... right to keep and bear arms"); *see Antonyuk v. James*, 120 F.4th 941, 986 (2d Cir. 2024) ("*Bruen* was a facial challenge"). *Compare also* Complaint ¶¶ 15, 22, *Parker v. District of Columbia*, No. 1:03-cv-02131 (D.D.C. filed Nov. 6, 2003) (*Heller* Complaint) (attacking D.C.'s law banning "the home ownership and possession of handguns by private citizens"), *with Heller*, 554 U.S. at 635, 128 S.Ct. 2783 (holding that "the District's ban on handgun possession in the home violates the Second Amendment"); *see also City of Los Angeles v. Patel*, 576 U.S. 409, 415, 135 S.Ct. 2443, 192 L.Ed.2d 435 (2015) (describing *Heller* as addressing a "[f]acial challenge[ ]").

6    That is why Judge Wardlaw is wrong when she states that "California's switchblade regulations *constitutionally* prohibit concealed carry." Conc. at —— n.2 (emphasis added). *Bruen* makes clear that a prohibition on concealed carry is *not* constitutional when open carry is *also* prohibited.

7    Judge Wardlaw acknowledges a conflict with a decision of the Supreme Judicial Court of Massachusetts but contends that this does not support en banc review. Conc. at —— n.3. To be sure, Federal Rule of Appellate Procedure 40(b)(2) does not require specification of a state-supreme-court conflict in a petitioner's statement. But such a conflict supports the notion that "the proceeding involves one or more questions of exceptional importance." Fed. R. App. P. 40(b)(2)(D). In any event, the panel's decision "conflicts with a decision of the United States Supreme Court" (Fed. R. App. P. 40(b)(2)(B))—*Bruen*—which is sufficient to justify en banc review.

8    As *Bruen* discusses, this statute was held to be unconstitutional to the extent the statute banned "bearing arms openly." *Bruen*, 597 U.S. at 54, 142 S.Ct. 2111 (citing *Nunn v. State*, 1 Ga. 243, 251 (1846)).

9    Dr. Spitzer cites Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248 (1881). *See* 10-ER-2344. We are unable to verify the existence of this law. The text he provides for this citation matches with COLO. STAT. ch. 35 § 1830 (1911), and so we assume that he meant to cite this provision.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

CASE 0:24-cv-03749-PJS-DTS    Doc. 67    Filed 07/27/26    Page 46 of 85

2026 WL 1982951
Only the Westlaw citation is currently available.
United States Court of Appeals, Seventh Circuit.

Caleb BARNETT, et al., Plaintiffs-Appellees,
v.
Kwame RAOUL, Attorney General of the
State of Illinois, et al., Defendants-Appellants.

Nos. 24-3060, 24-3061, 24-3062 & 24-3063
|
Argued September 22, 2025
|
Decided July 9, 2026

**Synopsis**
**Background:** Individuals, firearm market participants, and Second Amendment advocacy organizations brought § 1983 actions against state and local officials alleging that provisions of Protect Illinois Communities Act that criminalized manufacture, sale, delivery, purchase, and possession of assault weapons and large-capacity magazines violated Second Amendment. After cases were consolidated, bench trial was held. The United States District Court for the Southern District of Illinois, Stephen P. McGlynn, J., ruled that Act violated Second Amendment and enjoined its enforcement. State appealed.

**Holdings:** The Court of Appeals, St. Eve, Circuit Judge, held that:

Act did not on its face violate Second Amendment in its entirety;

Act's restrictions on assault weapons and large-capacity magazines did not violate Second Amendment; and

Act's registration requirement that owners of restricted weapons register those weapons in order to take advantage of its grandfather clause did not violate Second Amendment.

Reversed and remanded.

Brennan, Chief Judge, dissented and filed opinion.

**Procedural Posture(s):** On Appeal; Judgment.

**West Codenotes**

**Negative Treatment Reconsidered**
720 Ill. Comp. Stat. Ann. 5/24-1.9, 5/24-1.10

Appeals from the United States District Court for the Southern District of Illinois. Nos. 3:23-cv-209, 3:23-cv-141, 3:23-cv-192 & 3:23-cv-215 — **Stephen P. McGlynn**, *Judge.*

**Attorneys and Law Firms**

Paul D. Clement, Attorney, Erin Murphy, Attorney, Nicholas Albert Aquart, Attorney, Matthew Rowen, Attorney, Clement & Murphy, PLLC, Alexandria, VA, Andrew Arthur Lothson, Attorney, Swanson, Martin & Bell, LLP, Chicago, IL, for Plaintiffs-Appellees in 24-3060.

Megan L. Brown, Attorney, Sarah A. Hunger, Deputy Solicitor General, Office of the Attorney General, Chicago, IL, for Defendants-Appellants in 24-3060, 24-3061, 24-3062, and 24-3063.

Jordan Wilkow, Attorney, Tabet, Divito & Rothstein LLC, Chicago, IL, for Amicus Curiae March for Our Lives Foundation.

Elizabeth Tisher, Attorney, City of Chicago Law Department, Chicago, IL, for Amicus Curiae City of Chicago.

Jeremy M. Feigenbaum, Attorney, Kirkland & Ellis LLP, New York, NY, for Amici Curiae State of New Jersey, State of Massachusetts, State of California, State of Colorado, State of Connecticut.

Jonathon D. Byrer, Attorney, Office of the Cook County State's Attorney, Chicago, IL, for Amicus Curiae Cook County, Illinois.

Jennifer Loeb, Attorney, Freshfields US LLP, Washington, DC, for Amici Curiae Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence.

Barry K. Arrington, Attorney, Arrington Law Firm, Wheat Ridge, CO, for Amicus Curiae National Association for Gun Rights.

Donald Kilmer, Jr., Attorney, Law Offices of Donald Kilmer, Caldwell, ID, for Amici Curiae Second Amendment Defense and Education Coalition, Ltd., Second Amendment Law Center.

Andrew G. Braniff, Attorney, Harmeet Dhillon, Attorney, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for Amicus Curiae United States of America.

Thomas A. Haine, Attorney, Office of the Madison County State's Attorney, Edwardsville, IL, for Amici Curiae Office of the Brown County State's Attorney, Office of the Calhoun County State's Attorney, Office of the Carroll County State's Attorney, Office of the Christian County State's Attorney, Office of the Clark County State's Attorney.

David G. Sigale, Attorney, Law Firm of David G. Sigale, P.C., Lombard, IL, David Thompson, Attorney, Cooper & Kirk, Washington, DC, for Plaintiffs-Appellees in 24-3061.

Thomas G. Maag, Attorney, Peter J. Maag, Attorney, Maag Law Firm, LLC, Wood River, IL, for Plaintiffs-Appellees in 24-3062.

Sean Anthony Brady, Attorney, Carl D. Michel, Senior Attorney, Michel & Associates, Long Beach, CA, Jennifer Craigmile Neubauer, Attorney, Mark L. Shaw, Attorney, Shaw Law Ltd, Waukegan, IL, for Plaintiffs-Appellees 24-3063.

Before Brennan, Chief Judge, and Easterbrook and St. Eve, Circuit Judges.

## Opinion

St. Eve, Circuit Judge.

**\*1** In 2023, six months after a mass shooting at a Chicago suburb's Independence Day parade left seven dead and dozens more wounded, Illinois enacted the Protect Illinois Communities Act. Among other things, the Act criminalizes the manufacture, sale, delivery, purchase, and possession of assault weapons and large-capacity magazines. A grandfather clause permits preexisting lawful owners of the regulated items to continue possessing them.

Plaintiffs across Illinois swiftly challenged the Act, suing state and local officials for declaratory and injunctive relief protecting their right to keep and bear arms. One federal court granted a preliminary injunction, two did not, and all three losing parties appealed. We consolidated their appeals and held in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), that the plaintiffs were unlikely to succeed on the merits of their challenges.

One of the consolidated cases in *Bevis* was *Barnett v. Raoul*, which itself was the lead case for a set of four similar challenges pending in the Southern District of Illinois. After building out the record following *Bevis*, the *Barnett* parties proceeded to a bench trial. In the end, the district court held that much of the Act violated the Second Amendment and that the offending provisions were not severable. The court therefore enjoined enforcement of the Act in its entirety. The defendants appealed.

For reasons that follow, we focus on the Act's application to AR-15s and thirty-round rifle magazines. The Act's restrictions on these items, we hold, are consistent with the principles that underpin our Nation's tradition of firearm regulation. Whether to adopt them is thus a decision reposed in our elected representatives, and we reverse.

### I. Background

**A. The Protect Illinois Communities Act**

The Protect Illinois Communities Act, *see* Pub. Act 102-1116 (2023), 2022 Ill. Laws 8833, covers a broad array of matters, both substantive and administrative, but its restrictions on weapons, parts, accessories, and the like are the subject of the disputes before us.

Beginning with the restrictions on firearms, the Act makes it unlawful to knowingly carry, possess, manufacture, sell, deliver, import, or purchase any assault weapon. 720 ILCS 5/24-1.9(b)–(c); *see* 720 ILCS 5/24-1(a)(15)–(16), (b). Given the range of conduct proscribed, the Act effectively amounts to a ban. That ban, however, does not apply to qualified

law enforcement officers, members of the military performing official duties, and other similar groups. 720 ILCS 5/24-1.9(e).

The Act defines four types of weapons as assault weapons. First are semiautomatic rifles that can accept a detachable magazine and have at least one of the following features: a pistol grip or thumbhole stock; a protruding grip that can be held by the non-trigger hand; a folding, telescoping, thumbhole, or detachable stock; a flash suppressor; a grenade launcher; or a barrel shroud. *Id.* 5/24-1.9(a)(1)(A). Second and third, the Act bans semiautomatic pistols and shotguns that can accept detachable magazines and have at least one feature from enumerated lists, the details of which are not relevant here. *Id.* 5/24-1.9(a)(1)(C), (F). Finally, the Act bans certain firearms based on the type of ammunition feeding device they utilize— for example, semiautomatic weapons that can accept a belt ammunition feeding device. *Id.* 5/24-1.9(a)(1) (B), (D)–(E), (G). As with the expired federal assault weapon ban from which Illinois borrowed, the Act defines assault weapons not only by reference to these features but also through a list of prohibited models, including the AR-15. *Id.* 5/24-1.9(a)(1)(J)–(L). The Act also bans "assault weapon attachments"—that is, "any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into" an assault weapon. *Id.* 5/24-1.9(a)(3), (b)–(c).

 **\*2**  The Act next criminalizes the knowing manufacture, delivery, sale, purchase, or possession of "large capacity ammunition feeding devices." *Id.* 5/24-1.10(b)–(c), (g). That term is defined to include "a magazine, belt, drum, feed strip, or similar device that has a capacity of" more than ten rounds for rifles and shotguns, and more than fifteen rounds for handguns. *Id.* 5/24-1.10(a)(1). We will focus, as the parties have, on magazines, the most common type of ammunition feeding device. And we will refer to the restricted ones as "large-capacity magazines."

Finally, the Act bans certain .50 caliber rifles and their cartridges, as well as any device or accessory—like a bump stock—"that is designed to and functions to increase the rate of fire of a semiautomatic firearm above the standard rate of fire for semiautomatic firearms." *Id.* 5/24-1.9(a)(6), 5/24–1(a)(14).

The Act's grandfather clauses provide significant exceptions to these restrictions. As to assault weapons, assault weapon attachments, .50 caliber rifles, or .50 caliber cartridges, preexisting lawful owners could continue possessing them if they provided the Illinois State Police an "endorsement affidavit" containing certain information by January 1, 2024. *Id.* 5/24-1.9(d). The required information consisted of the owner's firearm license number, an affirmation that he possessed the item before the Act went into effect, and the make, model, caliber, and serial number of the item. *Id.* 5/24-1.9(d)(1)–(3). This registration process, which was free, "create[d] a rebuttable presumption that the person [was] entitled to possess and transport the" restricted item. *Id.* 5/24-1.9(d)(3). As to large capacity ammunition feeding devices, preexisting lawful owners could continue possessing them (subject to locational restrictions) with no registration required. *Id.* 5/24-1.10(d). Those who move to Illinois today and wish to possess the restricted items may avail themselves of the grandfather clauses by applying for an Illinois firearm license and (for everything but the ammunition feeding devices) completing an endorsement affidavit within sixty days of moving. *Id.* 5/24-1.9(d), 5/24-1.10(d).

**B. Procedural History**

Four related cases, which the district court consolidated, are now before us. *See Langley v. Kelly*, No. 3:23-cv-192 (S.D. Ill.); *Harrel v. Raoul*, No. 3:23-cv-141 (S.D. Ill.); *Barnett v. Raoul*, 3:23-cv-209 (S.D. Ill.); *Federal Firearms Licensees of Ill. v. Pritzker*, No. 3:23-cv-215 (S.D. Ill.). The plaintiffs consist of individuals, participants in the commercial firearm market, and organizations that advocate for Second Amendment rights. The defendants are a wide range of state and local officials charged with enforcing the Act in one way or another.

Each of the plaintiffs, relying on 42 U.S.C. § 1983, challenged the Act's ban on assault weapons, large-capacity magazines, and assault weapon attachments under the Second Amendment. The *Langley* and *Federal Firearms Licensees* plaintiffs further challenged the Act's ban on .50 caliber rifles and cartridges. Only the *Langley* plaintiffs attacked the Act's registration requirement. [1]

After each set of plaintiffs moved for a preliminary injunction, the district court consolidated the four actions, designating *Barnett* as the lead case. It then granted the plaintiffs preliminary relief. *See generally Barnett v. Raoul*, 671 F. Supp. 3d 928 (S.D. Ill. 2023). But in functionally identical Second Amendment challenges, two district judges in the Northern District of Illinois came out the other way. *See generally Bevis v. City of Naperville*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023); *Herrera v. Raoul*, 670 F. Supp. 3d 665 (N.D. Ill. 2023). So when all three losing parties appealed, we consolidated the three cases to unify the Act's status across Illinois and to guide the district courts and parties in litigating the cases to final judgment. *See generally Bevis*, 85 F.4th 1175.

**\*3** When we decided *Bevis*, no circuit court had applied the Supreme Court's seminal decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), to assault weapons and large-capacity magazines. In *Bruen*, the Supreme Court established a new test governing Second Amendment claims: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24, 142 S.Ct. 2111.

*Bevis* sought to flesh out the *Bruen* inquiry, particularly its first step. Based on an analysis of *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), *Bevis* concluded that *Bruen*'s first step required "the plaintiffs in each of the cases before us [to show] that the weapons addressed in the pertinent legislation are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Bevis*, 85 F.4th at 1194. If a regulated weapon meets this definition, it is an "Arm" covered by the Second Amendment's plain text, satisfying *Bruen*'s first step; if not, the regulation is constitutional without need to evaluate our historical tradition of firearm regulation.

Applying this test, *Bevis* concluded the plaintiffs were not likely to succeed on the merits of their Second Amendment challenges because AR-15s (which the court used as representative of the banned weapons) and large-capacity magazines "are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense (or so the legislature was entitled to conclude)." *Id.* at 1195. AR-15s, *Bevis* concluded, are not "materially different" from M16s—which *Heller* confirmed may be banned. *Id.* at 1195–97; *see Heller*, 554 U.S. at 627, 128 S.Ct. 2783. To be sure, *Bevis* recognized that AR-15s are limited to semiautomatic fire, whereas M16s are capable of both semiautomatic and automatic fire. *See Bevis*, 85 F.4th at 1195–96. And *Bevis* recognized this difference in firing modes translates to a difference in firing rates. *Id.* at 1196. But *Bevis* ultimately concluded that the distinctions between AR-15s and M16s paled in comparison to their similarities, placing AR-15s beyond the Second Amendment's protections.

After assuming that the regulated items were "Arms" under the Second Amendment, *Bevis* went on to hold that the Act also passed muster under *Bruen*'s second step. Our Nation's history of firearm regulation, *Bevis* concluded, revealed a tradition of reserving especially dangerous weapons for military use while leaving many other weapons available for civilians. *See id.* at 1197–1202. And the Act "respects and relies on" that tradition. *Id.* at 1202. We therefore vacated the preliminary injunctions that the district court had entered in *Barnett, Harrel, Langley*, and *Federal Firearms Licensees. See id.* at 1203. [2]

Following *Bevis*'s direction, the plaintiffs and defendants in *Barnett* and the consolidated cases developed the record. The parties stipulated to presenting much of the evidence on the papers, but the court also held a four-day bench trial. At the conclusion, the district court held in a thorough opinion that the Act's ban on assault weapons, assault weapon attachments, and large-capacity magazines violated the Second Amendment, as did the registration requirement.

**\*4** Tackling *Bevis*'s "Arms" inquiry, the district court first concluded that ordinary citizens choose assault weapons, large-capacity magazines, and assault

weapon attachments for self-defense. With respect to the firearms themselves, the court relied on both statistical evidence of these items' wide circulation and testimony from self-defense experts, firearm instructors, and a gun store owner. As for the large-capacity magazines, the court noted that "every round matters in a self-defense scenario." And the attachments, the district court reasoned, are "well-suited for self-defense," especially for "an individual who is infirm, small-statured, or has limited firearms training." The district court concluded, by contrast, that law-abiding citizens would not choose .50 caliber rifles, their ammunition, .50 caliber pistols, belt-fed weapons, and grenade launchers for self-defense, so these items failed to qualify for presumptive constitutional protection under *Bevis*.

Moving to whether the regulated items are exclusively or predominantly useful in military service, the district court concluded that AR-15s are materially distinct from the M16 rifles that the U.S. military issues. The court first stressed that no military has ever issued AR-15s to its troops, largely because of their different firing modes: AR-15s can fire only semiautomatically, whereas M16s are capable of semiautomatic, automatic, and burst fire. [3] The court stressed, too, that AR-15s are not "subject to exact standards of military specificity and rigorous quality-insurance [sic] inspections." The court further held that large-capacity magazines and assault weapon attachments are not predominantly useful in military service because the military does not issue them for use in combat. And finally, the court concluded that people do not possess AR-15–style semiautomatic rifles, large-capacity magazines holding up to thirty rounds, and assault weapon attachments (other than grenade launchers) for unlawful purposes because most of the weapons are not used in illegal activity.

Having concluded that the items the Act regulates qualify as "Arms" for Second Amendment purposes under *Bevis*, the court proceeded to *Bruen*'s second step, where it held that the defendants failed to establish that the Act is consistent with our Nation's history of firearm regulation. At this stage, the court did not make or rely on factual findings undercutting the applicability of *Bevis*'s historical assessment. Instead, looking at essentially the same record as existed at the preliminary injunction stage, the district

court found *Bevis*'s dissenting opinion more persuasive than its majority, holding that the historical analogues on which *Bevis* relied were insufficient to sustain the Act.

Because the district court concluded that the offending provisions of the Act were not severable, it enjoined the Act in its entirety. The court's permanent injunctions (one for each of the four cases), entered under Federal Rule of Civil Procedure 65, enjoined "the State of Illinois" from enforcing the Act against anyone. [4] The defendants appealed, and we granted their request to stay the district court's injunctions pending appeal.

## II. Discussion

### A. Standard of Review

**\*5** We begin with our standard of review. We review the district court's decision to grant a permanent injunction for abuse of discretion. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006); *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, 135 F.4th 572, 587 (7th Cir. 2025). On the merits, however, our standard of review is somewhat murkier. Though it is clear (and undisputed) that we review "the underlying question of constitutional law *de novo*," *Schoenthal v. Raoul*, 150 F.4th 889, 901 (7th Cir. 2025), it is less clear (and is disputed) how much deference, if any, we owe the district court's findings of fact.

As a general matter, Federal Rule of Civil Procedure 52(a) prescribes that on appellate review of a bench trial, "[f]indings of fact ... must not be set aside unless clearly erroneous." That standard is satisfied only if we are "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). But the Supreme Court has recognized that appellate review may be more searching as to legislative facts than adjudicative facts. *See Lockhart v. McCree*, 476 U.S. 162, 168 n.3, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) ("We are far from persuaded ... that the 'clearly erroneous' standard of Rule 52(a) applies to the kind of 'legislative' facts at issue here."); *see also Doe v. Prosecutor, Marion Cnty.*, 705 F.3d 694, 697 n.4 (7th Cir. 2013). Though the

line between the two can be blurry, roughly speaking, "[l]egislative facts are those general considerations that move a lawmaking or rulemaking body to adopt a rule, as distinct from the facts which determine whether the rule was correctly applied." *Menora v. Ill. High Sch. Ass'n*, 683 F.2d 1030, 1036 (7th Cir. 1982); *see also Frank v. Walker*, 773 F.3d 783, 795 (7th Cir. 2014) (Posner, J., dissenting) ("The concept of a legislative fact comes into its own when there is no reason to believe that certain facts pertinent to a case vary from locality to locality, or from person to person; a typical definition of legislative facts is broad, general facts that are not unique to a particular case and provide therefore an appropriate basis for legislation of general application."). And even for adjudicative facts, an exception to Rule 52(a) for so-called constitutional facts—ultimate facts in constitutional cases—might create yet another obstacle to clear-error review. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510–14, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (making an independent determination of "actual malice" for First Amendment purposes); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 689 (7th Cir. 2002) (explaining that de novo review of constitutional facts "prevent[s] the idiosyncrasies of a single judge or jury from having far-reaching legal effects").

We need not wade into these murky waters, however. Instead, "[b]ecause we do not ultimately base our decision today on the invalidity of the lower court['s] factual findings, we need not decide the standard of review issue." *McCree*, 476 U.S. at 168 n.3, 106 S.Ct. 1758 (citation modified). We therefore assume that the district court's factual findings are shielded by clear-error review.[5]

## B. The Plaintiffs' Facial Challenges

**\*6** Each of the plaintiffs presses a facial challenge against the Act's operative provisions in 720 ILCS 5/24-1.9(b)–(c) and 5/24-1.10(b)–(c). The former provisions make it unlawful to "knowingly manufacture, deliver, sell, import, or purchase ... an assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge," 720 ILCS 5/24-1.9(b), or "to knowingly possess" these items, *id.* 5/24-1.9(c). The latter provisions make it unlawful "to knowingly manufacture, deliver, sell, [or] purchase ... a large

capacity ammunition feeding device," *id.* 5/24-1.10(b), or "to knowingly possess" one, *id.* 5/24-1.10(c).[6]

The plaintiffs' decisions to pursue facial claims "come[ ] at a cost," as the Supreme Court has "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723, 144 S.Ct. 2383, 219 L.Ed.2d 1075 (2024); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (explaining that facial challenges are "disfavored" because they "often rest on speculation," "short circuit the democratic process," and "run contrary to the fundamental principle of judicial restraint"). To prevail on a claim of facial invalidity, the challenger must "establish that no set of circumstances exists under which the [challenged provisions] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). In the context of these appeals, that standard requires us to side with the defendants as to 720 ILCS 5/24-1.9(b) and (c) if the Act's restriction of *any* "assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge" is constitutional. The same goes with respect to 720 ILCS 5/24-1.10(b) and (c) if the Act's restriction on any "large capacity ammunition feeding device" is valid. *See, e.g., Bianchi v. Brown*, 111 F.4th 438, 452–54 (4th Cir. 2024) (en banc) (exemplifying this approach); *Capen v. Campbell*, 134 F.4th 660, 668–69 (1st Cir. 2025) (same).

The plaintiffs cannot satisfy this demanding standard. Indeed, they do not even advance arguments as to some of the items that 720 ILCS 5/24-1.9 and 5/24-1.10 regulate, *all* of which must be constitutionally protected for their facial claims to be viable. The Act, for example, restricts semiautomatic rifles that have grenade launchers attached, 720 ILCS 5/24-1.9(a)(1)(A)(v), yet the district court unsurprisingly held that the Act may ban these weapons because they are not in common use for lawful purposes, and no plaintiff argues otherwise on appeal. Likewise, the plaintiffs focus on magazines holding up to thirty rounds, but 720 ILCS 5/24-1.10's restriction of "large capacity ammunition feeding device[s]" also includes, among other things, belts and ammunition feeding devices holding more than thirty rounds. Notwithstanding their failure to substantiate their attack on every item that

the challenged provisions regulate, the plaintiffs ask that we enjoin the Act in its entirety. But because the plaintiffs have not made the showing that Supreme Court precedent requires, "the broad relief their facial challenge seeks is not ours to grant." *Bianchi*, 111 F.4th at 453; *see also, e.g., United States v. Charles*, 159 F.4th 545, 547 (8th Cir. 2025) (rejecting facial challenge to federal machine gun ban because some machine guns, such as the M230 machine gun mounted on military helicopters, are not bearable and thus lie beyond the Second Amendment's scope).

**\*7** Following the Fourth Circuit's model under similar circumstances, we nonetheless proceed to evaluate the Act's restrictions on assault weapons and large-capacity magazines based on the circumstances on which the parties have principally focused: an AR-15 (as representative of the banned rifles) and a thirty-round rifle magazine.[7] *See Bianchi*, 111 F.4th at 452–54. As in *Bianchi*, "the parties thoroughly briefed the issue of whether the Second Amendment protects a citizen's ability to purchase and possess" these items, and moreover, the parties developed a record focused primarily on them. *Id.* at 453–54. "Not to address [them] would be to bypass the very heart of the dispute in this proceeding." *Id.* at 454. It would also leave the two other cases *Bevis* consolidated, which remain pending in the Northern District of Illinois, in limbo.

### C. The Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court recognized in *Heller* that these words secure an individual right to keep and bear arms for self-defense, *see* 554 U.S. at 576–600, 128 S.Ct. 2783—a right that Justice Story called "the palladium of the liberties of a republic," 2 Joseph Story, *Commentaries on the Constitution of the United States* 620 (4th ed. Boston, Little, Brown & Co. 1873). Two years after *Heller*, the Court confirmed that the states must respect that right by virtue of the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 750, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). All Americans, therefore, may enjoy the "means of self-defense" that "the right secures." *Rahimi*, 602 U.S. at 690, 144 S.Ct. 1889.

Fundamental as it is, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. In this respect, the right to keep and bear arms is just like other constitutional rights. The Free Speech Clause does not enshrine an absolute right to express oneself however one sees fit. The Free Exercise Clause does not protect believers from any and all burdens on their religious practice. And the Second Amendment does not secure "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*; *see Wolford v. Lopez*, 609 U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2026 WL 1825723, at \*5 (2026) ("[W]hile the founding generation cherished the Second Amendment right, they did not think it was absolute.").

What *does* distinguish the Second Amendment is the nature of the standard governing challenges brought under it. Rejecting means-end scrutiny in favor of history and tradition, the Court in *Bruen* set out a two-step framework for adjudicating challenges to firearm regulations. Courts first ask whether "the Second Amendment's plain text covers an individual's conduct"; if it does, "the Constitution presumptively protects that conduct." 597 U.S. at 17, 142 S.Ct. 2111. At that point, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only if the government carries that burden "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961)).

In assessing whether a state's proffered historical analogues satisfy its step-two burden, courts should consider "the number of jurisdictions in which they were adopted," "the extent to which they were well-accepted," and whether they are " 'relevantly similar' to the modern law." *Wolford*, —— S.Ct. at ——, 2026 WL 1825723, at \*6. Ascertaining whether historical analogues are "relevantly similar" to a modern law in turn "requires consideration of 'how' the analogue restricted the keeping or bearing of arms" and " 'why' the analogue restricted the keeping or bearing of arms." *Id.*

**\*8** Especially because "states were not bound by the Second Amendment until the Fourteenth Amendment was ratified in 1868," we may rely on nineteenth-century statutes to shed light on the prevailing understanding of the right to keep and bear arms. *Schoenthal*, 150 F.4th at 913; *see United States v. Hemani*, 608 U.S. ——, 146 S.Ct. 1677, 1687 n.3, —— L.Ed.2d —— (2026) (reserving the question " 'whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791" (quoting *Bruen*, 597 U.S. at 37–38, 142 S.Ct. 2111)); *Wolford*, —— S.Ct. at ——, 2026 WL 1825723, at \*13 (indicating that the adoption of the Fourteenth Amendment may be a relevant time period for purposes of ascertaining the Second Amendment's meaning); *see also Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 235 (2d Cir. 2025); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1121 (11th Cir. 2025).

### D. AR-15s and Large-Capacity Magazines

We turn now to whether the Act's restrictions on AR-15s and thirty-round rifle magazines pass muster. We will assume for purposes of today's ruling that the regulated items are "Arms" under *Bevis*, such that their possession is presumptively entitled to constitutional protection, and move to *Bruen*'s second step. We hold that the Act is consistent with the principles that underpin our regulatory tradition. In short, legislatures have long imposed restrictions on particularly dangerous weapons, and the Act is but another chapter in that story.

As an initial matter, little has changed since we held in *Bevis* that the Act satisfies *Bruen*'s historical inquiry. *See* 85 F.4th at 1197–1202. To be sure, the parties developed the record in the years since *Bevis.* But that development—and the district court's factual findings—went almost exclusively to step one. By contrast, the historical laws in the record, and the parties' arguments about them, remain essentially the same as they stood at the preliminary injunction stage. Indeed, notable intervening developments favor the defendants. First, the Court decided *Rahimi*, which "clarified that the *Bruen* standard should not be misunderstood to mean that modern firearm regulations require close founding-era comparators." *United States v. Reyna*, 165 F.4th 1056, 1062 (7th Cir. 2026). And second,

every circuit to have confronted the issue has agreed with our conclusion that legislatures may ban AR-15s and large-capacity magazines. [8] Though we do not rest on this point, we note that creating a conflict under these circumstances would be imprudent. *See United States v. Tuggle*, 4 F.4th 505, 522 (7th Cir. 2021).

In any event, we remain persuaded by the unanimous circuit consensus. Using one or another label —"dangerous and unusual," "unusually dangerous," "especially dangerous," "particularly capable of unprecedented lethality"—these courts have coalesced around a largely overlapping set of historical regulations imposing targeted restrictions on weapons whose danger and lethality stand out. These courts have further concluded that those regulations justify restrictions on AR-15s and large-capacity magazines equivalent to those the Act imposes. *See Ocean State Tactical*, 95 F.4th at 44–52; *Capen*, 134 F.4th at 669–73; *Lamont*, 153 F.4th at 240–47; *Bianchi*, 111 F.4th at 464–72; *Duncan*, 133 F.4th at 874–84; *Hanson*, 120 F.4th at 234–40. Given the ground already covered, we think it unnecessary to reiterate the courts' analyses of each of the statutes comprising this tradition, which spans from the pre-Founding going-armed laws through today's machine gun ban. [9] Although we adopt the courts' well-reasoned analyses of these statutes, we focus here instead on a leading example of this tradition: regulations of the Bowie knife [10]—or, as one Reconstruction-era court called it, the "instrument of almost certain death." *Cockrum v. State*, 24 Tex. 394, 402 (1859).

**\*9** Popularized in the 1830s, Bowie knives came in a variety of forms, but "in its purest form" it was "a large knife with a clipped point" making the tip more piercing. Harold L. Peterson, *American Knives: The First History and Collectors' Guide* 26 (1958). These features, combined with the technological shortcomings plaguing the era's prominent firearms— which required the user to carefully reload after every shot, such that one missed shot could leave the user defenseless—made Bowie knives a popular choice for fights and duels.

Contrary to the dissenting opinion's efforts (often without citation) to conclusively link Bowie knives to criminality, however, Bowie knives were both widespread and used for lawful purposes. One expert

in the history of arms in America, for example, explained that in the nineteenth century, "European visitors who ventured beyond the Appalachians found [the Bowie knife] such an integral part of the American way of life that they felt compelled to comment on it at length in accounts of their adventures.... In many communities, no man, whether hunter, gambler, tradesman or political leader felt himself fully clothed without one." Peterson, *supra*, at 25. Similarly, the historian who (literally) wrote the book on Bowie knives noted they were "widely carried by Americans of all stripes"; "served everyone equally, upstanding citizens and villains" alike; were "wide[ly] popular[ ], in the North and South" during the Civil War; and were "common[ ]"—"a weapon carried by men of all walks of life." Norm Flayderman, *The Bowie Knife: Unsheathing an American Legend* 20, 125, 130 (2004). Other scholars agree. *See* David B. Kopel, Clayton E. Cramer & Joseph Edward Olson, *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 184 (2013) ("During the nineteenth century, Bowie knives were commonly present in many areas of the United States. Contemporary sources leave no question that Bowie knives, Arkansas Toothpicks, and similar knives were a common part of American life until well after the Civil War....").

Bowie knives were also "particularly suitable for self-defense" and "typically possessed for self-defense." *Id.* at 180, 185; *see* Peterson, *supra*, at 26 ("[T]he original knife made for James Bowie was a large heavy knife suitable for both self-defense and general utility in the woods."); *Cockrum*, 24 Tex. at 402 (noting that "[t]he gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least," whereas the Bowie knife is "difficult to defend against"). Hunting served as another lawful purpose for which people owned Bowie knives. *See* Joseph E. Worcester, Dictionary of the English Language 165 (1860) (defining the term as "[a] large knife or dagger, used as a weapon, and carried by hunters in the South-western part of the United States"); *see also Wolford*, ––– S.Ct. at ––– n.4, 2026 WL 1825723, at *4 n.4 ("[M]ost Americans in the late 18th century also 'undoubtedly thought' that the codified Second Amendment was 'important for hunting,' which, particularly for those moving west, was an important source of sustenance." (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783)). But their

"large blades ... wreaked particularly bloody and gruesome injuries," *Lamont*, 153 F.4th at 243 (citation modified), and no doubt criminals misused them.

Legislatures responded accordingly, enacting criminal prohibitions that often authorized imprisonment. Some jurisdictions banned the carry of Bowie knives, with narrow exceptions or none at all—a broad proscription. *See* 1871 Tex. Laws 1st Sess. 25; 1881 Ark. Acts 191; 1889 Ariz. Sess. Laws 30. Others prohibited their concealed carry. *See, e.g.*, 1820 Ind. Acts 39; 1838 Va. Acts 76; 1838 Tenn. Pub. Acts 200; 1839 Ala. Acts 67; 1878 Miss. Laws 175; 1879 N.C. Sess. Laws 231; 1880 S.C. Acts 448. While these restrictions targeted what one did in public, others burdened one's ability to own Bowie knives for use in private too, such as for defense of the home, by banning the sale of Bowie knives or imposing burdensome, and sometimes prohibitive, taxes. *See* 1838 Tenn. Pub. Acts 200 (banning sale); 1881 Ark. Acts 192 (same); 1837 Ala. Laws 7 ($100 tax per sale, which is equivalent to several thousand dollars today); 1838 Fla. Terr. Laws 36 ($200 per year tax on Bowie-knife sellers and $10 per year on Bowie-knife carriers).

 **\*10**  The dissenting opinion seeks to undermine our reliance on the Texas, Arkansas, and Arizona carry bans, but it misapprehends these statutes. The dissenting opinion first claims that the Texas and Arizona statutes permitted carry for self-defense, but their exceptions were significantly narrower. The Arizona statute, for example, excepted only "one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process." 1889 Ariz. Sess. Laws 30. The Texas statute employed a similar standard. *See* 1871 Tex. Laws 1st Sess. 25. In other words, neither statute permitted carry for self-defense generally; they allowed it only for those with a heightened and urgent need. *Bruen*'s holding—striking down a New York regime under which concealed carry licenses were available to only those with "a special need for self-protection distinguishable from that of the general community," 597 U.S. at 12, 142 S.Ct. 2111—underscores that notwithstanding Arizona's and Texas's narrow exceptions, their statutes meaningfully burdened the right to armed self-defense.

The dissenting opinion next claims that the Arkansas statute did not apply to public carry because of its exception for those "carrying any weapon when upon a journey." 1881 Ark. Acts 191. The dissenting opinion ignores the meaning of "journey" in this statute. If "journey" were synonymous with "public carry," the statutory prohibition on "wear[ing] or carry[ing]" Bowie knives "in any manner whatever" would be sapped of all meaning. Instead, as the Supreme Court of Arkansas explained, "journey" meant something far more narrow. *See Carr v. State*, 34 Ark. 448, 449 (1879) ("The exception [for journeys] in [a statute proscribing concealed carry of a pistol] is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed."); *Hathcote v. State*, 55 Ark. 181, 17 S.W. 721, 722 (1891) ("The prohibition was designed to stop the carrying of weapons on the streets, in society, and among one's habitual associates. The exception [for journeys] was designed to permit it when necessary to defend against perils of the highway to which strangers are exposed, and that are not supposed to exist among one's own neighbors.").

Contemporaneous court decisions rejected Second Amendment challenges (or those predicated on state-constitutional analogues) to statutes like these. In *Aymette v. State*, for example, the Supreme Court of Tennessee sustained, over the defendant's constitutional objection, a conviction for concealed carry of a Bowie knife. *See* 21 Tenn. 154, 156–62 (1840). The Supreme Court of Tennessee later upheld another conviction for concealed carry of a similar knife; though this defendant's challenge was on statutory, not constitutional, grounds, the court's explanation of why the legislature regulated such knives is instructive: "The design of the statute was to prohibit the wearing of bowie-knives, and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil-disposed persons but too often ended in assassination." *Haynes v. State*, 24 Tenn. 120, 122

(1844). The Supreme Court of Texas weighed in too, upholding the application of a penalty enhancement for homicides committed with a Bowie knife. *Cockrum*, 24 Tex. at 402. In doing so, the court stressed the knife's great danger, calling it "an exceeding[ly] destructive weapon," "the instrument of almost certain death," and "the most deadly of all weapons in common use," such that carrying the knife makes one "more dangerous to the rights of others ... than if [one] carried a less dangerous weapon." *See id.* at 402–03; *see also Wolford*, —— S.Ct. at ——, 2026 WL 1825723, at *18 (Barrett, J., concurring) (favorably citing *Cockrum* as an example of a state court decision that "upheld [a] gun regulation[ ] ... because the State[ ] [was] pursuing specific regulatory ends, not because [it was] hostile to gun rights").

**\*11** Contrary evidence is limited. The plaintiffs highlight the Supreme Court of Georgia's decision in *Nunn v. State*, 1 Ga. 243 (1846), which upheld an ambiguous statute to the extent it prohibited concealed carry but struck it down to the extent it prohibited open carry. *Id.* at 251. Most fundamentally, *Nunn* is only one case; just as in *Bruen* the Court refused to "give disproportionate weight to a single statute and a pair of state-court decisions," we refuse to place on *Nunn* more weight than it can bear. *Bruen*, 597 U.S. at 65, 142 S.Ct. 2111; *cf. Wolford*, —— S.Ct. at ——, 2026 WL 1825723, at *6. Furthermore, it is hard to discern what, if anything, we can draw from *Nunn*, which conceived of the Second Amendment as protecting the right "to keep and bear *arms of every description*," 1 Ga. at 251 (emphasis added)—a view plainly inconsistent with the Court's pronouncements in *Heller* that machine guns and sawed-off shotguns are not protected, *see* 554 U.S. at 625, 627, 128 S.Ct. 2783; *see also Bianchi*, 111 F.4th at 513 n.47 (Richardson, J., dissenting) (explaining that, for this reason, *Nunn* is an "outlier of little value in discerning the nature of 'dangerous and unusual' weapons in the Anglo-American legal tradition"). [11]

In evaluating whether a modern law coheres with the principles underpinning our regulatory tradition, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889. Doing so requires comparing the modern and historical regulations across at least two

metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111; *see Hemani*, 146 S.Ct. 1677, 2026 WL 1751710, at *5 ("The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld."). The "how" component of the *Bruen* inquiry in turn encompasses at least four considerations: how the Act operates mechanically, how much it burdens the right of armed self-defense, the restriction's duration, and the penalty associated with violating it. *See Rahimi*, 602 U.S. at 698–99, 144 S.Ct. 1889 (noting that 18 U.S.C. § 922(g)(8), like historical antecedents, disarms individuals only temporarily and only after an individualized judicial determination of dangerousness, and that its penalty is consistent with the regulatory tradition); *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111 (asking "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"). The "why" inquiry asks whether the burdens imposed by modern and historical regulations are "comparably justified." *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111.

While the Act "is by no means identical to" the historical regimes, "it does not need to be." *Rahimi*, 602 U.S. at 698, 144 S.Ct. 1889. In both how and why it burdens the right to keep and bear arms, the Act is " 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 692, 144 S.Ct. 1889 (quoting *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111).

Start with "how." Like historical regulations, the Act operates by imposing targeted restrictions on particular weapons, leaving untouched a wide variety of other arms—including many handguns, which *Heller* called "the quintessential self-defense weapon." 554 U.S. at 629. It also applies categorically to most of the population while carving out exceptions for special groups like law enforcement, a dividing line that *Bevis* noted our regulatory tradition establishes. *See* 85 F.4th at 1201–02. The Act also "fits within the regulatory tradition," *Rahimi*, 602 U.S. at 699, 144 S.Ct. 1889, because it applies indefinitely and authorizes imprisonment for violations, like the Bowie knife statutes.

**\*12** Moreover, the Act's "burden on the right of armed self-defense," *Bruen*, 597 U.S. at 29, 142

S.Ct. 2111, is minimal. To be sure, the district court found that AR-15s offer self-defense utility and that "every round matters in a self-defense scenario"; we accept those findings and therefore accept that the Act imposes *some* burden. We also of course agree, as the dissenting opinion emphasizes, that self-defense has long been a cherished and closely guarded right. But the burden the Act imposes on that right is mitigated by what the record indicates about how frequently individuals *actually use* AR-15s and more than ten rounds in self-defense—a matter on which the district court made no factual findings and on which the only evidence came from the defendants' expert. [12] *See Ocean State Tactical*, 95 F.4th at 50 ("Depriving citizens of a device that is virtually never used in self-defense imposes less of a burden on [the right of armed self-defense] than does banning a weapon that is, in fact, traditionally used in self-defense."). According to her report, using more than ten rounds in self-defense is "extremely rare": She identified only two such incidents in a sample of roughly five thousand instances of armed self-defense. Indeed, those engaged in self-defense fire only 2.2 rounds on average. It is also quite rare for individuals to use rifles in self-defense: The same expert's analysis of an online database containing over one thousand defensive gun uses reveals that whereas 90% of defenders employed a handgun, a mere 4% turned to a rifle. [13] These figures remained the same after excluding states with assault weapon bans, meaning they reflect self-defenders' choices when unfettered by regulation. [14]

While in the district court the plaintiffs cited a smattering of online articles reporting on the self-defensive use of items that the Act regulates, the plaintiffs submitted no evidence on the frequency of such occurrences. The articles that the plaintiffs cited, moreover, are entirely consistent with the defendants' evidence; the defense expert did not conclude that the regulated items are *never* used for self-defense —only that such use is exceedingly rare. [15] The Act therefore imposes a limited burden on the right of armed self-defense, one comparable to historical antecedents considering Bowie knives' utility and use for self-defense. That is especially so given that the Act's grandfather clause permitted citizens who already owned AR-15s and large-capacity magazines to continue possessing them.

The plaintiffs object that the Act's "how" differs too greatly from those of historical regulations. Many of the Bowie knife regulations, the plaintiffs stress, imposed less burdensome restrictions than does the Act —mostly because they regulated only carry or only concealed carry, but also because some only imposed penalty enhancements for crimes committed with the knives or severely taxed them. The Act therefore incomparably burdens the right of armed self-defense, the plaintiffs contend.

We accept the premise that the Act lacks a "historical twin," *Rahimi*, 602 U.S. at 701, 144 S.Ct. 1889, but that is not the touchstone, so we reject the conclusion that the historical antecedents on which the defendants rely are insufficient. First, the Supreme Court itself took just the leap that the plaintiffs argue is impermissible. In *Heller*, the Court invoked "the historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons' " in explaining that M16 rifles "may be *banned*." 554 U.S. at 627, 128 S.Ct. 2783 (emphasis added). And while *Heller* was not applying *Bruen*'s inquiry per se, *Bruen* made clear that its approach was consistent with—even more, *stemmed from*—*Heller*. *See, e.g.*, 597 U.S. at 26, 142 S.Ct. 2111 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.").

**\*13** Second, *Rahimi*, which "refine[d]" *Bruen*, "confirmed that a closer match to a historical precursor is not necessary" by rejecting distinctions no smaller than those here. *Reyna*, 165 F. 4th at 1064. *Rahimi* considered the constitutionality of 18 U.S.C. § 922(g)(8), which "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." *Rahimi*, 602 U.S. at 684–85, 144 S.Ct. 1889 (alteration in original) (quoting 18 U.S.C. § 922(g)(8)). In rejecting a facial challenge to that provision, the Court relied on two historical regimes: surety laws and going-armed laws. Neither regime, however, imposed anything particularly close to the restriction of § 922(g)(8).

Under the surety laws, a judicial officer could require one proven likely to misuse firearms to post a bond that would forfeit if one ultimately misused them. *See id.* at 695–96, 144 S.Ct. 1889. But that was all—it was, "in a nutshell, a fine on certain behavior." *Id.* at 753, 144 S.Ct. 1889 (Thomas, J., dissenting). "After providing sureties, a person kept possession of all his firearms; could purchase additional firearms; and could carry firearms in public and private. Even if he breached the peace, the only penalty was that he and his sureties had to pay a sum of money." *Id.* at 764, 144 S.Ct. 1889. As for the going-armed laws, those prohibited "carrying certain weapons ... in a particular manner ... and in particular places." *Id.* at 770, 144 S.Ct. 1889. In stark contrast to both these regimes, § 922(g)(8) completely denies an individual the ability to keep and bear arms for the duration of his restraining order; regardless of how much he is willing to put up as bond, he may not possess any firearm in any place or in any manner. No matter: Without denying the existence of the gaps the dissent emphasized, the Court's majority had "no trouble" concluding, with an emphasis on the *principles* underlying the historical regulations, that § 922(g)(8) was facially constitutional. *Id.* at 700, 144 S.Ct. 1889 (majority opinion).

The same goes here. True, the Act is "by no means identical" to its antecedents, but neither was § 922(g)(8). *Id.* at 698, 144 S.Ct. 1889. If anything, the distinctions between § 922(g)(8) and its antecedents seem of a greater magnitude than those between the Act and its antecedents. But most important is that the *principles* underlying each tradition justify the modern regulation: For § 922(g)(8), disarming those found by a court to pose a credible threat to the physical safety of another, and for the Act, imposing a targeted restriction on particularly dangerous weapons while leaving a host of others available for self-defense.

Finally, and most generally, the Supreme Court recently stressed that the primacy of history and tradition does not create "a law trapped in amber." *Id.* at 691, 144 S.Ct. 1889. Just as the Second Amendment protects more than just "muskets and sabers," so too it "permits more than just those regulations identical to ones that could be found in 1791" or 1868. *Id.* at 692, 144 S.Ct. 1889. The question confronting courts, then, is not whether there is a "dead ringer" or "historical twin" for

the challenged regulation, but instead "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* (emphasis added); *see id.* at 740, 144 S.Ct. 1889 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold."). Among other things, an excessively exacting approach would risk mistaking a historical legislature's decision not to maximally regulate as marking the outer limits of the Second Amendment's original meaning, when legislative restraint or raw political compromise may in fact have motivated the choice. *See id.* at 739–40, 144 S.Ct. 1889 (Barrett, J., concurring) (explaining that "imposing a test that demands overly specific analogues" inappropriately "assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority").

**\*14** As for the Act's justification—the "why"—the defendants seem to offer both "protect[ing] Illinois communities" and "protect[ing] the public from weapons that pose a special danger to its safety." We cannot accept the former. Because every firearm regulation is at some level about public safety, that justification operates "at such a high level of generality that it waters down the right." *Id.* at 740, 144 S.Ct. 1889. But the latter is more specific, appropriately so, and better coheres with the statutory text of the challenged provisions, which focuses not on safety generally but on especially dangerous weapons specifically. And that justification is consistent with the rationales underlying the historical regulations canvassed above, as our sister circuits have concluded. *See, e.g., Hanson,* 120 F.4th at 240; *Lamont,* 153 F.4th at 246.

The record confirms that AR-15s equipped with thirty-round magazines are indeed particularly dangerous—far more like the bannable M16 than "the quintessential self-defense weapon" that we know may not be banned for the entire population, the handgun. *Heller,* 554 U.S. at 629, 128 S.Ct. 2783. There is no dispute that when chambered with identical bullets, the AR-15 and the M16 fire rounds at approximately the same velocity—about 3,100 feet, or ten football fields, per second. That is about three times the velocity of a standard handgun bullet. There is also no dispute that AR-15s and M16s firing the same ammunition have the same maximum effective range of about 500 yards, compared to just 50

yards for a 9mm handgun. Likewise, the parties agree that AR-15s and M16s firing the same ammunition will have consistent wounding capabilities, as measured by the kinetic (or muzzle) energy of the rounds fired. Moreover, the plaintiffs do not dispute the state's evidence that the 5.56 NATO bullets commonly fired by AR-15s and M16s are more likely than slower, heavier handgun bullets to rotate within the body and potentially fragment, which causes additional damage to tissue and organs adjacent to the bullet's entry point. AR-15s, in other words, are dangerous not only in the sense that all firearms are dangerous but also relative to the semiautomatic handguns that *Heller* confirmed are protected. And large-capacity magazines amplify each and every one of the AR-15's dangerous characteristics by allowing a shooter to fire more of these lethal rounds without breaking to reload.

We recite these uncontested facts not to suggest that "the gravity of the harms the legislation was designed to avert and the appropriateness of the mechanism they adopt" justify the Act or to engage in interest balancing. *Bevis,* 85 F.4th at 1200. *Bruen* clearly rejected means-end scrutiny. We recite these facts, instead, to demonstrate that the Act and its antecedents are "comparably justified." *Bruen,* 597 U.S. at 29, 142 S.Ct. 2111; *see Schoenthal,* 150 F.4th at 910 (recognizing that "the fact that similar points can be made under different tests is a familiar aspect of the law"). The justification for the Act is akin to that seen in our history and tradition. As the Reconstruction-era judicial decisions cited earlier demonstrate, our ancestors regulated particularly dangerous weapons for sufficiently specific similar reasons as Illinois is regulating AR-15s and large-capacity magazines. *See, e.g., Haynes,* 24 Tenn. at 122 ("The design of the statute was to prohibit the wearing of bowie-knives, and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life...."); *Cockrum,* 24 Tex. at 402; *see also Wolford,* —— S.Ct. at ——, 2026 WL 1825723, at *17 (Barrett, J., concurring) (criticizing the challenged regulation because "[r]ather than identifying a specific threat to public peace and safety," the state "is responding to the general danger associated with the presence of firearms").

**\*15** We must address one final point. The district court, plaintiffs, and dissenting opinion have made much of the fact that AR-15s and large-capacity magazines are popular—i.e., there are many in civilian hands—and therefore (they argue) "in common use" as *Heller* and its progeny have used that term. *See Heller*, 554 U.S. at 627, 128 S.Ct. 2783. We do not deny that AR-15s are "both widely legal and bought by many ordinary consumers." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297, 145 S.Ct. 1556, 221 L.Ed.2d 910 (2025). As in *Bevis*, however, "we decline to base our assessment of the constitutionality of [the Act] on numbers alone." 85 F.4th at 1198–99. We need not belabor this point, which the Supreme Court's post-*Bevis* precedents do not address and which our precedents in *Bevis* and *Friedman v. City of Highland Park* have forcefully made. *See* 85 F.4th at 1198–99; 784 F.3d 406, 408–09 (7th Cir. 2015). We add only that *Bruen* cuts against the conclusion that a weapon's "common use" leaves it immune from regulation. After confirming that "handguns are weapons in common use today for self-defense," *Bruen*, 597 U.S. at 32, 142 S.Ct. 2111 (citation modified), the Court proceeded to undertake an "extended analysis of the Government's proposed historical analogues, hardly an *obiter dictum*," *Hanson*, 120 F.4th at 234.

\* \* \*

Before moving on, we must address a methodological divergence between our opinion and the dissenting opinion. The dissenting opinion asserts that we "break fresh ground" by not applying its understanding of "[t]he only relevant historical tradition the Court has recognized"—"the regulation of 'dangerous and unusual' weapons." But the Court has not set out a comprehensive framework through which to evaluate challenges to restrictions on particular weapons, as its recent grant of certiorari in cases similar to this one indicates. *See Viramontes v. Cook County*, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2026 WL 1871322 (2026); *Grant v. Higgins*, ––– U.S. ––––, ––– S.Ct. ––––, ––– L.Ed.2d ––––, 2026 WL 1871312 (2026). Accordingly, far from breaking fresh ground, we have applied the general methodological principles established in the Court's recent Second Amendment jurisprudence by identifying relevantly similar historical analogues.

### E. A More Nuanced Approach

*Bruen*'s recognition that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to its historical inquiry fortifies, but is not essential to, our conclusion. [16] 597 U.S. at 27, 142 S.Ct. 2111. This consideration—the flipside of the more "straightforward" inquiry applicable where the challenged regulation addresses an age-old problem—reflects that the farther today's regulatory challenges get from "those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," the greater the need to "reason[ ] by analogy." *Id.* at 28, 142 S.Ct. 2111; *see Wolford*, ––– S.Ct. at –––– – ––––, 2026 WL 1825723, at \*6–7 (cases involving "distinctively modern" conduct, as when "the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted," "call[ ] for a more difficult exercise of judgment").

A more nuanced approach reinforces our conclusion here, as our sister circuits have concluded. *See, e.g., Lamont*, 153 F.4th at 236–40; *Hanson*, 120 F.4th at 240–42; *Bianchi*, 111 F.4th at 463–64. Indeed, this case implicates both of the grounds *Bruen* identified in an interdependent way: The dramatic technological change embodied in AR-15s equipped with large-capacity magazines has enabled the unprecedented societal concern of mass killings speedily carried out by lone shooters. *See Bianchi*, 111 F.4th at 464 ("These are not our forebears' arms, and these are not our forebears' calamities.").

From 1791 through the mid-nineteenth century, the ubiquitous firearm was a single-shot, muzzle-loaded firearm. In other words, these guns could not fire consecutive rounds; someone seeking to fire two shots would have needed to reload the gun in between rounds by meticulously loading the projectile and a propellant into the muzzle—a process that could take half a minute. As such, they "did not have the capacity to occasion a societal concern with mass shootings...." *Hanson*, 120 F.4th at 240.

**\*16** AR-15s equipped with large-capacity magazines are a far cry from these antecedents. With this combination, a shooter can discharge thirty rounds—

each of which travels five football fields in half-a-second and releases ten times the energy of a musket ball upon impact—as quickly as he can pull the trigger. And when that magazine is empty, he can replace it in just a few seconds, reloading thirty rounds in a fraction of the time it would have taken to reload one in 1791 or 1868. Taking all of this together, a modern shooter armed with an AR-15 and thirty-round magazines can fire almost sixty extraordinarily lethal rounds—assuming about one pull of the trigger per second, with a few seconds to change out magazines—in the time it took to fire a pair of far less damaging shots at the Founding. In other words, Illinois faces a "regulatory challenge[ ]" unlike "those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111. [17]

True, as the plaintiffs and dissenting opinion note, repeating arms (i.e., those capable of firing multiple rounds without reloading) existed during this era. But through most of the nineteenth century, these weapons remained technologically flawed curios with limited practical utility. The 1779 Girandoni air rifle, for example, was fragile, complex, and impractical, while the 1821 Jennings flintlock rifle "was beset by technical challenges," *Hanson*, 120 F.4th at 249 (citation modified), such as its use of "superposed loads" (stacking multiple loads in the barrel at once) that "were prone to explode if the sequencing between rounds was off," *Lamont*, 153 F.4th at 237 (citation modified). These firearms, moreover, were exceedingly rare and never penetrated the commercial or military markets—so it is hard to see how either could have posed a "regulatory challenge[ ]" for historical legislatures, let alone one that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111. And the Winchester repeating rifle, introduced in 1866 and refined in 1873, was not a true semiautomatic firearm—the shooter was required to manipulate a lever forward and then backward between each shot—and was reloaded one round at a time. [18] In other words, AR-15s with large-capacity magazines represent a dramatic technological change over these arms, too. "Their advanced military-like features enable them to inflict catastrophic injuries that bear no similarity to those injuries caused by the comparatively primitive firearms that were widely available in the founding and reconstruction eras." *Lamont*, 153 F.4th at 237.

The plaintiffs' argument that the capabilities and ubiquity of repeating rifles grew *gradually* as America grew—and not as a "dramatic" technological change—overlooks the extent to which incremental innovation, compounded over more than a century, can yield a dramatic technological change over the long run. There need not be a singular, transformative moment in the history of firearm innovation for AR-15s and large-capacity magazines to be "different in form and in kind from arms in common use during the Founding and Reconstruction eras, the relevant periods for assessing the original understanding of the Second and the Fourteenth Amendments, respectively." *Hanson*, 120 F.4th at 242.

**\*17** This dramatic technological change, moreover, has given rise to the unprecedented societal concern of mass shootings, especially those with high fatality counts carried out by lone shooters. Whereas the technological limitations of our forebears' arms "prevented a single gunman from using them to unleash a massacre in a matter of seconds," *Lamont*, 153 F.4th at 237, the same assuredly cannot be said for AR-15s and large-capacity magazines. Indeed, the first known mass shooting resulting in at least ten deaths did not occur until 1949. And the frequency of such events has only increased over time. We need not belabor the all too familiar prevalence of these episodes.

Neither of the plaintiffs' counterarguments persuades us otherwise. They emphasize (echoed by the dissenting opinion) the district court's conclusion that "[m]ass murder has been a fact of life in the United States since the mid-nineteenth century," accusing the defendants of overlooking atrocities committed against groups like Native Americans and slaves. But this asserted problem of "mass murder" is framed at too high a level of generality, obscuring distinctions with important consequences for how a legislature might respond. When the Second and Fourteenth Amendments were ratified, mass killings were a "group activity," *Bianchi*, 111 F.4th at 463, relying on "primitive firearms and melee weapons" because individuals lacked "the means to inflict mass casualties on their own," *Lamont*, 153 F.4th at 239. A regulatory response to *that* problem was not to impose a targeted restriction on certain arms, no one of which was principally responsible for the

lawlessness; rather, it was to target armed *groups*. And that is just what Founding- and Reconstruction-era legislatures did. *See* Mark Anthony Frassetto, *Mass Violence and the Second Amendment*, 76 Ala. L. Rev. 43, 54–58 (2024) (collecting statutes prohibiting armed groups). But whereas the firepower needed to carry out a mass killing used to come from an aggregation of people, now it comes from an AR-15 and large-capacity magazines—a problem for which the historical solution is self-evidently unfit. The difference between the shameful history on which the plaintiffs rely and the problem facing modern legislatures therefore weakens the inference we can draw from the lack of historical regulations that are extremely similar to the Act. *See Bruen,* 597 U.S. at 27, 142 S.Ct. 2111 (recognizing that nuance is required where "[t]he regulatory challenges posed by firearms today are" different from "those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868"); *cf. Wolford,* —— S.Ct. at ——, 2026 WL 1825723, at *17 (Barrett, J., concurring) (because "the right to bear arms is misused in ... ways that were unknown to our forebears but pose an equivalent risk to persons or property," historical antipoaching laws can justify more than merely modern antipoaching laws—they "support the principle that when a State identifies specific places that are prone to particular abuses of the right, it can respond with focused regulations to address the threat" (citation modified)).

The dissenting opinion, moreover, relies almost exclusively on twentieth-century mass shootings to undermine our claim of an unprecedented societal concern. Putting aside that the scale of today's mass-shooting problem is unprecedented even compared to a century ago, twentieth-century incidents cannot undermine the propriety of adopting a more nuanced approach. The conceptual underpinning of the more nuanced approach is straightforward: The strength of the inference a court can draw from a lack of precise historical precursors is mitigated where "[t]he regulatory challenges posed by firearms today are not ... the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen,* 597 U.S. at 27, 142 S.Ct. 2111. That concept remains coherent only if courts measure changes in technology or society against the time period from which courts may draw historical analogues. But we agree with the dissenting opinion that twentieth-

century analogues cannot sustain a modern firearm regulation, so it must also be the case that twentieth-century regulatory challenges do not undermine the "distinctively modern" nature of the conduct here. *Wolford,* —— S.Ct. at ——, 2026 WL 1825723, at *7. Put another way, because legislative responses to those twentieth-century incidents could not sustain the Act, the incidents themselves cannot undercut the unprecedented (in the relevant sense) nature of the societal problem the Act addresses.

**\*18** The plaintiffs also argue that, even if there is an unprecedented societal concern of mass shootings, the arms the Act bans are not intrinsic to that problem. The undisputed record evidence undercuts that claim, showing that the presence of assault weapons and large-capacity magazines is strongly correlated with the severity of the societal problem. In a sample of mass shootings with at least four fatalities, 24% involved assault weapons and 63% involved large-capacity magazines. Raise the fatality count to six, and assault-weapon and large-capacity-magazine usage rates jump to 53% and 80%, respectively, between 2019 and 2022. Raise it further, to twenty fatalities, and the respective figures climb to 75% and 88% for all incidents between 1991 and 2022. And since September 11, 2001, the seven deadliest individual acts of intentional criminal violence in the United States have been mass shootings, six of which used assault weapons and large-capacity magazines that the Act regulates.[19] In short, whatever else may be contributing to America's mass-shooting epidemic, the record makes one thing clear: The more people killed, the more likely it is that the killer used an assault weapon and large-capacity magazines.

Overall, then, it is appropriate to take a more nuanced approach to the historical inquiry. Though we do not see this conclusion as necessary to upholding the Act, it nevertheless reinforces our holding that the Act is consistent with our regulatory tradition. The distinctions between the Act and its antecedents are yet less material in light of the dramatic technological changes and unprecedented societal concerns that have taken root since the Founding and Reconstruction eras.

\* \* \*

In sum, the plaintiffs' request that we find the Act facially unconstitutional and enjoin it entirely falls short twice over. First, and most simply, the plaintiffs did not even address every application of the Act's operative provisions (5/24-1.9(b)–(c) and 5/24-1.10(b)–(c)) and thus cannot show, as Supreme Court precedent requires, that "no set of circumstances exists under which the [challenged provisions] would be valid." *Rahimi*, 602 U.S. at 693, 144 S.Ct. 1889 (quoting *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095). That is enough to deny their claim of facial invalidity and leave the Act's more contested applications for as-applied challenges. Second, though, we also hold that the Act's application to AR-15s and thirty-round rifle magazines is constitutional, supplying a second, independent basis for reversal.

### F. Endorsement Affidavit Requirement

As noted above, the *Federal Firearms Licensees* plaintiffs also challenge the Act's registration requirement. Recall that to effectuate the Act's grandfather clause, the Act required those wishing to continue possessing certain restricted items to provide the Illinois State Police an "endorsement affidavit" containing certain information. 720 ILCS 5/24-1.9(d). Registration was free, simple, and not subject to official discretion; providing basic information about one's firearm license and the firearms in question automatically entitled the registrant to keep them.

We easily (and unanimously) upheld the constitutionality of the registration requirement in *Bevis*, and the record casts no doubt on that conclusion. *See* 85 F.4th at 1202. Registration is free of charge, subject to well-defined standards, and leaves no room for government discretion. It is therefore akin to the sort of "shall-issue" licensing regime that *Bruen* approved in dicta. *See* 597 U.S. at 38 n.9, 142 S.Ct. 2111; *id.* at 80, 142 S.Ct. 2111 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice."); *see also Maryland Shall Issue v. Moore*, 116 F.4th 211, 222–23 (4th Cir. 2024) (holding that "shall-issue" licensing regimes are presumptively constitutional under *Bruen*); *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024) (same).

### III. Conclusion

**\*19** We REVERSE the judgments of the district court, and we REMAND the cases with directions to enter judgments for the defendants.

Brennan, Chief Judge, dissenting.

Illinois has banned the best-selling rifle in America and its standard magazine. That ban—part of an extraordinarily broad and strict set of laws—was preliminarily upheld as constitutional in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023).

Now, with perhaps the most comprehensive trial record in any Second Amendment case to date, this court repeats its error. Our Nation's enduring traditions forbid governments from prohibiting firearms commonly owned for self-defense. Because *the people* have overwhelmingly chosen the AR-15 rifle and its magazine as their weapon of choice, they are protected by the Second Amendment.

Instead, the majority opinion holds that a state may prohibit the possession and sale of AR-15s and 30-round magazines. That conclusion cannot be reconciled with the "common use" test as applied in *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and is not supported by the historical record. The district court's permanent injunction should be affirmed. I therefore respectfully dissent.

### I. Background

#### A. The Act

At the center of these consolidated appeals is the Protect Illinois Communities Act, Pub. Act 102-1116 (2023) ("the Act"). The Act makes it a crime to manufacture, deliver, sell, import, or purchase an "assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge." 720 ILCS 5/24-1.9(b). With a few exceptions, the Act also makes it unlawful for any person to knowingly "possess an assault weapon." *Id.* § 1.9(c)–(d).

In all, the Act covers nearly 1,000 different firearms. This includes "assault weapon[s]," which encompasses certain semiautomatic rifles and pistols. *Id.* § 1.9(a)(1). A semiautomatic rifle is covered if it "has the capacity to accept a detachable magazine or ... may be readily modified to accept a detachable magazine" and has one or more of the following features: a pistol grip or thumbhole stock; any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; a folding, telescoping, thumbhole, or detachable stock; a flash suppressor; a grenade launcher; or a barrel shroud. *Id.* § 1.9(a)(1)(A)(i)–(vi). A semiautomatic rifle with a fixed magazine capacity of greater than 10 rounds is also covered. *Id.* § 1.9(a)(1)(B). As a result, Illinois's ban captures more than 20% of all the types of firearms sold in the United States in 2020.

The Act also outlaws particular models of "assault weapons." *Id.* § 1.9(a)(1)(J). Among those are "all AR types," including AR-15s. *Id.* § 1.9(a)(1)(J)(ii). The AR-15 is one of the most widely owned firearms in the Nation and is the most popular rifle in the country. *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297, 145 S.Ct. 1556, 221 L.Ed.2d 910 (2025) ("AR-15 rifles, AK-47 rifles, and .50 caliber sniper rifles ... are both widely legal and bought by many ordinary consumers."). Millions are in circulation in the United States. Their popularity stems from their self-defense properties. For example, they are easier to aim and control than shotguns and machine guns. And their grips make them safer and easier to aim, particularly for those who are infirm, small-statured, or have limited training. So, it is no surprise that "AR-15s are legal in 41 of the 50 States." *Snope v. Brown*, ––– U.S. ––––, 145 S. Ct. 1534, 1534, 222 L.Ed.2d 1059 (2025) (Kavanaugh, J., statement respecting the denial of cert.).

**\*20** Certain pistols and shotguns are also banned under the Act. That includes all semiautomatic pistols with "the capacity to accept a detachable magazine" that have "a threaded barrel," "a second pistol grip," a protruding grip, a barrel shroud, or other features. 720 ILCS 5/24-1.9(a)(1)(C)(i)–(vi). Further, any semiautomatic pistol with a "fixed magazine with the capacity to accept more than 15 rounds" is banned. *Id.* § 1.9(a)(1)(D). All semiautomatic shotguns with a fixed magazine that holds more than five rounds,

have a pistol grip, or can accept a detachable magazine, among other features, are also covered. *Id.* § 1.9(a)(1)(F)(i)–(vi).

The Act also prohibits types of magazines. Section 5/24-1.10 covers large-capacity magazines, or magazines with a capacity of "more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." 720 ILCS 5/24-1.10(a)(1). These large-capacity magazines cannot be sold, delivered, manufactured, or purchased. *Id.* § 1.10(b). And their possession is outlawed too, save certain exceptions. *Id.* § 1.10(c)–(d). Illinois prohibited these magazines despite their wide ownership—"easily more than 100 million" exist. *Duncan v. Bonta*, 133 F.4th 852, 902 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting). As the D.C. Circuit recognized over a decade ago, "[t]here may well be some capacity above which magazines are not in common use," but "that capacity surely is not ten." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

## B. Proceedings

In 2023 several groups of plaintiffs challenged the Act as violating their Second Amendment rights. The appeals from these cases were consolidated and heard together in *Bevis v. City of Naperville*, 85 F.4th at 1181–84. Over my dissent, this court concluded that the Act does not violate the Second Amendment. *Id.* at 1197.

The majority opinion resolved the case on *Bruen*'s first step.[1] *See New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022). "We begin by looking at the 'plain text' of the Second Amendment to see whether the assault weapons and large-capacity magazines ... fall within the scope of the 'Arms' that individual persons are entitled to keep and bear." *Bevis*, 85 F.4th at 1192. "Arms," the court concluded, are not weapons "exclusively or predominantly useful in military service." *Id.* at 1194. AR-15s, and the other weapons covered in the Act, were "much more like machineguns and military-grade weaponry." *Id.* at 1195. "Indeed, the AR-15 is almost the same gun as the M16 machinegun," with the only meaningful difference being the AR-15 has semiautomatic fire only. *Id.*

My dissent disagreed with the *Bevis* majority's arbitrary definition of "Arms." "My colleagues read the passages in [*District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)*]* discussing weapons with military capabilities too broadly, however, placing controlling weight on supporting or explanatory language in that decision." *Id.* at 1222 (Brennan, J., dissenting). Others agreed. "[T]he Seventh Circuit reached its conclusion by conducting a lengthy (and questionable) exegesis of some dicta in *Heller* about 'dangerous and unusual' weapons." William Baude & Robert Leider, *The General-Law Right to Bear Arms,* 99 NOTRE DAME L. REV. 1467, 1502 (2024).

The Supreme Court denied certiorari, but Justice Thomas disagreed with the *Bevis* majority. *Bevis,* 85 F.4th at 1175, *cert. denied sub nom. Harrel v. Raoul,* ⸺ U.S. ⸺, 144 S. Ct. 2491, 2492, 219 L.Ed.2d 1333 (2024) (Thomas, J., statement). "By contorting what little guidance our precedents provide, the Seventh Circuit concluded that the Second Amendment does not protect 'militaristic' weapons." *Id.* But, despite its "tautological[ ]" and "unmoored" reasoning, the majority opinion was preliminary. *Id.* at 2492–93. If, he cautioned, "the Seventh Circuit ultimately allows Illinois to ban America's most common civilian rifle, we can—and should—review that decision once the cases reach a final judgment." *Id.*

 **\*21**  On remand, the parties developed an expansive and comprehensive trial record. Plaintiffs proffered nearly 200 pieces of evidence. This included live and written testimony from civilians, firearm design and self-defense experts, firearm instructors, weapon experts, and a firearm retailer. For its part, the State submitted expert reports from a firearms expert, a public safety expert, a doctor, and professors of history and political science. In addition, two military experts testified on behalf of the State: Col. Craig Tucker and Lt. Col. (ret.) Jason Dempsey. Dempsey himself owned an AR-15 for self-defense and disapproved of the State's efforts to "outright" ban common firearms. In all, the parties offered initial and rebuttal reports from 24 experts.

The district court heard four days of live testimony. Four experts testified for plaintiffs; two testified for the State. The parties then filed over 400 pages of fact-intensive post-trial briefing. The district court wrote an insightful and comprehensive 160-page opinion, which detailed the history of the relevant Second Amendment jurisprudence and evaluated a mountain of technical evidence.

The district court concluded that the Act violates the Second Amendment and entered a permanent injunction. First, the court made numerous findings of fact, distinguishing AR-15s from M16s in several ways:

- "[T]he M16 and M4 are designed to fulfill a specific niche; their semiautomatic fire feature permits precise target shooting while their ability to fire in a fully automatic capacity is designed to provide suppression fire in a situation where members of a squad are moving to or from an objective. Fully automatic fire is incredibly inaccurate and impractical, even in a military situation."

- "A machine gun is ... extremely difficult, if not impossible," for the ordinary person "to control ... or to fix ... on a discrete target."

- M16 and M4 have distinct barrels to prevent overheating and receive quality inspections. By contrast, an "AR-15 is, frankly, not at all the same weapon as the M16 rifle or M4 carbine used by the United States military."

- "A semi-automatic rifle does not suffer from the lack of control as is inherent to machineguns and sawed-off shotguns."

- The civilian AR-15 has not been used by any military force.

- Millions of Americans own AR-15s.

The court also found that the 30-round magazines prohibited by the Act have legitimate self-defense purposes. "Every round matters in a self-defense scenario": the more rounds fired, the less time spent reloading, meaning "the difference between life and death for a person defending him or herself in the home." And these are widely owned because they are commonly sold with semiautomatic rifles. [2]

The district court then applied *Heller*'s "dangerous and unusual" test. The "semiautomatic rifles, shotguns, and some of the large-capacity magazines and attachments proscribed by PICA are in common use." In addition, "the AR-15 (and similar copycat weapons) are ideally suited for self-defense in the home." Such weapons can be controlled and aimed effectively, unlike machine guns and sawed-off shotguns. Thirty-round magazines, too, could not be lawfully banned. They are in common use and serve legitimate self-defense purposes.

After concluding that such firearms and magazines are protected, the court moved to *Bruen*'s second step: whether the government can identify a history and tradition of restricting these firearms or relevantly similar weapons. *See Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. Acts like a 1746 Massachusetts Bay Colony ban on discharging a firearm or bans on the sale of Bowie knives did not evince a history and tradition of banning weapons commonly owned for self-defense. What is more, historical "prohibitions on the carrying of certain weapons do not amount to a categorical ban of whole classes of firearms." For that reason, the district court concluded that the Act violated the Second Amendment. The State timely appealed.

 **\*22**  Months later, the Supreme Court denied certiorari in a similar case. *Snope*, 145 S. Ct. at 1534. Three Justices would have granted the petition for a writ of certiorari. Justice Kavanaugh wrote a statement respecting the denial of certiorari. *Id.* at 1534 (Kavanaugh, J., statement respecting the denial of cert.). In his view, Maryland's ban on AR-15s was likely unconstitutional because AR-15 bans are outliers among the states. *Id.* In addition, AR-15s are "analytically difficult to distinguish" from the handguns held protected in *Heller*. *Id.* Although the Court denied certiorari, Justice Kavanaugh called for the Courts of Appeals to assist the Supreme Court's "ultimate decisionmaking on the AR-15 issue." *Id.*

In its opinion permanently enjoining the Act, the district court made findings of fact and conclusions of law. I agree with my colleagues that the court's factual findings here are reviewed for clear error. *See United States v. Griffin*, 806 F.3d 890, 892 (7th Cir. 2015). The clear error standard is "highly deferential" and allows this court to deviate from the district court only when we have a "definite and firm conviction that a mistake

has been made." *Id.* (citations omitted). By contrast, all conclusions of law are reviewed de novo. *3M v. Pribyl*, 259 F.3d 587, 597 (7th Cir. 2001).

## II. *Bruen* Step One

The majority opinion correctly declines to recommit to the analysis in *Bevis* on *Bruen* step one—whether the plain text of the Second Amendment covers the AR-15. But for the sake of completeness, I explain why an AR-15 qualifies as an "Arm" covered by the Second Amendment.

### A. *Bevis* Does Not Control

The holding in *Bevis* that AR-15s are not "arms" lurks in the background of these appeals, but it does not bind us. "The Supreme Court has held that legal and factual rulings made as part of a preliminary-injunction analysis are not binding upon panels when they later consider the matter on the merits." *Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)); *see also Lackey v. Stinnie*, 604 U.S. 192, 201, 145 S.Ct. 659, 221 L.Ed.2d 63 (2025) ("Likelihood of success" is not "success."). The *Bevis* majority recognized this, repeatedly emphasizing the preliminary status of its holding. *Bevis*, 85 F.4th at 1197. "There thus will be more to come, and we do not rule out the possibility that the plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s (and each one's relatives) than the present record reveals." *Id.*

The conclusions offered in support of the holding in *Bevis* have not aged well. For example, it stated, "[t]he M16 has an automatic firing rate of 700 rounds per minute, while the AR-15 has a semiautomatic rate of 'only' 300 rounds per minute" without citation. *Id.* at 1196. But "record sources ... give good reason to doubt that figure." *Id.* at 1223 (Brennan, J., dissenting). According to the U.S. Army marksmanship manual, the M16A1 can shoot 45 to 65 rounds per minute in semiautomatic mode and 150 to 200 rounds per minute in automatic mode. And in *Bevis*, "Arm" was defined based on the Supreme Court's "comments about the role of the militia." *Id.* at 1193. That contradicts the holding of *Heller*: the right to keep and bear arms

is an *individual* right. *McDonald v. City of Chicago,* 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). The scope of the Second Amendment "is defined not by what the militia needs, but by what private citizens commonly possess." *Friedman v. City of Highland Park,* 577 U.S. 1039, 136 S. Ct. 447, 449, 193 L.Ed.2d 483 (2015) (Thomas, J., dissenting from the denial of cert.). The *Bevis* majority opinion also barely scratched the historical surface. Baude, *supra,* at 1501–02 (criticizing the *Bevis* majority for ignoring caselaw, treatises, legislative precedents and drawing a conclusion not derived from history). We should move past that opinion and follow *Bruen* and *Heller* in the following way.

## B. The Text of the Second Amendment

**\*23** *Bruen*'s first step instructs courts to decide whether the Second Amendment's text covers an individual's conduct. 597 U.S. at 24, 142 S.Ct. 2111. In other words, are the firearms at issue "Arms?" The answer is yes.

The Act prohibits the possession of AR-15s sold after the law takes effect. That limits the constitutional right to "keep ... Arms," as *Heller* defined that right to mean to "have weapons." 554 U.S. at 582, 128 S.Ct. 2783. *Cf. Wolford v. Lopez,* ––– U.S. ––––, ––– S.Ct. ––––, ––––, ––– L.Ed.2d ––––, 2026 WL 1825723, at \*9 (2026) ("The plain text of the Second Amendment protects what petitioners want to do: carry handguns for self-defense." (citation modified)). The Act also forbids buying AR-15s. Purchasing and acquiring firearms is a prerequisite to exercising Second Amendment rights. *Ortega v. Grisham,* 148 F.4th 1134, 1143 (10th Cir. 2025) ("[T]he right to bear arms requires a right to acquire arms.").

The AR-15 rifle is an "Arm." *Heller,* relying on historical sources, defined "Arm" to mean "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581, 128 S.Ct. 2783. A person fires an AR-15 to protect himself and strike assailants. It is therefore an "Arm." *Harrel,* 144 S. Ct. at 2492–93 (Thomas, J., statement respecting denial of cert.) (AR-15 is an "Arm"); *Snope,* 145 S. Ct. at 1535 (Thomas, J., dissenting from denial of cert.) (same); *cf.*

*United States v. Reyna,* 165 F.4th 1056, 1062 (7th Cir. 2026) (deserialized firearms are "Arms").

Following *Heller,* another circuit concluded that a machine gun is an "Arm." *See, e.g., United States v. Bridges,* 150 F.4th 517, 524 (6th Cir. 2025). Others, however, have applied the atextual "common use" test at step one. *Bevis,* 85 F.4th at 1193; *Bianchi v. Brown,* 111 F.4th 438, 460 (4th Cir. 2024) (en banc).

The "common use" test does not belong in *Bruen*'s first step. A firearm is still a firearm, regardless of its popularity. *Bevis,* 85 F.4th at 1209 (Brennan, J., dissenting) ("The nature of an object does not change based on its popularity."). In addition, the "common use" test derives from the historical tradition of regulating "dangerous and unusual" weapons. *Id.* at 1209–10; *Snope,* 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting denial of cert.) ("The Court's later Second Amendment decisions in *Bruen* and *Rahimi* did not disturb the *historically based* 'common use' test." (emphasis added)). Accordingly, the common use test more properly belongs in *Bruen*'s second step, where courts examine the Nation's "historical tradition of firearm regulation." *Bruen,* 597 U.S. at 24, 142 S.Ct. 2111.

Plaintiffs have proved that the Second Amendment's plain text covers their conduct, so it is presumptively constitutionally protected.

## III. *Bruen* Step Two

At *Bruen*'s second step, Illinois has the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* The contemporary restriction must be "relevantly similar" to that historical tradition. *Id.* at 29, 142 S.Ct. 2111. When making that determination, it is imperative for a court to analogize at the proper level of generality. If a court takes too narrow a view, the Second Amendment is "trapped in amber" and cannot respond to technological developments. *United States v. Rahimi,* 602 U.S. 680, 691, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024). But at too broad a generality, any historical regulation can look like a contemporary restriction. For example, both a colonial era ban on storing gunpowder and

the District of Columbia's 2000s handgun ban were enacted to keep citizens safe. *But see Heller*, 554 U.S. at 632, 128 S.Ct. 2783 ("Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns."). Thus, I tread carefully not to read historical principles "at such a high level of generality" to "water[ ] down the right." *Rahimi*, 602 U.S. at 740, 144 S.Ct. 1889 (Barrett, J., concurring).

**\*24** To ensure fidelity to *Bruen* and the Second Amendment, a court looks to the "[w]hy and how" of historical regulations. *Id.* at 692, 144 S.Ct. 1889. "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* "[T]he principles underlying the Second Amendment" guide *Bruen*'s historical tradition step. *Id.*

Although the majority opinion here thinks it unnecessary to review the applicable historical traditions, I do so because they inform the "dangerous and unusual" test as understood today. Historical analysis reveals three enduring traditions. First, and most importantly, "dangerous and unusual" weapons —those suited for or overwhelmingly used by criminals—could be prohibited. Second, the people of England and the United States closely guarded the right of self-defense. Third, the weapons chosen by the people for self-defense were not outlawed.

**A. The History of the "Common Use" Test**

"From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626, 128 S.Ct. 2783. Today, we know this as the historical tradition of prohibiting "dangerous and unusual weapons." *Id.* at 627, 128 S.Ct. 2783. This "dangerous and unusual" test "roughly tracks" *Bruen*'s "why" and "how" inquiry. *Bridges*, 150 F.4th at 534 (Nalbandian, J., concurring in part) (citation modified).

*1. Pre-Founding English Regulations*

The Second Amendment protects a preexisting right "inherited from our English ancestors." *Heller*, 554 U.S. at 599, 128 S.Ct. 2783 (citation omitted). Restrictions on the right to own arms that predate the Second Amendment, then, inform how we understand the original meaning of the Amendment. But those historical restrictions do little to "illuminate the scope of the right" if legal conventions changed in the following years. *Bruen*, 597 U.S. at 34, 142 S.Ct. 2111. Thus, courts should give weight only to a "long, unbroken line of common-law precedent" rather than a "short-lived, 14th-century English practice." *Id.* at 35, 142 S.Ct. 2111.

Until the late 1600s, England had no standing army or police force. Instead, an Englishman defended himself and his family with his arms. *Bianchi*, 111 F.4th at 484 (Richardson, J., dissenting) (citing JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 2 (1994) ("MALCOLM")). Militia service was also mandatory to respond to domestic and foreign threats. MALCOLM, at 2–3.

At the same time, sovereigns restricted the use of arms for public safety. For example, squires, footmen, and spectators sometimes rioted at jousting and melee tournaments. R.W. HUNT, ET. AL., STUDIES IN MEDIEVAL HISTORY PRESENTED TO FREDERICK MAURICE POWICKE 257, 261– 62. (1948). So, in 1260, the Statuta Armorum forbade tournament attendees from bearing lethal weapons, such as "sword, or dagger, or staff, or mace, or stone." Statuta Armorum (The Statutes of Arms), c. 1260. Another problem was roving gangs attacking jurors traveling to jury duty, preventing the King's courts from functioning. David Kopel, *English Legal History and the Right to Carry Arms*, VOLOKH CONSPIRACY (Oct. 31, 2015), https://reason.com/ volokh/2015/10/31/english-legal-history-and-the/.  In response, a 1351 royal proclamation forbade "any one" from going "armed with haketon, or with plate, or with habergeon [or with sword], or with long dagger, or with any other manner of arms suspected, within the City of London, or within the suburbs." 25 Edw. 3 (1351). The proclamation noted that the "riots, and

disputes" "impeded" the "business of our Lord the King" and presented an "alarmed threat [sic]" to the "great people." *Id.* Such "going armed" laws were passed to "bar[ ] people from misusing weapons to harm or menace others." *Rahimi*, 602 U.S. at 693, 144 S.Ct. 1889.

 **\*25** A similar example is the 1328 Statute of Northampton. The law provided that Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." 2 Edw. 3 c. 3 (1328); *Bruen*, 597 U.S. at 40, 142 S.Ct. 2111. But the statute "prohibited people from carrying [weapons] with such ill intent." *Bianchi*, 111 F.4th at 505 (Richardson, J., dissenting). As Blackstone observed, "the Statute codified the preexisting, common-law crime" of "riding or going armed, with *dangerous or unusual weapons*, which would terrify the good people of the land." *Id.* (citation modified).

Of these "dangerous or unusual" weapons, one example was a launcegay, a medieval lance. The lance was "generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace." *Bruen*, 597 U.S. at 41, 142 S.Ct. 2111. This is why a "going armed" statute prohibited its public carry. *Id.* But at the same time, daggers and knives, often carried for self-defense, were not covered by the Statute. *Id.* at 41–42, 142 S.Ct. 2111.

Up to this point, there were no blanket prohibitions on owning classes of weapons. Rather, sovereigns outlawed the public or concealed carry of weapons particularly useful for crime or breaching the peace, like launcegays. Or they prohibited the carrying of certain weapons in common places, like in cities and tournaments. The law focused on who was carrying arms, where they were carried, and how they were being used.

Two hundred years and a Welsh rebellion later, King Henry VIII sought to incorporate Wales into the realm of England. Among several acts passed in 1534, any resident or person living in Wales was forbidden from carrying "any bill, long-bow, cross-bow, hand-gun, sword, staff, dagger, halbert, morespike, spear or any other manner of weapon, privy coat or armour defensive" in certain public areas. 26 Hen. 8, c. 6 (1534). Thus, certain groups believed to be dangerous—like the rebellious Welsh—could have their weapons seized.

Around the same time, small handguns and crossbows were banned. 33 Hen. 8 c. 6 (1542); *Bruen*, 597 U.S. at 42, 142 S.Ct. 2111. Two aspects of these laws are notable. First, as *Bruen* recognized, Henry VIII's prohibition stemmed from a concern that "handguns threatened Englishmen's proficiency with the longbow—a weapon many believed was crucial to English military victories." 597 U.S. at 42, 142 S.Ct. 2111. Second, the Act stated that crossbows and handguns were being used "to the great [peril] and contynuall feare and daunger of the Kinge most [loving] subjecte." 33 Hen. 8 c. 6 (1542). These weapons engendered public concern, and were thus banned, because they were "concealable" and "frequently employed in crime." MALCOLM, at 9. That is why the Act banned handguns with barrels less than one yard in length. *Id.* at 10. Thus, like the laws prohibiting the public carry of launcegays, Henry's ban proscribed arms overwhelmingly used by or designed for criminals.

Similarly, a 1579 Proclamation outlawed the carry of "*Dagges, Handgunnes, Harquebuzes, Calliuers and Cotes of Defence* (Harquebuzes were early rifles; Dagges were small handguns). 21 Eliz. (1579). That Proclamation noted that such weapons were carried by the "evil disposed, who ... do so commonly carry such offensive weapons, being in time of peace only [meant] for thieves, robbers & murderers." *Id.* (citation modified). Because these weapons, from what I can tell, were used by thieves and robbers, the weapons, including handguns, were banned. But by the 1600s, "the public carry of handguns was no longer widely proscribed." *Bruen*, 597 U.S. at 42, 142 S.Ct. 2111. A similar 1616 proclamation banning dagges and pistols was disregarded. *Bianchi*, 111 F.4th at 504 (Richardson, J., dissenting). So, once the arm was widely adopted for lawful purposes, it was not banned.

**\*26** This takes us to the late 1600s, during which a firearm restriction would have enormous consequences on our understanding of the right to bear arms. For our purposes, the most revealing pre-Founding law was the Game Act of 1671, passed by Parliament but supported by Charles II. 22 & 23 Car. 2, ch. 25 (1671). The Game Act confiscated firearms from wide swaths of the English population. MALCOLM, at 74, 76. "Few acts affected daily life in the countryside as profoundly. It wounded the pride of the more than 90 percent of the population who were forbidden not only to kill a rabbit on their own land but to own a gun for their personal protection." *Id.* at 76. As *Heller* hints, this law was likely pretextual; the Stuart kings intended to disarm Protestants. 554 U.S. at 593, 128 S.Ct. 2783. Today, the Game Act of 1671 remains the closest historical analogy to the Illinois Act's blanket ban on possessing certain weapons used for self-defense.

The Game Act was largely reviled. That Act, like the Militia Act of 1662, "caused Englishmen to be extremely wary of concentrated military forces run by the state and to be jealous of their arms." *Id.* at 593, 128 S.Ct. 2783; MALCOLM, at 76. This led to assurances from William and Mary in the Declaration of Rights (the English Bill of Rights) about bearing weapons for self-defense. *Heller*, 554 U.S. at 593, 128 S.Ct. 2783. "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* As Blackstone explained, this enshrined "the natural right of resistance and self-preservation" and "the right of having and using arms for self-preservation and defence." *Id.* at 594, 128 S.Ct. 2783 (quoting 1 William Blackstone, *Commentaries* \*144). This individual right codified in the English Bill of Rights is "the predecessor to our Second Amendment." *Id.* at 593.

This historical record yields several conclusions. History and tradition allow the government to prohibit the carry or possession of dangerous and unusual weapons. But at the same time, the right of self-defense was recognized and guarded closely—indeed, it was necessary to maintain peace throughout England. So, when the sovereign attempted to outlaw weapons used for self-defense and disarm a significant portion of the populace in the Game Act of 1671, the people pushed back, and they were ensured the right to keep arms

for self-defense. That promise is the predecessor to our Second Amendment.

### 2. The Founding

Across the Atlantic, these traditions endured. Regulations on Arms in the colonies mirrored the purposes and limits of their predecessors. Those weapons used overwhelmingly by criminals —"dangerous and unusual weapons"—could be prohibited. Yet the right of self-defense was rigorously safeguarded against sovereign intrusions, and the weapons chosen by the people were not proscribed.

"Many colonial charters expressly guaranteed the right to have arms." *Bianchi,* 111 F.4th at 488 n.9 (Richardson, J., dissenting). But restrictions did exist. A 1686 East New Jersey statute, for example, banned the private wearing of "pocket pistol[s] ... daggers or dirks." These arms were banned because "there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks ... or any other *unusual or unlawful* weapons" caused "several persons in this Province, [to] receive great abuses. An Act Against Wearing Swords, &c., ch. 9, in AARON LEAMING AND JACOB SPICER, GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY 290 (2D ED. 1881) (GRANTS AND CONCESSIONS). This prohibition on the concealed carry of pocket pistols "presumably did not by its terms touch the open carry of larger, presumably more common pistols." *Bruen,* 597 U.S. at 48, 142 S.Ct. 2111. Two identical statutes from colonial Massachusetts and New Hampshire authorized the arrest of those who "shall ride or go armed Offensively ... by Night or by Day, in Fear of Affray of Their Majesties Liege People." *Id.* at 46, 142 S.Ct. 2111 (quoting statutes). Considered together, these show "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons,' " as England had. *Id.* at 47, 142 S.Ct. 2111.

**\*27** One aspect of the historical record is especially revealing: like others, I have not located a Founding-era statute proscribing the possession of an entire class of weapons. *See, e.g., Bianchi,* 111 F.4th at 506 (Richardson, J., dissenting) ("I am unaware of

any laws before the American Founding that deprived citizens of the right to possess certain weapons."); *Bridges*, 150 F.4th at 534 (Nalbandian, J., concurring in part) ("From what we can tell, no American jurisdiction prohibited any kind of weapon in the eighteenth century."); David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. 223, 261 (2024) ("Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory. Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787."). [3]

Some, including my colleagues, maintain that AR-15s would be unrecognizable to the Founders. *See Bianchi*, 111 F.4th at 452 ("[AR-15s] are not the modern equivalents of weapons that were commonly possessed and employed for self-preservation by your shopkeeper, or your butcher, or your blacksmith up the road in colonial America."). That suggests the Second Amendment protects only those pistols and muskets known to our Founders. This argument "border[s] on the frivolous." *Heller*, 554 U.S. at 582, 128 S.Ct. 2783. And repeating rifles did exist during the Founding. The Belton repeating rifle, circa 1777, fired several rounds before reloading. *Or. Firearms Fed. v. Kotek*, 682 F. Supp. 3d 874, 901–02 (D. Or. 2023). The Girandoni air rifle had a twenty-two-shot magazine capacity. David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 853 (2015). Meriwether Lewis took one on his expedition. *Bevis*, 85 F.4th at 1225 (Brennan, J., dissenting). So, "multi-shot guns predate Colonel Colt by over two centuries." Kopel, *supra*, at 849.

On this point, the majority opinion states that at the Founding, certain knives were more dangerous than that era's firearms, as the latter required users to "carefully reload after every shot." To my colleagues, this is evidence that modern semiautomatic weapons present a societal problem unimaginable at the Founding. Yet the majority opinion then acknowledges that repeating firearms were available; for example, that the Girandoni air rifle was "fragile, complex, and impractical." That proto-semiautomatic weapons were available and not banned is evidence that AR-15s may not be prohibited consistent with our historical regulatory tradition. The wide availability of revolvers

and semiautomatic pistols is also overlooked by the majority opinion. *See* Kopel, *supra* at 856. And it accords no weight to the absence of categorical bans on any classes of weapons—knives or firearms—when the Second Amendment was enacted.

As tensions flared between the Colonists and British, the right of self-defense became even more important to the citizens of the burgeoning republic. The British would impose stringent gun control measures. David Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 285 (2012). General Gage confiscated gunpowder and destroyed public firearms. *Id.* at 313. By disarming Americans, "the British were attempting to make the practical exercise of the right of personal self-defense much more difficult." *Id.* at 301. These attempts "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594, 128 S.Ct. 2783. As a New York newspaper stated, "[i]t is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence." *Id.* Reverend John Witherspoon, early President of Princeton and teacher to James Madison, pronounced that the people of England "mean to force us to be absolute slaves," so the colonial legislatures should ensure "all Americans [ ] provide themselves with arms ... in case they should be reduced to hard necessity of defending themselves from murder and assassination." John Witherspoon, Thoughts on American Liberty, (August 1774) (transcript available at the N.J. state library).

**\*28**  Other dangers at the time required firearms for self-defense. "There were no police forces, and most Americans lived in rural areas, often in homes located miles from the closest neighbor." *Wolford*, ––– S.Ct. at ––––, 2026 WL 1825723, at \*4. Access to firearms was thus imperative to ward off hostile Indians, criminals, or wild beasts. Given these threats, "the right to keep and bear arms was included among the other treasured liberties protected by the Bill of Rights." *Id.*

After the Revolutionary War, "[f]our States adopted analogues to the Federal Second Amendment in the period between independence and the ratification of the Bill of Rights." *Heller*, 554 U.S. at 601, 128 S.Ct. 2783. "[A]ll four of these pre-Second Amendment

state constitutional provisions ... secured an individual right to bear arms for defensive purposes." *Id.* at 602, 128 S.Ct. 2783. This included Pennsylvania and Vermont, which "clearly adopted individual rights unconnected to militia service." *Id.* at 601, 128 S.Ct. 2783.

This time period—which best illuminates the meaning of the Second Amendment [4]—highlights that the colonies and states banned the carrying of "dangerous and unusual" weapons. *Id.* at 47–48, 142 S.Ct. 2111. But no Founding-era law prohibited the possession and ownership of an entire class of weapons. At the same time, the right to own firearms used for self-defense was respected and enshrined in the Constitution for the new Republic.

### 3. Post-Founding/Nineteenth-Century Regulations

Courts must not "give[ ] postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35, 142 S.Ct. 2111. Still, evidence of how the Second Amendment was interpreted during this era can be a "critical tool," particularly if a regular course of practice has "liquidate[d]," or settled, the meaning of the right. *Id.* (quoting *Heller*, 554 U.S. at 605, 128 S.Ct. 2783). The three historical trends described above continue in this time period: (1) states regulated "dangerous and unusual" weapons, (2) there were few to no bans on weapons in common use for lawful ends, and (3) self-defense was a cherished, closely guarded right.

States regulated the carry of "dangerous and unusual" weapons. One example is the Bowie knife, which has a long, fixed blade with cross guards to protect the attacker's hand and was often used in fights and duels. The knife was named after Jim Bowie, who used one to kill several men during the infamous Sandbar fight. *See Bianchi*, 111 F.4th at 465. Criminals using Bowie knives led many states to regulate them in some way. From what I could find, Georgia was the only pre-Civil War state to ban their possession. [5] But the ban was promptly held unconstitutional. *Nunn v. State*, 1 Ga. 243 (Ga. 1846). Instead, most states banned the concealed carry of Bowie knives. *Bevis*, 85 F.4th at 1216 (Brennan, J., dissenting).

The majority opinion cites three statutes—two from states and one from a territory—of broad Bowie knife bans. These statutes cannot bear the weight placed on them. They were enacted after 1871, much later than the Second Amendment and after the ratification of the Fourteenth Amendment. So, their import for constitutional meaning is limited. Even more, it is doubtful that three statutes establish a tradition. *Cf. Bruen*, 597 U.S. at 46, 142 S.Ct. 2111 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition.").

**\*29** Most importantly, these are not the "broad proscription[s]" my colleagues believe them to be. Both the 1871 Texas and the 1889 Arizona (territory) bans allowed the carrying of pistols and knives for self-defense. *See* 1871 Tex. Laws 1st Sess. 25; 1889 Ariz. Sess. Laws 30. That leaves Arkansas's 1881 ban. But the majority opinion cites only one section of that Act. *See* 1881 Ark. Acts 191, § 1. ("That any person who shall wear or carry, in any manner whatever ... any pistol of any kind ... shall be guilty of a misdemeanor."). As far as I can tell, a different part of the Arkansas Act states it does not apply to possession or public carry: "*Provided, further*, That nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey, or upon his own premises." *Id.* An Act to Preserve the Public Peace and Prevent Crime, no. 96, §§ 1–8, 1881 Ark. Acts 191, 191–92 (Mitchell & Bettis). Accordingly, these Bowie knife "bans"—rare and narrow—are far from analogous to Illinois's extraordinarily broad prohibitions. *Cf. Wolford*, ––– S.Ct. at ––––, 2026 WL 1825723, at \*17 (Barrett, J., concurring) (Hawaii cannot broadly restrict the carry of firearms in public when no historical laws did so).

States did not enact laws to limit the possession or carry of Bowie knives because they were extremely dangerous. Rather, they did so because they were commonly concealed and used by criminals. [6] This is evident from several cases discussing these bans under the right to bear arms. For example, in 1840, William Aymette was convicted for wearing a concealed Bowie knife, violating a Tennessee statute. *Aymette v. State*, 21 Tenn. 154, 155 (Tenn. 1840). The Tennessee Supreme Court drew the boundaries of the right to self-defense. "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous

to the peace and safety of the citizens, and which ... would not contribute to the common defence." *Id. at 159.* But those arms "usually employed in private broils, and which are efficient only in the hands of the robber and the assassin," may be banned. *Id. at 158.* Because Bowie knives were not used for lawful but criminal purposes, the Supreme Court upheld the conviction. The Louisiana Supreme Court reached the same conclusions when analyzing that state's ban on the concealed carry of Bowie knives and like weapons. Such weapons are "not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke." *State v. Smith,* 11 La. Ann. 633, 633 (1856).

For support, the majority opinion cites *Cockrum v. State,* 24 Tex. 394 (1859). There, as my colleagues point out, the Supreme Court of Texas upheld a penalty enhancement for a homicide committed with a Bowie knife. *Id. at 402.* But the court emphasized that the legislature could not prohibit the carry of Bowie knives wholesale, as it would "deter the citizen from its lawful exercise." *Id. at 402–03.* Instead, as the court stated, its holding is confined to the context of manslaughter and murder: "The legislature has the power to put all cases of manslaughter, committed with deadly weapons, on the same footing with murder." *Id. at 403.*

Next, consider bans on using trap guns. These are loaded guns "intended to go off or discharge itself, or be discharged by any String, Rope or other Contrivance" to protect property. 1771 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10. New Jersey prohibited the "set[ting]" of a trap gun. *Id.*

At the outset, it is questionable whether trap guns are even protectable "Arms." They are not "bearable." After all, "the whole design of the trap gun was to allow a firearm to be discharged *without* a person needing to 'keep' or 'bear' it." *Duncan,* 133 F.4th at 908 (Bumatay, J., dissenting). And even if they are "Arms," they are unhelpful for personal self-defense. Indeed, they fire indiscriminately, possibly even injuring the owner. *Bevis,* 85 F.4th at 1218 (Brennan, J., dissenting).

**\*30** In sum, prohibitions on Bowie knives and trap guns illustrate how states understood the "dangerous and unusual" test. A weapon could be banned if it was particularly suited for criminality and it was not used for self-defense.

Caselaw from the high courts of Texas, Arkansas, Louisiana, and Georgia also informs our understanding of the "dangerous and unusual" test.

In *State v. Duke,* 42 Tex. 455 (1875), the Supreme Court of Texas evaluated the State's ban on the "keeping and bearing of deadly weapons." *Id. at 456.* That court spoke to which arms received constitutional protection: "The arms which every person is secured the right to keep and bear ... must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense." *Id. at 458.* Because the law excepted carry for self-defense and in the home, the court concluded the statute did not infringe the right to bear arms. *Id. at 459.*

The Supreme Court of Arkansas, when faced with a defendant's criminal indictment for carrying a pistol, emphasized that sovereigns should punish wrongdoers, not strip the populace of the right to self-defense. *Wilson v. State,* 33 Ark. 557, 559 (1878). "If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Id. at 560.* The judgment therefore was reversed and the case remanded for a new trial on self-defense. So too, the Louisiana Supreme Court concluded that citizens had a right to carry arms because "[t]his is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves," *State v. Chandler,* 5 La. Ann. 489, 490 (La. 1850).

Important for this evaluation is *Nunn v. State,* 1 Ga. 243 (1846). Georgia made it a crime "to sell, or offer to sell, or to keep[,] or to have about their persons" Bowie knives, pistols, dirks, sword-canes, spears— not too different from Illinois's Act here. *Id. at 246.* The Supreme Court of Georgia enjoined the ban on carrying pistols openly. *Id. at 251.* That court stated, "[t]he right of the whole people ... to keep and bear

*arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed.*" *Id.* The majority opinion disclaims reliance on *Nunn*, despite the Supreme Court in *Heller* concluding that *Nunn* "perfectly captured" the meaning of the Second Amendment. 554 U.S. at 612, 128 S.Ct. 2783. During this period, state courts continued to recognize the importance of self-defense. "In *Nunn* ... the Georgia Supreme Court construed the Second Amendment as protecting the '*natural* right of self-defence.' " *Id.*

The most vulnerable members of the public understood better than anyone the importance of self-defense. "Blacks were routinely disarmed by Southern States after the Civil War. Those who opposed these injustices frequently stated that they infringed blacks' constitutional right to keep and bear arms." *Heller,* 554 U.S. at 614, 128 S.Ct. 2783. Horrific injustices were committed against black Americans at the time. For example, "members of a white militia ... brutally murdered as many as 165 black Louisianians congregating outside a courthouse." *McDonald,* 561 U.S. at 808–09, 130 S.Ct. 3020 (Thomas, J., concurring in part) (discussing *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1876)). Republicans in Congress sought to suppress armed gangs of ex-Confederates from terrorizing the newly freed blacks by passing the Freedmen's Bureau Act of 1866 and the Civil Rights Act of 1866. Both guaranteed blacks the right to self-defense. *Id.* at 771–74, 130 S.Ct. 3020. And the co-founder of the NAACP, Ida Wells, wrote, "a Winchester rifle should have a place of honor in every black home, and it should be used for that protection which the law refuses to give." Ida B. Wells-Barnett, *Southern Horrors and Other Writings: The Anti-Lynching Campaign of Ida B. Wells, 1892–1900* 70 (Jacqueline Jones Royster ed., 1997).

**\*31** Twentieth-century bans do not help inform the "dangerous and unusual" test. In 1934 and 1968, Congress severely restricted the possession of machine guns and similar firearms. *Bevis,* 85 F.4th at 1202. Then, in 1986, machine guns manufactured after that year were banned. *Id.* But those enactments happened too recently to be considered an enduring national tradition. *See Bruen,* 597 U.S. at 83, 142 S.Ct. 2111 (Barrett, J., concurring) (cautioning against a "freewheeling reliance on historical practice from

the mid-to-late 19th century to establish the original meaning of the Bill of Rights").

To conclude, this history yields three traditions. First, from England until the late 19th century, self-defense was a natural right, imperative to the functioning of democracy and a safe society. Second, the weapons that could be banned were overwhelmingly used to commit crimes. In particular, England and the early United States focused on easily concealable arms. Such arms are "dangerous and unusual." Third, arms commonly used by the people for self-defense were not banned. And the few times sovereigns attempted to do so, in the 1671 Game Act or by the State of Georgia in 1837, the people and courts pushed back, reaffirming the right to own weapons for self-defense.

**B. The "Dangerous and Unusual" Test Today**

As discussed, a "dangerous and unusual" weapon is one particularly suited for and used by criminals and not widely owned for lawful self-defense.[7] This follows *Heller*'s instruction that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes ... . That accords with the historical understanding of the scope of the right." 554 U.S. at 625, 128 S.Ct. 2783. Thus, the "dangerous and unusual" test and the "common use" test are two sides of the same coin: a "dangerous" gun, particularly suited for and used by criminals, is not used "for lawful purposes." And an "unusual" arm is not "in common use." So, the critical inquiry becomes (1) how many of the firearms are in private hands and (2) whether they are overwhelmingly used for self-defense.

That test properly focuses on *the people.* The Second Amendment right is an individual right, as *Heller* held. The Court rejected a test in which judges decide what weapons are necessary for self-defense. "There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police." *Id.* at 629, 128 S.Ct. 2783.

All that mattered was that handguns were in common use for a lawful purpose: they "are the most popular weapon chosen by Americans for self-defense in the home." *Id.* So the ban was unconstitutional. *See also* Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. 13, 39 (2025) ("*Bruen* describes the rejected form of means-end scrutiny ... that involves 'the evolving product of federal judges,' and it contrasts this form of scrutiny with its own approach, in which the balance of means and ends is the 'product of an interest balancing *by the people.*' ").

Bowie knife bans illustrate the application of the "dangerous and unusual" test. Suppose a court is deciding for the first time whether such knives can be prohibited. First, Bowie knives were overwhelmingly used by thieves and murderers to terrorize the public. *See Aymette,* 21 Tenn. at 158. People did not choose them "for [the] open and manly use in self-defense." *Duke,* 42 Tex. at 458. The knives are therefore "dangerous" (or "not used for lawful purposes"). Second, Bowie knives are not "commonly kept, according to the customs of the people." *Id.* They are therefore "unusual" (or not in "common use"). As a result, they can be prohibited.

 **\*32**  Or count the number of states that prohibit the firearm at issue. In *Bruen*, two justices concurred, emphasizing that New York's licensing regime was an "outlier" among the states. 597 U.S. at 79, 142 S.Ct. 2111 (Kavanaugh, J., joined by Roberts, C.J., concurring) (noting that only six states had such a regime). The same is true with AR-15 bans. "AR-15s are legal in 41 of the 50 States, meaning that the States such as Maryland that prohibit AR15s are something of an outlier." *Snope,* 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting denial of cert.). So, a court can account for how many of the firearms are owned and how many states ban their possession to determine whether a firearm is in common use.

The State contends the common-use test is circular. *See also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). Take the AR-15 as an example. The Federal Assault Weapons Ban of 1994 prohibited the sale and manufacture of AR-15s. That ban expired in 2004. Then sales of AR-15s skyrocketed. A test that considers only how many AR-15s are in existence would conclude they are in common use. But had the federal ban not lapsed, AR-15s may not be widely owned, meaning they would not be in "common use," and Illinois could lawfully ban them. In other words, what *can be* banned depends on what *has been* banned.

Counting the number of state bans has the same flaw. If on Monday two states banned AR-15s, then on Tuesday 30 states banned them, then a state ban passed on Wednesday would be constitutional—an AR-15 ban would no longer be an outlier among the states. Yet that same ban passed on Monday would be unconstitutional.

Two counterarguments spring to mind. First, the *Heller* majority did not find this circularity argument persuasive. In dissent, Justice Breyer observed that if the ban on machine guns were lifted, and they became ubiquitous, "the Court will have to reverse course and find that the Second Amendment *does*, in fact, protect the individual self-defense-related right to possess a machinegun" despite the majority holding that the Second Amendment does not protect machine guns. *Heller,* 554 U.S. at 721, 128 S.Ct. 2783 (Breyer, J., dissenting). "There is no basis for believing that the Framers intended such circular reasoning." *Id.* The majority in *Friedman* embraced this argument, 784 F.3d at 409, as did the majority in *Bevis,* 85 F.4th at 1190. But it is not for us to inject the circularity argument back into Second Amendment law. If a majority of the Supreme Court did not adopt that argument in *Heller*, neither should we.

Second, the circularity concern is not as problematic as it appears. Its proponents cite the machine gun as paradigmatic of the problems with a weapons count test. Because machine guns were banned, they have never been in common use and thus can now be banned. *Friedman,* 784 F.3d at 409. But machine guns were available for sale to the public. *United States v. Alsenat,* 174 F.4th 45, 47 (11th Cir. 2026).; David B. Kopel, *Machine Gun History and Bibliography,* 25 WYO. L. REV. 45, 89 (2025) (describing how machine guns were advertised as "a machine gun for the home" and to ranchers to fend off "desperadoes"). "For commercial sales to law-abiding citizens, the Thompson submachine gun was a flop, but gangsters loved it." Kopel, *supra* at 89 (citation modified). And after some time, it became obvious that the American people were not choosing machine guns for self-

defense; rather, they were commonly used by gangsters in shootings like the Saint Valentine's Day Massacre.[8] The same happened with Bowie knives. After their invention, their use became widespread in unlawful duels and knife fights. In short, the Constitution looks to the people to decide which weapons are used for self-defense. Those weapons overwhelmingly chosen or particularly suited for criminality are considered "dangerous and unusual."

**\*33** Another criticism of the "dangerous and unusual" test is that it creates an under-protection problem. If a new firearm is released, a government can act quickly to ban it, and that firearm will never be in "common use" and thus protected. But the "dangerous and unusual" test would not allow for that. When a new firearm is introduced to the market, it will almost always be too early to tell whether it is "dangerous and unusual." To immediately regulate this weapon, the government must proffer evidence that it is being used by criminals, not law-abiding citizens for lawful self-defense. At a minimum, the government must "wait and see" whether and how the public adopts and uses the firearm before it can be banned. That accords with the history of weapons bans, such as Bowie knives and machine guns, and respects the right of the people to choose which firearms to use for self-defense.[9]

It may well be that the "common use" test has an aspect of circularity, but that is far from an anomaly in constitutional law. For example, the Fourth Amendment's reasonable expectation of privacy test is circular. *See* Richard A. Posner, *The Uncertain Protection of Privacy by the Supreme Court*, 1979 S. CT. REV. 173, 188. Circularity, then, is an insufficient reason to jettison a constitutional test, particularly one backed by immense historical support.

The majority opinion states: "It is also quite rare for individuals to use [AR-15] rifles in self-defense," and the plaintiffs' "smattering of online articles" are insufficient to show any real burden on the right to self-defense. But this lacks support for many reasons.

Foremost, it incorrectly shifts the burden of proof that the firearms are used for self-defense onto the plaintiffs. After they satisfy their burden on *Bruen* step one, a firearm is "presumptively" protected. *Bruen, 597 U.S. at 24, 142 S.Ct. 2111*. So, Illinois must

justify its ban on the most popular rifle in America and its magazine. To do so, the State must proffer evidence that AR-15s are "dangerous and unusual." That means Illinois must do more than find historical statutes showing that legislatures had the power to ban such weapons. The State must also show that AR-15s are not in common use for lawful purposes. Illinois must supply the evidence showing that AR-15s are predominantly used by criminals for illegal purposes. But no such evidence exists in the record.

Even if the burden rested on the plaintiffs—which it does not—at trial they offered extensive evidence that AR-15s are chosen for self-defense. They cited four consumer studies showing that a principal reason consumers purchase AR-15s is for self-defense.[10] And experts explained to the district court that the AR-15 is chosen for its self-defense properties.[11] So, the district court's conclusions that AR-15s are "ideally suited" for self-defense, and that many Americans in fact use them for self-defense, are not clearly erroneous.

This point also reveals a broader concern that the majority opinion cannot be squared with *Heller*. There, the Supreme Court held D.C.'s handgun ban unconstitutional, but it did not require "evidence on the frequency" of handguns actually being used for self-defense, as under the reasoning of the majority opinion. Instead, *Heller* concluded that the Second Amendment protects handguns because they "are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *554 U.S. at 629, 128 S.Ct. 2783*. That is, because handguns are owned by millions of people, under *Heller* they are in common use for self-defense. The same is true here. That millions of AR-15s are owned and have obvious self-defense properties means the firearm is in common use for self-defense.

**\*34** My colleagues also reason that Illinois's Act leaves other weapons available for self-defense. Yet *Heller* rejected this argument. "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Heller, 554 U.S. at 629, 128 S.Ct. 2783*. Likewise, AR-15s are

owned in the millions. So it is "no answer" to say they can be banned because handguns are available.

## C. AR-15s Pass the "Common Use" Test

In applying the "dangerous and unusual" test, courts may start with the "unusual" prong (which, as shown, is the opposite of "common use"). For a firearm to be "unusual," it must be highly unusual in society at large. *Bruen*, 597 U.S. at 47, 142 S.Ct. 2111. "Society" refers to today, not at the adoption of the Second Amendment. *Id.* at 48, 142 S.Ct. 2111.

To say AR-15s are not in "common use" does not pass the "red face" test. The district court correctly found that "millions of Americans own AR-15s at this very moment." [12] Per the State's political scientist Professor Louis Klarevas, that number is conservative. [13] Even accounting for the AR-15s owned by firearms dealers (which the government argued was around 37.1% of all AR-15s), "there are still *millions* of weapons in circulation in the United States (and, it follows, in Illinois) that the Illinois Government has rendered illegal." [14] The record evidence here well supports these conclusions. Plaintiffs collected several articles discussing how AR-15s are exceedingly popular. [15] Professor Klarevas estimated the number of Americans who own an AR-15 to be around 14.1 to 18.2 million. [16] Indeed, one of the State's witnesses, retired Lieutenant Colonel Dempsey, keeps an AR-15 for self-defense. [17] The district court's finding is well supported in the record and certainly not clearly erroneous.

The Supreme Court agrees that AR-15s are widely owned. "AR-15 rifles, AK-47 rifles, and .50 caliber sniper rifles ... are both widely legal and bought by many ordinary consumers." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297, 145 S.Ct. 1556, 221 L.Ed.2d 910 (2025); *Garland v. Cargill*, 602 U.S. 406, 430, 144 S.Ct. 1613, 219 L.Ed.2d 151 (2024) (Sotomayor, J., dissenting) (the shooter in the 2017 Las Vegas mass shooting used a "commonly available, semiautomatic rifle[ ]" with a bump stock attached). Justice Thomas and Justice Kavanaugh recently agreed AR-15s are widely owned and thus in common use. *Snope*, 145 S. Ct.

at 1534 (Kavanaugh, J., statement respecting the denial of cert.) ("Given that millions of Americans own AR-15s and that a significant majority of the States allow possession of those rifles, petitioners have a strong argument that AR-15s are in 'common use.' "); *id.* at 1538 (Thomas, J., dissenting from denial of cert.). And if tasers are protected because "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," AR-15s are certainly protected because millions have been sold to consumers. *Caetano v. Massachusetts*, 577 U.S. 411, 420, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (Alito, J., concurring).

Another measure of "common use" is to examine the number of state prohibitions on an arm. *Bruen*, 597 U.S. at 79, 142 S.Ct. 2111 (Kavanaugh, J., concurring) (observing that New York's "may-issue" licensing regime was an "outlier" because only six states used such a regime). By that metric, AR-15s are also in "common use" because only nine or ten states prohibit them. [18] "AR-15s are legal in 41 of the 50 States, meaning that the States such as Maryland that prohibit AR-15s are something of an outlier." *Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting denial of cert.).

**\*35** The majority opinion, however, does not apply the "common use" test at all. It cites a purported historical tradition of regulating "particularly dangerous weapons" or "weapons whose danger and lethality stand out." To my colleagues, such weapons can be regulated regardless of whether they are in common use for lawful purposes or not.

But the Supreme Court has not adopted or endorsed such a test. The only relevant historical tradition the Court has recognized is the regulation of "dangerous and unusual" weapons—which requires proof that the weapons are both "dangerous" and "unusual." *See Caetano*, 577 U.S. at 411–12, 136 S.Ct. 1027 (per curiam); *id.* at 417, 136 S.Ct. 1027 (Alito, J., concurring in the judgment). So, my colleagues break fresh ground by defining a new "tradition" that has not been recognized by the Supreme Court.

The next inquiry is whether AR-15s are "dangerous"— the focal point of the majority's analysis. Though all guns are in some sense "dangerous," recall that this

is a term of art. Historically, "dangerous" weapons were those particularly suited for criminality or overwhelmingly used by criminals. Sovereigns were particularly concerned with weapons that could be concealed.

AR-15s are widely owned for self-defense. After hearing from firearm instructors as well as self-defense and military experts, the district court concluded that AR-15s are "ideally suited for self-defense in the home." Both "*experts* ... and *fact witnesses* attest to the fact that law-abiding citizens choose [AR-15s] for self-defense." The court found that AR-15s are light, short, and have less recoil, making them easier to handle and fire. The district court also heard from self-defense experts who all reported "recoil[,] ... lighter weight, shorter barrel, and ergonomic stock and grip" make "AR platform rifles" well suited for self-defense, which is why they are commonly used in popular "defensive carbine course[s]." [19]

Evidence offered by plaintiffs supports the district court's findings. One reason AR-15s are easy to shoot is the manner in which the firearm expels gas, which reduces felt recoil. [20] Reduced recoil also helps keep the muzzle on target, increasing accuracy. [21] And the AR-15's expulsion design removes the need for the shooter to manually reload, meaning the firearm "runs itself." [22] These features are all useful for self-defense.

To my colleagues, AR-15s are more dangerous than handguns. The rifle's ammunition has a higher velocity, and AR-15s are more accurate at longer ranges. The State, for its part, focuses on range, penetration, and rate of fire to argue that AR-15s are poor self-defense weapons.

But a citizen may prefer an AR-15 over a handgun for self-defense for many reasons. An AR-15 is more accurate than a pistol and easier to aim. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 403 (1994). And "[i]t would be rather irrational to ban a firearm because it was particularly accurate and, hence, posed a smaller danger of stray shots." *Id.* Those who chose a firearm that does not fire wildly, possibly endangering bystanders, should not be punished. These self-defense benefits rebut the assertion that an AR-15 is unusually

dangerous and might suggest the State simply dislikes the weapon. But distaste for a particular firearm cannot justify proscribing it. *Cf. Wolford*, —— S.Ct. at ——, 2026 WL 1825723, at *11 (The Second Amendment does not yield to Hawaii's "spirit of Aloha ... any more than it can yield to the spirit of ... the Windy City.").

**\*36** Whether a firearm is useful for self-defense is not a decision for judges. *The people* choose which weapons to own for self-defense. As *Heller* tells us, "There are many reasons that a citizen may prefer a handgun for home defense," but "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629, 128 S.Ct. 2783. "Our Constitution allows the American people—not the government—to decide which weapons are useful for self-defense." *Snope*, 145 S. Ct. at 1537 (Thomas, J., dissenting from denial of cert.). Judges are to examine what weapons Americans do own for self-defense. And the people have spoken: AR-15s are the most popular rifle in America, so a prohibition on the possession of that firearm and its magazine is unconstitutional.

Judges do not define the scope of other constitutional amendments, as would follow from my colleagues' position. A judge could not label a particular type of speech as "dangerous" or "lacking value" and thus conclude it is not protected by the First Amendment. Quite the opposite. "The First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586, 143 S.Ct. 2298, 216 L.Ed.2d 1131 (2023) (citation modified). The same applies for the Second Amendment. AR-15s are overwhelmingly purchased and possessed for self-defense. *See Heller*, 554 U.S. at 629, 128 S.Ct. 2783. Courts do not evaluate the prudence of that choice, just as they do not assess the value of particular speech.

Finally, the focus of the majority opinion on "particularly dangerous weapons" invites difficult line-drawing problems. AR-15s are very similar to the semiautomatic pistols *Heller* held were protected. "The semiautomatic mechanism in an AR-15 rifle is, in all material respects, the same as in a semiautomatic handgun." *Bevis*, 85 F.4th at 1215 (Brennan, J., dissenting). "That mechanism is gas powered, and the

impact of the pin firing the bullet pushes back the lock mechanism, ejects the old shell, and loads the new round from the magazine." *Id.* As a result, "it can be analytically difficult to distinguish the AR-15s at issue here from the handguns at issue in *Heller.*" *Snope*, 145 S. Ct. at 1534 (Kavanaugh, J., statement respecting denial of cert.). Variations between AR-15s and handguns in the rate of fire and penetration matter little in a gunfight.

AR-15s are no more suited for criminal activities than a handgun. If anything, "a handgun could be viewed as more dangerous than an AR-15 rifle because the handgun is less accurate and more concealable." *Bevis*, 85 F.4th at 1215 (Brennan, J., dissenting). By contrast, short-barreled rifles and shotguns are easy to conceal and add "little—if any—functionality to the firearm for lawful use." *United States v. Rush*, 130 F.4th 633, 637 (7th Cir. 2025); *see also Duke*, 42 Tex. at 458 (The right to keep and bear arms "does not include ... such pistols at least as are not adapted to being carried concealed."); MALCOLM, at 9 (discussing Henry VIII's ban on concealable firearms "frequently employed in crime"). Under the reasoning in the majority opinion, both Bowie knives and AR-15s would qualify as "particularly dangerous"—but not handguns. That cannot follow as a practical matter and as a matter of history.

### D. Nuanced Approach

As an alternative, the majority opinion invokes the so-called "nuanced approach," which derives from one sentence in *Bruen*: "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27, 142 S.Ct. 2111; *see also Duncan*, 133 F.4th at 869–70. The majority's primary holding does not rest on this "nuanced approach," but I submit this method should not be invoked at all.

 **\*37** The "nuanced approach" is not its own test—it is a truism. A 19th-century law regulating Bowie knives may be compared with a contemporary ban on switchblades, as the knives are similar. That same Bowie knife law, though, cannot be compared to a ban on rocket launchers. To do so, more nuance is necessary, which "undeniably necessitates an exercise

of judgment." *Wolford*, —— S.Ct. at ——, 2026 WL 1825723, at *6.

But the application of the "nuanced approach" is too freewheeling. My colleagues believe that the "unprecedented societal concern of mass killings speedily carried out by lone shooters," facilitated by "dramatic technological change[s] embodied in AR-15s equipped with large-capacity magazines," gives legislatures more leeway to regulate arms that otherwise would be presumptively protected under the Second Amendment. Yet that is not how *Bruen* has been applied. Although courts focus on the Second Amendment's principles, *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889, those principles must be sufficiently narrow to permit reasoning-by-analogy. "[A] court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 740, 144 S.Ct. 1889 (Barrett, J., concurring). Ironically, the "nuanced approach" allows courts to be even less nuanced in drawing historical comparators, directly contrary to the guidance from *Bruen* and *Rahimi.*

Even more, applying that approach here makes it more difficult to reconcile the majority opinion and *Heller.* Semiautomatic handguns today are far more effective than the single-shot, muzzle-loaded firearm that was ubiquitous at the Founding. And many more mass shooters use handguns than rifles—a ratio of roughly 74% using at least one handgun to 33% involving at least one rifle. [23] The assertion that technological changes facilitated the rise of mass shootings cannot justify a ban on AR-15s, because the same logic would require banning handguns. Yet the Supreme Court has told us that a handgun ban violated the Second Amendment. And the Court did so over Justice Breyer's dissent, which would have made new societal concerns a central component of his analysis. *Heller*, 554 U.S. at 681–82, 696–99, 128 S.Ct. 2783.

The majority opinion asserts that lone-wolf mass shootings are "unprecedented." It states "the first known mass shooting resulting in at least ten deaths did not occur until 1949." Tragically, however, gun violence in America has a much older pedigree. Documented instances of school shootings date back to at least the 1850s. [24] Mobs with guns often committed serious atrocities, like when members of a white militia

murdered as many as 165 black Louisianians during the Colfax massacre. *McDonald*, 561 U.S. at 808, 130 S.Ct. 3020 (citing *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1876)). [25]

**\*38** In March of 1891, for example, a man armed with a double-barreled shotgun fired upon a crowd of students and faculty in a schoolhouse in Mississippi. He injured fourteen people in a "cowardly attempt at wholesale murder." [26] A similar shooting occurred one month later, when a seventy-year-old man shot at a crowd of children on a playground in New York, thankfully killing none but injuring several. [27]

Casualties amassed after the turn of the twentieth century. In 1903, a lone-wolf shooter killed nine and injured twenty-five people with a double-barreled shotgun at a concert in Winfield, Kansas. [28] The 1906 Asheville shooting involved five deaths and at least twelve injuries at the hands of a gunman with a lever-action rifle. [29] And other bloody shootings predated the infamous Saint Valentine's Day Massacre of 1929. [30] Though no lone-wolf shooting resulted in at least *ten* deaths until 1949, *nine* had been killed nearly a half-century earlier.

Mass shootings are horrific, and in no way do I minimize these tremendous losses of life. These examples show that in the wake of these awful incidents, legislatures did not enact categorical bans on double-barreled shotguns or lever-action rifles. Instead, they legislated within the parameters of our historical tradition—limiting the carry of firearms in "sensitive places," disarming dangerous individuals, and banning only the most dangerous and unusual weapons with no legitimate self-defense functions. They also harshly punished those who committed lesser acts of violence. [31]

Illinois has many options for stopping or limiting these horrendous attacks. But the enshrinement of constitutional rights "necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636, 128 S.Ct. 2783. That includes taking millions of AR-15s out of the hands of law-abiding citizens. The waxing, or we pray the waning, of societal problems does not amend the scope or effect of the Second Amendment.

* * *

The Second Amendment protects AR-15 rifles, which easily pass the "dangerous and unusual" test. Millions of AR-15s are owned nationwide, and laws prohibiting AR-15s are "outliers." Nor is the AR-15 "dangerous" because the firearm is widely owned for self-defense, and its features are not particularly useful for criminals.

### IV. The Second Amendment Protects Magazines Banned by the Act

**\*39** The Act makes it unlawful to "knowingly manufacture, deliver, sell, purchase," or possess a "large capacity ammunition feeding device." 720 ILCS 5/24-1.10(b), (c). A "large capacity ammunition feeding device" is a magazine that holds more than 10 rounds of ammunition for long guns and more than 15 rounds for handguns. *Id.* at (a). The Act places severe restrictions on preexisting owners of such magazines. *Id.* at (d). *Bevis* held that the Act was constitutional because "high-capacity magazines are ... military-grade weaponry." 85 F.4th at 1195.

Begin with *Bruen* step one: whether the "Second Amendment's plain text covers" plaintiffs' ability to possess and acquire magazines holding more than 10 rounds. *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. The Constitution not only protects rights. It also protects those things necessary to effectuate the exercise of those rights. Taxing ink burdens the freedom of the press. *Minneapolis Star and Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). Likewise, the Second Amendment not only protects the right to "keep and bear Arms" but the prerequisites for exercising the right. *Ortega*, 148 F.4th at 1143. So too, "the right to maintain proficiency in firearm use [is] an important corollary to the meaningful exercise of the core right to possess firearms." *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011).

Here, the parties disagree. To the State, the question is whether *30-round* magazines are necessary to operate a firearm. By contrast, plaintiffs believe the question is whether *magazines* are necessary.

Plaintiffs have the better argument. Claiming that a 30-round magazine is unnecessary, as the State does, requires knowing the "Platonic ideal of a firearm." *Duncan*, 133 F.4th at 918 (VanDyke, J., dissenting). Said differently, whether a 30-round magazine is necessary to operate a firearm depends on what a "firearm" is, after being stripped of all necessities. That is not possible to answer. The better question is whether magazines generally are necessary to operate a firearm, which of course they are. Thus, under *Bruen*'s step one, magazines are "Arms" under the Second Amendment.

*Bruen*'s second step requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. This takes us to the "dangerous and unusual" arms test. A "dangerous" weapon is one particularly suited for criminality and has little self-defense value. An "unusual" weapon is not commonly owned or commonly regulated.

Large-capacity magazines are not "unusual." The district court on remand found thirty-round magazines are "in common use." That finding is supported by evidence in the record: "50% of consumer detachable rifle magazines have a capacity of more than 10 rounds, totaling 451,393,000." [32] *See also Duncan*, 133 F.4th at 902 (Bumatay, J., dissenting); *Heller*, 670 F.3d at 1261.

Bans on magazines that hold 10 or more rounds are also uncommon among the states. Twelve states and D.C. ban outright possession of magazines with more than a certain number of rounds. *Duncan*, 133 F.4th at 892 n.3 (Bumatay, J., dissenting). Such bans are thus "outliers" and unconstitutional. *See Bruen*, 597 U.S. at 79, 142 S.Ct. 2111 (Kavanaugh, J., concurring).

Large-capacity magazines are not "dangerous" because they are widely owned for self-defense and not particularly suited for criminality. The district court found these magazines "have legitimate self-defense purposes." "[E]very round matters in a self-defense scenario ... Thus, in a critical self-defense scenario, more rounds equals a higher chance of survival." Evidence in the record supports that conclusion. The State's own firearms expert concluded that restricting citizens to a smaller magazine could prove fatal in self-

defense situations. [33] The need for more than a handful of rounds in those scenarios is why manufacturers include magazines with more than ten rounds when selling semiautomatic rifles. [34] *See Duncan*, 133 F.4th at 923 (VanDyke, J., dissenting) (providing example in which a thirty-round magazine would have helped fend off a group of assailants). And a large-capacity magazine does not make a firearm more concealable.

**\*40** Nor is there an enduring tradition of regulating magazines. "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 864 (2015). The closest regulation to a magazine ban was gunpowder storage laws. But "[f]ire-safety laws do not create a comparable burden to an absolute ban on arms." *Bevis*, 85 F.4th at 1217 (Brennan, J., dissenting); *see also Heller*, 554 U.S. at 632, 128 S.Ct. 2783 ("[F]ire-safety laws ... do not remotely burden the right of self-defense as much as an absolute ban on handguns."). Indeed, the oldest magazine ban appears to have first been enacted during Prohibition, well into the twentieth century. Kopel, *supra*, at 864.

Throughout our nation's history, states were free to ban magazines. But they did not. In fact, the opposite is true: firearms with large magazines have been immensely popular and common. The Winchester 1866 had a seventeen-round magazine and was widely owned in the West. *Id.* at 869. Indeed, the first firearms with large-capacity magazines existed before the Constitution. *Bevis*, 85 F.4th at 1224–25 (Brennan, J., dissenting) (discussing the Girandoni air rifle). So, although courts should not assume "founding-era legislatures maximally exercised their power to regulate," *Rahimi*, 602 U.S. at 739–40, 144 S.Ct. 1889 (Barrett, J., concurring), this enduring tradition strongly suggests large-capacity magazines were viewed as protected because such magazines were well known and still not banned.

Magazines are "Arms" under the Second Amendment's plain text because firearms require magazines to function. Magazines are not "dangerous and unusual" as that test is historically understood. Nor is there a history and tradition of regulating these types of magazines. I would accordingly remand for the district

court to evaluate whether the rest of the Act is constitutional.

One last thought: This dissent addresses the district court's conclusion that the Act's ban on the AR-15 and its magazine is unconstitutional. But the Act is breathtaking in its coverage, covering hundreds of different firearms. The district court did not evaluate, or leave open, the constitutionality of the Act's ban on those weapons. I would remand the case for the district court to analyze those portions in full detail. It may well be that portions of the Act are constitutional, but I cannot conclude so without more findings of fact.

Plaintiffs are part of the people who seek to possess and own firearms, so their conduct is presumptively constitutional. Illinois has not shown that its restrictions are consistent with our country's history and tradition of weapons regulations. The most common firearms Illinois banned—the AR-15 and its magazine—are not dangerous and unusual. They are in common use and owned for self-defense. Illinois's ban goes too far and should be enjoined as unconstitutional. I respectfully dissent.

**All Citations**

--- F.4th ----, 2026 WL 1982951

### V. Conclusion

---

**Footnotes**

1    The *Langley* plaintiffs also asserted a due process challenge below, but the district court granted summary judgment to the defendants on that claim. The *Langley* plaintiffs did not cross-appeal that decision.

2    The plaintiffs filed a petition for certiorari, which the Supreme Court denied. *See Harrel v. Raoul,* ——— U.S. ———, 144 S. Ct. 2491, 219 L.Ed.2d 1333 (2024).

3    Though *Bevis* had identified the difference in firing rates between AR-15s and M16s as important, the district court did not expressly make a finding on this matter. It came close, however, in a footnote—located in the court's summary of circuit caselaw—where it cited a U.S. Army manual stating that an M16 in automatic mode has a maximum effective firing rate of 150–200 rounds per minute, whereas in semiautomatic mode it has a maximum effective firing rate of 45–65 rounds per minute.

4    Enjoining enforcement of the Act against *anyone*—i.e., entering a universal injunction—became problematic after the Supreme Court's decision in *Trump v. CASA, Inc.,* 606 U.S. 831, 837, 145 S.Ct. 2540, 222 L.Ed.2d 930 (2025), but our conclusion in these appeals renders that flaw moot.

5    The defendants separately contend that the district court did not make *any* factual findings under Rule 52(a)(1)—which requires "the court" to "find the facts specially and state its conclusions of law separately"—because its opinion contained only introduction, background, and analysis sections. But substance, not form, determines compliance with Rule 52(a)(1). *See Bartsh v. Nw. Airlines, Inc.,* 831 F.2d 1297, 1304 (7th Cir. 1987); *see also Valsamis v. Gonzalez-Romero,* 748 F.3d 61, 63 (1st Cir. 2014). The district court made factual findings, even if it did not specifically delineate them.

6    The *Federal Firearms Licensees* plaintiffs also challenge the endorsement affidavit requirement (part of the Act's grandfather clause), which we address below.

7    Thus, we do not resolve the constitutionality of the Act's application to the pistols and shotguns that the Act defines as assault weapons. Nor do we address pistol or shotgun magazines that qualify as large-capacity magazines under the Act. These restrictions, and any others not addressed in this opinion, are better left for another day and remain open to challenge on an as-applied basis.

8    *See Capen*, 134 F.4th at 668–77 (assault weapons and large-capacity magazines); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43–52 (1st Cir. 2024) (large-capacity magazines); *Lamont*, 153 F.4th at 235–47 (assault weapons and large-capacity magazines); *Bianchi*, 111 F.4th at 446–72 (assault weapons); *Duncan v. Bonta*, 133 F.4th 852, 865–84 (9th Cir. 2025) (en banc) (large-capacity magazines); *Hanson v. District of Columbia*, 120 F.4th 223, 234–43 (D.C. Cir. 2024) (large-capacity magazines).

9    To be clear, we recognize that twentieth century machine gun bans are "insufficient to support a tradition of regulating [arms] in and of themselves." *Hanson*, 120 F.4th at 239. They "fit nicely," however, "into the tradition of regulating weapons particularly capable of unprecedented lethality." *Id.*

10   The Second Amendment's plain text is not limited to firearms. *See Caetano v. Massachusetts*, 577 U.S. 411, 411–12, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (per curiam).

11   Seeking to bolster *Nunn*, the dissenting opinion states that *Heller* concluded *Nunn* " 'perfectly captured' the meaning of the Second Amendment." More precisely, however, *Heller* said that *Nunn* "perfectly captured *the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause.*" 554 U.S. at 612, 128 S.Ct. 2783 (emphasis added). *Heller*'s endorsement of *Nunn*'s recognition that the Second Amendment protects more than just a militia-centered right does not imply wholesale endorsement of *Nunn*'s every word— especially when, as relevant here and as explained above, *Nunn*'s conception of the scope of protected arms conflicts with *Heller*'s.

12   The dissenting opinion claims that "many Americans in fact use [AR-15s] for self-defense," but the evidence it relies on—consumer surveys about why Americans buy AR-15s and expert testimony about AR-15s' properties—does not support that assertion.

13   These are the figures for incidents in which the gun type was known.

14   Perhaps *Heller*'s reasoning for why handguns are "the quintessential self-defense weapon" explains this phenomenon. *See* 554 U.S. at 629, 128 S.Ct. 2783 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police.").

15   To be clear, we are not, as the dissenting opinion suggests, shifting the burden to the plaintiffs. No doubt, the defendants bear the burden at *Bruen*'s second step, and we are relying on the evidence they submitted—the expert report referenced above—to evaluate whether they carried that burden. We reference the plaintiffs' evidentiary showing only to make clear that we are not improperly resolving a factual dispute about how frequently AR-15s and more than ten rounds are actually used in self-defense.

In other words, we do not—as the dissenting opinion claims—conclude that the Constitution would protect AR-15s but for dramatic technological changes and unprecedented societal concerns.

Relying on our identification of these technological advancements, the dissenting opinion incorrectly imputes to us the position that the Second Amendment protects only those arms known to the Founders. That is certainly not our stance. Just as the First Amendment protects speech made on the Internet and the Fourth Amendment protects cell-phone location information, the Second Amendment "is not limited only to those arms that were in existence at the founding." *Rahimi*, 602 U.S. at 691, 144 S.Ct. 1889. Still, the Supreme Court has recognized that "cases implicating ... dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27, 142 S.Ct. 2111. Or, put another way, that cases involving "distinctively modern" conduct "call[ ] for a more difficult exercise of judgment." *Wolford*, —— S.Ct. at ——, 2026 WL 1825723, at *7. This is such a case.

The Act does not ban such firearms. *See* 720 ILCS 5/24-1.9(a)(2) (excluding from the definition of "assault weapon" any "firearm that is manually operated by ... lever ... action, unless the firearm is a shotgun with a revolving cylinder").

The dissenting opinion looks past this record evidence to an online database stating that more mass shooters use handguns than rifles. That database, however, includes all incidents with multiple victims, whether injured or deceased—such as an incident in which a shooter wounded two victims and killed none. While such incidents are undoubtedly serious, the fact that handguns are used more often than rifles for mass shootings thus defined does not undermine our point that AR-15s and large-capacity magazines are more likely to be used as the societal concern becomes more grave—as, in other words, mass shootings cause more casualties.

The court moved to *Bruen*'s second step "for the sake of completeness." *Id.* at 1197. That treatment is dicta because that appeal was resolved on step one. *Id.* ("[W]e are satisfied that these appeals can be resolved at the first step of the *Bruen* framework.").

But the district court found .50 caliber rifles and ammunition and grenade launcher attachments served little self-defense utility.

At oral argument, the State pointed to a Founding-era New Jersey law banning trap guns. Oral Argument at 22:20–28. I explain below why this is not a categorical ban on a class of weapons.

*Bruen*, 597 U.S. at 82–83, 142 S.Ct. 2111 (Barrett, J., concurring).

Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90, 90 (possession or sale of Bowie knives, pistols, dirks, sword canes, or spears).

"The antebellum right to bear arms was fought primarily over the early concealed weapons statutes." Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 IND. L. J. 1857, 1601 (2014).

I do not discuss whether other lawful purposes could protect a firearm, such as hunting or community self-defense, but I do not doubt that is true.

*See Staples v. United States*, 511 U.S. 600, 626 n.4, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (Stevens, J., dissenting) ("The late 1920s and early 1930s brought ... a growing perception of crime both as a major problem and as a national one ... Criminal gangs found the submachinegun (a fully automatic, shoulder-fired weapon utilizing automatic pistol cartridges) and sawed-off shotgun deadly for close-range fighting." (citation modified)).

9      Circularity and new firearms may also be a theoretical problem, not so much a practical problem. Rarely will a weapon enter the market that is entirely new; most are variants of an already legal firearm. *Friedman*, 784 F.3d at 416 n.5 (Manion, J., dissenting).

10     ECF No. 253 at 22, ¶ 87.

11     *Id.* at 22, ¶¶ 86–87.

12     ECF No. 253 at 24, ¶ 98; ECF No. 258 at 101.

13     *Id.*

14     *Id.*

15     ECF No. 253 at 21–22, ¶ 85.

16     *Id.* at 24 ¶ 98.

17     *Id.* at 25 ¶ 100.

18     Colorado enacted S.B. 25-03, which requires that state's residents to obtain a license and receive firearms training before purchasing certain semiautomatic firearms. *See* COLO. REV. STAT. § 18-12-116 (2026).

19     ECF No. 253 at 26–27, ¶¶ 107–09. The FBI Ballistic Research Facility confirmed the same. *See id.* at 26 ¶ 107.

20     *Id.* at 14, ¶¶ 38–39.

21     *Id.* at 15, ¶ 41.

22     *Id.* at 14, ¶ 39.

23     Rockefeller Institute of Government, "Mass Shooting Factsheet," SUNY (June 3, 2026), https://rockinst.org/gun-violence/mass-shooting-factsheet/.

24     *See* "Serious Case of Shooting—Navigation," N.Y. TIMES 1 (Nov. 3, 1853) (student shoots teacher in Louisville, KY); "Fourth of July North," THE DAILY DISPATCH 2 (July 7, 1858) (escaped perpetrator shot Sabbath School student in Baltimore, MD).

25     These horrific incidents of racial violence involving guns continued into the twentieth century, including the Ocoee massacre (approximately 35 deaths), the Tulsa massacre (30–300 deaths), and the Rosewood massacre (8 deaths, potentially hundreds injured). On the Ocoee massacre, *see* "A Perfect Storm: The Ocoee Riot of 1920," 93 FLA. HIST. Q. 25, 25–26 (2014); "Ocoee Election Day Violence—November 1920," FLA. OPPAGA 2–4 (2019). On the Tulsa massacre, *see* "Tulsa Race Massacre of 1921," Encyc. Brittanica (June 1, 2026), https://www.britannica.com/event/Tulsarace-massacre-of-1921. On Rosewood, *see* R. Thomas Dye, "Rosewood, Florida: The Destruction of an African American Community," 19 THE HISTORIAN 605, 608, 614–15, 617 (1997).

26     "Fourteen Persons Wounded," DAILY ALTA CA. 1 (Mar. 31, 1891).

27     "Fired into a Group of Children," N.Y. TIMES 2 (Apr. 10, 1891).

28      "Five are Dead at Winfield," THE WICHITA EAGLE 5 (Aug. 14, 1903); "A Twigg Snaps: Spurned Lover Killed 9 at Kansas Concert in 1903," N.Y. DAILY NEWS 35 (June 19, 2016).

29      "Harris Slain by Posse," N.Y. TIMES 2 (Nov. 16, 1906).

30      *See, e.g.*, Randall L. Hall, "A Courtroom Massacre: Politics and Public Sentiment in Progressive-era Virginia," 70 J.S. HIST. 249, 249–50 (2004) (retelling the 1912 Floyd Allen courtroom shootout); "The Wolf Family Murders: A Brutal Crime in Small Town North Dakota," THE LINEUP (Apr. 5, 2018), https://the-line-up.com/the-wolf-family (eight killed by hatchet and double-barreled shotgun); "Chinese Confesses Killing of Ten: Dope Was Cause of Sad Deed," SAN JOSE EVENING NEWS 1 (Aug. 23, 1928) (sawn-off shotgun and axe used to kill eleven).

31      "If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Wilson*, 33 Ark. at 560.

32      ECF No. 253 at 33, ¶ 141.

33      *Id.* at 34–35, ¶ 149.

34      *Id.* at 33–34, ¶ 143-45.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.